## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.: 1:17-CV-01636-WJM-MJW**

DIGITALGLOBE, INC., a Delaware corporation, and
DIGITALGLOBE INTELLIGENCE SOLUTIONS, INC., a Delaware corporation,

      Plaintiffs,

v.

LOU PALADINO, an individual,

      Defendant.

---

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

John V. McDermott, Colo. Atty. Reg. No. 11854
Van Aaron Hughes, Colo. Atty. Reg. No. 19812
Craig M. Finger, Colo. Atty. Reg. No. 50134
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO  80202
Phone:  303.223.1100
Emails:  jmcdermott@bhfs.com
        vhughes@bhfs.com
        cfinger@bhfs.com

*Attorneys for Plaintiffs DigitalGlobe, Inc. and*
*DigitalGlobe Intelligence Solutions, Inc.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 3

I.      DIGITALGLOBE IS THE WORLDWIDE LEADER IN HIGH-RESOLUTION
EARTH IMAGERY ................................................................................................. 3

II.     MR. PALADINO'S EMPLOYMENT AT DIGITALGLOBE ......................................... 4

III.    MR. PALADINO'S BREACH .................................................................................. 6

IV.    THE AGREEMENTS ............................................................................................ 10

      A.     The Non-Compete Covenants ............................................................... 10

      B.     The Non-Solicitation of Employees Covenants ................................... 11

      C.     The Non-Disclosure Covenants ........................................................... 13

ARGUMENT ................................................................................................................... 14

I.      DIGITALGLOBE IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE
MERITS OF ITS CLAIMS ................................................................................... 15

      A.     Paladino Is Subject to Valid and Enforceable Contracts ..................... 15

            1.     The Non-Compete Covenants Are Valid and Enforceable ...................... 16

                 a.     The Executive and Management Personnel Exception
Applies ................................................................................. 16

                 b.     The Trade Secret Exception Applies ........................................... 17

                     (1)    The Agreements Were Executed for the Express
Purpose of Protecting DigitalGlobe's Trade Secrets ....... 18

                     (2)    The Agreements Address Valid and Protectable
Trade Secrets Under Colorado Law ................................ 20

                 c.     The One-Year Covenants Are Reasonable in Duration and
Scope ..................................................................................... 23

            2.     The Non-Disclosure and Non-Solicitation of Employees Covenants
Are Not "Covenants Not to Compete" and Thus Are Independently
Valid and Enforceable. .............................................................. 24

      B.     DigitalGlobe Performed under the Non-Competition and Non-Disclosure
Agreements .......................................................................................... 25

      C.     Mr. Paladino Has Breached the Agreements. ...................................... 26

      D.     Mr. Paladino's Breach Has Caused and Is Causing DigitalGlobe Damage. ....... 26

II.     MR. PALADINO'S BREACH OF THE AGREEMENTS IRREPARABLY
HARMS DIGITALGLOBE. .................................................................................. 27

**TABLE OF CONTENTS**
(continued)

**Page**

III.   GRANTING THE PRELIMINARY INJUNCTION WILL NOT DISSERVE THE PUBLIC INTEREST. ...................................................................................... 30

IV.   THE BALANCE OF EQUITIES FAVORS AN INJUNCTION. ................................... 31

V.   DIGITALGLOBE SHOULD NOT BE REQUIRED TO POST BOND ......................... 33

CONCLUSION ......................................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Television & Commc'ns Corp. v. Manning*,
    651 P.2d 440 (Colo. App. 1982) .................................................................................29

*AMG Nat'l Trust Bank v. Ries*,
    No. 06-CV-4337, 2011 WL 6840586 (E.D. Pa. Dec. 29, 2011) ..............................23

*Atmel Corp. v. Vitesse Semiconductor Corp.*,
    30 P.3d 789 (Colo. App. 2001) .................................................................................25

*Big O Tires, Inc. v. Bigfoot 4X4, Inc.*,
    167 F. Supp. 2d 1216 (D. Colo. 2001) ....................................................................14

*Big O Tires v. JDV. LLC*,
    No. 08-cv-1046-WYD, 2008 WL 4787619 (D. Colo. Oct. 31, 2008) .....................31

*Brumfiel v. U.S. Bank*,
    No. 12-cv-02716-WJM, 2013 WL 1874186 (D. Colo. May 6, 2013) .....................33

*Cocona, Inc. v. Singtex Indus. Co.*,
    No. 14-cv-01593-MJW, 2014 WL 5072730 (D. Colo. Oct. 9, 2014) .....................25

*Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech. Inc.*,
    492 F. Supp. 2d 600 (E.D. Tex. 2007) ....................................................................30

*CPI Card Grp.--Colorado, Inc. v. Lehouck*,
    No. Civ. A. 14-13435, 2014 WL 5025356 (D. Mass. Oct. 8, 2014) .......................18

*DBA Enters., Inc. v. Findlay*,
    923 P.2d 298 (Colo. App. 1996) ..............................................................................28

*DISH Network Corp. v. Altomari*,
    224 P.3d 362 (Colo. App. 2009) ........................................................................16, 17

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
    269 F.3d 1149 (10th Cir. 2001) ....................................................................15, 28, 29

*Doubleclick Inc. v. Paikin*,
    402 F. Supp. 2d 1251 (D. Colo. 2005) ..........................................................17, 31, 32

*Elec. Distrib., Inc. v. SFR, Inc.*,
    166 F.3d 1074 (10th Cir. 1999) ...............................................................................23

*Emerson v. Wembly USA, Inc.*,
   433 F. Supp. 2d 1200 (D. Colo. 2006)....................................................................15

*Energex Enters., Inc. v. Anthony Doors, Inc.*,
   250 F. Supp. 2d 1278 (D. Colo. 2003).......................................................18, 23, 24

*Equifax Servs., Inc. v. Hitz*,
   905 F.2d 1355 (10th Cir. 1990) ...............................................................................28

*Gitlitz v. Bellock*,
   171 P.3d 1274 (Colo. App. 2007) ............................................................................27

*Gold Messenger, Inc. v. McGuay*,
   937 P.2d 907 (Colo. App. 1997).................................................................17, 21, 23

*Greater Yellowstone Coal. v. Flowers*,
   321 F.3d 1250 (10th Cir. 2003) .........................................................................15, 27

*Harrison v. Albright*,
   577 P.2d 302 (Colo. App. 1977) ..............................................................................24

*Harvey Barnett, Inc. v. Shidler*,
   143 F. Supp. 2d 1247 (D. Colo. 2001)......................................................................15

*Harvey Barnett, Inc. v. Shidler*,
   338 F.3d 1125 (10th Cir. 2003) ...............................................................................20

*Heatron, Inc. v. Shackelford*,
   898 F. Supp. 1491 (D. Kan. 1995)............................................................................30

*I Can't Believe It's Yogurt v. Gunn*,
   No. CIV.A.94-OK-2109-TL, 1997 WL 599391 (D. Colo. Apr. 15, 1997) .............30

*Joseph Brazier, Ltd. v. Specialty Bar Prod. Co.*,
   No. 06-cv-01416-WDM-KLM, 2008 WL 791942 (D. Colo. Mar. 21, 2008) .........18

*Kodekey Elecs., Inc. v. Mechanex Corp.*,
   486 F.2d 449 (10th Cir. 1973) .................................................................................18

*Lundgrin v. Claytor*,
   619 F.2d 61 (10th Cir. 1980) ...................................................................................14

*In Re Marriage of Fischer*,
   834 P.2d 270 (Colo. App. 1992)...............................................................................24

*Mgmt. Recruiters of Boulder, Inc. v. Miller*,
   762 P.2d 763 (Colo. App. 1988)........................................................................23, 32

*Miller v. Kendall*,
    541 P.2d 126 (Colo. App. 1975) ...........................................................................28

*Modern Env'ts, Inc. v. Stinnett*,
    561 S.E.2d 694 (Va. 2002) ....................................................................................15

*Phoenix Capital, Inc. v. Dowell*,
    176 P.3d 835 (Colo. App. 2007) .....................................................................11, 25

*Porter Indus., Inc. v. Higgins*,
    680 P.2d 1339 (Colo. App. 1984) ........................................................................20

*Reed Mill & Lumber Co., Inc. v. Jensen*,
    165 P.3d 733 (Colo. App. 2006) ..........................................................................23

*Rivendell Forest Prods., Ltd v. Georgia-Pacific Corp.*,
    28 F.3d 1042 (10th Cir. 1994) .............................................................................20

*Shred–It USA, Inc. v. Mobile Data Shred, Inc.*,
    202 F. Supp. 2d 228 (S.D.N.Y. 2002) .............................................................28, 30

*Smith v. Hoyer*,
    697 P.2d 761 (Colo. App. 1984) ..........................................................................26

*W. Distrib. Co. v. Diodosio*,
    841 P.2d 1053 (Colo. 1992) .................................................................................15

*Winnebago Tribe of Nebraska v. Stovall*,
    341 F.3d 1202 (10th Cir.2002) ............................................................................33

*Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*,
    No. 07-cv-02324-WYD-MEH, 2008 WL 2185882 (D. Colo. May 23, 2008) ......14, 21, 32, 33

*Zeff, Farrington & Assocs., Inc. v. Farrington*,
    449 P.2d 813 (Colo. 1969) .............................................................................24, 32

**Statutes**

C.R.S. 8-2-113 ........................................................................................11, 15–17, 23–25

C.R.S. § 7-74-102 .........................................................................................................20

C.R.S. § 7-74-101 .........................................................................................................22

Plaintiffs DigitalGlobe, Inc. and DigitalGlobe Intelligence Solutions, Inc. ("DGIS") (collectively, "DigitalGlobe") respectfully move this Court to enter a preliminary injunction enjoining Defendant Lou Paladino ("Paladino") from: (i) competing with DigitalGlobe by working with DigitalGlobe customers or on DigitalGlobe direct lines of business for a period of one year; (2) soliciting any of DigitalGlobe's employees for a period of one year; and (3) using, disclosing, disseminating, or otherwise releasing DigitalGlobe's confidential and proprietary information to any party.  In support of its motion, DigitalGlobe states as follows.

### Certificate of Conferral Pursuant to D.C. Colo. L. Civ. R. 7.1(a)

Undersigned counsel for DigitalGlobe conferred with counsel for Lou Paladino on August 2, 2017 and was informed that Paladino opposes the relief requested herein.

### INTRODUCTION

DigitalGlobe is the leading private entity supplying high-resolution Earth imagery, data, and analysis to governments and private industries around the world.  The United States government and its defense and intelligence agencies are important DigitalGlobe clients.  As such, DigitalGlobe plays a critical role in this country's defense.

Lou Paladino managed a team of DigitalGlobe's high-level data analysts and developers performing a multimillion-dollar technical project for the United States government's Defense Intelligence Agency ("DIA" or the "Customer").  In late February 2017, DigitalGlobe announced it was merging with MacDonald, Dettwiler and Associates, Ltd. ("MDA"), a global communications and information company.  The MDA/DigitalGlobe merger concerned Paladino because of an issue that had arisen for him and his team in a prior project involving

1

MDA and DIA.  Paladino feared MDA was unhappy with him personally due to his

involvement in that earlier project.

   Instead of working with his team and with his DigitalGlobe superiors to address any

concerns DIA might have about the merger, Paladino saw an opportunity to seize personal

gains at DigitalGlobe's expense.  While still employed by DigitalGlobe, Paladino engineered a

scheme to divert work from DigitalGlobe to BigBear, Inc. ("BigBear"), which had previously

partnered with DigitalGlobe on an aspect of its work for DIA.  The intent behind this scheme

was to expand BigBear's role in the work for DIA to directly compete with DigitalGlobe.  While

at DigitalGlobe, Paladino deliberately slowed his team's productivity so that he could resume the

work after moving to BigBear, and he deliberately neglected a major DigitalGlobe growth

opportunity with DIA so he could instead pursue it with BigBear.  Paladino is now employed by

BigBear and has been actively soliciting other DigitalGlobe employees to leave DigitalGlobe to

work with him at BigBear.  Paladino's conduct directly violates the non-compete agreement,

which is expressly subject to Colorado law and forum, that he signed as a condition of his

employment, as well as a host of contractual, statutory, and common law duties Paladino owed

and continues to owe to DigitalGlobe as a prior employee and manager.  Injunctive relief is

necessary to prevent irreparable harm to DigitalGlobe and to safeguard DigitalGlobe's business

interests and confidential and proprietary information.

   This case illustrates why the Colorado Legislature enforces non-compete agreements in

certain situations.  Where a company bargains for a reasonable restrictive covenant with a

managerial employee to protect the company's core business and its confidential and proprietary

information, that agreement is binding and enforceable.  When an employee then flaunts that

agreement by deliberately diverting work to a direct competitor, going to work for that competitor, soliciting other employees to leave the company, and disclosing or using the company's proprietary information, immediate relief in the form of a preliminary injunction is warranted.  These are the precise circumstances of this dispute.

## FACTUAL BACKGROUND

Pursuant to Paragraph VII-D of the Court's Practice Standards, DigitalGlobe will present evidence at the hearing supporting the facts discussed in this motion, including direct testimony of DigitalGlobe representatives on all of the circumstances described below, in accordance with the Federal Rules of Evidence.  This background summary serves as an offer of proof as to the evidence DigitalGlobe is prepared to present at a hearing on its motion for preliminary injunction.

**I.**    **DigitalGlobe is the Worldwide Leader in High-Resolution Earth Imagery.**

Based in Westminster, Colorado, DigitalGlobe, Inc. is the world's leading provider of high-resolution Earth imagery, data, and analysis.  It has developed the most agile and sophisticated constellation of commercial Earth imaging satellites in the world.  With over three million square kilometers captured each day, DigitalGlobe, Inc. is the commercial industry leader in providing high-resolution satellite images, aerial photographs, and geospatial content.  Its subsidiary DGIS is an industry leader in processing and analyzing satellite imagery and other voluminous data.  DGIS is part of the "services" branch of DigitalGlobe's business.  Through DigitalGlobe's government services business, DGIS delivers advanced analytic services and ongoing mission support to meet its government clients' unique and demanding intelligence requirements.

Due to the unique and complex nature of DigitalGlobe's services, DigitalGlobe's clientele are located worldwide—servicing more than 30 governments across the planet. In particular, DGIS performs a host of highly sensitive technical services for DIA. DigitalGlobe relies upon its confidential and proprietary information, including its trade secrets (the "Confidential Information"), to maintain its success and market position. For example, through its patented software Signature Analyst, DigitalGlobe enables its analysts to examine thousands of geospatial data layers to discover spatial relationships, patterns, and preferences associated with different forms of human activity. This anticipatory intelligence tool can be leveraged in a variety of ways to support commercial, military, and intelligence requirements. DigitalGlobe's Confidential Information has supported counter-terrorism, counter-proliferation, surveillance, and reconnaissance optimization, and counter-drug trafficking, as well as identifying areas most susceptible to radicalization. DigitalGlobe takes great efforts to maintain the secrecy of its Confidential Information.

Because few competitors are capable of providing the same services as DigitalGlobe, and because a limited number of experienced individuals are capable of managing and leading the complex and sensitive nature of DigitalGlobe projects, DigitalGlobe requires its employees to sign non-compete, non-disclosure, and non-solicitation agreements to protect DigitalGlobe's Confidential Information. Such binding agreements are necessary to protect DigitalGlobe's business structure and to justify DigitalGlobe's investment in its research and technology.

## II.      <u>Mr. Paladino's Employment at DigitalGlobe.</u>

Mr. Paladino held the job title of Director of Geospatial at DigitalGlobe, since his prior employer, GeoEye Analytics, Inc., was acquired by DigitalGlobe in 2012. In that position,

Paladino managed a team of approximately thirty employees on projects generating multimillion-dollar annual revenues.  Specifically, Paladino directly supervised five high-level management employees, including two Geospatial Managers, a Senior Staff Software Engineer, a Principal Data Scientist, and a Senior Intelligence Analyst.  Each of these employees in turn supervised other employees.  Annual revenues from projects on which Paladino was responsible totaled approximately five to six million dollars.  Paladino played a critical role in DigitalGlobe's procurement of these multimillion-dollar projects and he utilized DigitalGlobe's Confidential Information, including trade secrets and patented technology, to secure these contracts.   Paladino's duties included managing and coordinating departmental and cross-functional teams; developing, defining, and executing project plans, schedules, budgets, and deliverables; identifying, defining, and assigning major project roles; monitoring the project from initiation through delivery, including scope of work, scheduling, and monitoring budgets; and ensuring completion of a project on schedule and within budget constraints.  Paladino was compensated at one of the highest compensation levels within DigitalGlobe and had the authority to hire and fire those he supervised.  Paladino had access to the highest levels of DigitalGlobe's confidential and proprietary information.

Due to the sensitive nature of Paladino's position, he executed several binding agreements with DigitalGlobe for the protection of its Confidential Information.  As a condition of his employment, Paladino executed: (i) the Employee Invention, Confidential Information, Noncompetition and Non-Solicitation Agreement (the "Non-Competition Agreement") (ECF # 1.1) on or about February 4, 2013; (ii) the DigitalGlobe, Inc. 2007 Employee Stock Option Plan, as restated on February 17, 2016 (the "Stock Option Plan") (ECF

# 1.2); and (iii) the Employee Non-Disclosure Agreement (the "Non-Disclosure Agreement")

(ECF # 1.3) on or about December 22, 2010[1] (collectively, the "Agreements").  Each of these

Agreements contains valid and enforceable non-compete, non-solicitation, and non-disclosure

covenants, which DigitalGlobe explicitly bargained for to protect its Confidential Information.

### III.     **Mr. Paladino's Breach**

To DigitalGlobe's knowledge, Mr. Paladino's illegal conduct first began in February

2017 when it was announced that MDA would acquire DigitalGlobe (the "Acquisition").

MDA is a global communications, surveillance, and information company based in Canada.

The purpose of this Acquisition is in part to expand opportunities and initiatives in North

America, and the Acquisition will not inhibit any of DigitalGlobe's active projects.

DigitalGlobe will retain its name and its Colorado headquarters.  Although the Acquisition

would have no immediate effect on Paladino's employment, after its announcement he

promptly devised and implemented a scheme to leave DigitalGlobe and take with him

DigitalGlobe's employees, customers, and Confidential Information.  In fact, the weekend after

the MDA announcement, Paladino began publicly expressing his discontent about the

Acquisition to DigitalGlobe employees and customers, stating that he was thinking about

starting his own business and that he would be contacting lawyers to determine what his rights

and obligations were under his various non-compete agreements with DigitalGlobe.

Among others, Paladino made these announcements to Terry Busch, the decision-maker

at that time for DIA, a key United States government customer, on a confidential, multimillion-

---

[1] The Non-Disclosure Agreement was executed between Paladino and DigitalGlobe's predecessor, GeoEye
Analytics, Inc. ("GeoEye").  DigitalGlobe acquired GeoEye in 2012 and as a consequence of that acquisition,
DigitalGlobe succeeded GeoEye as to its rights as Paladino's employer under the Non-Disclosure Agreement.

dollar project Paladino was managing for DigitalGlobe (the "Project").  Mr. Busch, while

employed by DIA, had a previous experience with MDA which resulted in Mr. Busch having a

concern about working more extensively with MDA.  Rather than leverage his close

relationship with Mr. Busch to assuage Mr. Busch's qualms about the Acquisition, Paladino

acted in direct contravention to DigitalGlobe's interests by urging Mr. Busch to divert DIA

business from DigitalGlobe to Paladino's new venture with BigBear.

DigitalGlobe anticipates Paladino may contend that DigitalGlobe was inevitably going

to lose its business with DIA on the Project due to the Acquisition, in light of Mr. Busch's

history with MDA.[2]  But the evidence will demonstrate to the contrary that (i) MDA does other

business with DIA; (ii) Paladino knew Mr. Busch was scheduled to leave his position and

would no longer be DIA's decision-maker on the Project; and (iii) the Acquisition would likely

not have a major impact on the existing contractual agreements and personal relationships

between DigitalGlobe and the Customer.  Yet Paladino did nothing to prevent DIA from

diverting business from DigitalGlobe, and instead encouraged DIA to do exactly that for his

own personal protection and benefit.

For months, while still employed by DigitalGlobe, Paladino contrived and executed his

plan to divert DigitalGlobe employees and customers from DigitalGlobe.  Specifically, at

different times Paladino approached DigitalGlobe employees Shane Cleary, Thomas Burk,

Chad Parvis, Bob Moreland, Sean Stuekerjuergen, Andrew Jenkins, and Arni Sumarlidason

about leaving DigitalGlobe.  Of these DigitalGlobe employees, all but Mr. Jenkins and Mr.

---

[2] Of course, as the discussion of the controlling legal principles below will demonstrate, this would do nothing to justify Paladino's disregard of his promises not to compete with DigitalGlobe, not to solicit other DigitalGlobe employees, and not to disclose or use DigitalGlobe Confidential Information.

Sumarlidason ultimately left DigitalGlobe and joined Paladino.  Paladino told DigitalGlobe

employees that he had significant "seed funding" to start a new business.  Paladino also

conducted meetings with DigitalGlobe employees at his home for the purpose of strategizing

about his planned transition from DigitalGlobe.  On one occasion, Paladino and BigBear Chief

Technology Officer Brian Levy met with DigitalGlobe employees at a brewery for the purpose

of recruiting those employees to join Paladino at BigBear.

At the same time, while still employed at DigitalGlobe, Paladino deliberately delayed

progress on certain work for the Project.  His conduct on the Project became antithetical to

completing important work for the Customer, and he specifically directed Jeffrey Watkins to

slow down work for the Project while Paladino contemplated his move from DigitalGlobe.

Paladino also entirely stopped work on development of a new source of data related to the

Project, which DigitalGlobe anticipated would be a major growth opportunity with DIA,

apparently so he could instead develop that opportunity himself or at BigBear.

During this planning and solicitation stage, Paladino informed other DigitalGlobe

employees that he had spoken to several lawyers to analyze his duties under his various non-

compete agreements with DigitalGlobe.  Paladino told one DigitalGlobe employee that those

lawyers advised him to concoct a complex scheme in an attempt to hide Paladino's intent to

compete with DigitalGlobe.  In accordance with this purported legal advice, Paladino entered

into an agreement with BigBear, a direct competitor of DigitalGlobe, where Paladino would

join BigBear, bring with him DigitalGlobe's key government Customer, and perform the same

work as well as some slightly different work—likely the very work DigitalGlobe intended as a

new growth opportunity.  BigBear agreed to pay for Paladino's legal fees associated with this

transition.  Paladino told various DigitalGlobe employees that he intended to remain with BigBear for only one year and then form his own venture where he would continue doing the exact work for the Customer that he previously did at DigitalGlobe.  As part of this plan, Paladino directed DigitalGlobe employees to move code used in the Project to infrastructure controlled by BigBear.  Paladino and five other DigitalGlobe employees have since begun or will soon begin employment at BigBear, working on the same Project for the same Customer as they were doing at DigitalGlobe.

Paladino also is actively using or attempting to obtain DigitalGlobe's Confidential Information in his employment at BigBear.  During the same weekend after the MDA announcement in which Paladino first began expressing his intent to leave DigitalGlobe, Terry Busch, the decision-maker for the U.S. government Customer, approached Dallas Smith, a DigitalGlobe Senior Intelligence Analyst who worked on the Project under Paladino.  Mr. Busch asked Mr. Smith if he knew anyone who could reverse-engineer DigitalGlobe's proprietary software, Signature Analyst.  This patented software was developed exclusively for DigitalGlobe and is a primary reason DigitalGlobe was awarded the Project.  DigitalGlobe places the highest priority on maintaining the confidential and proprietary nature of that software.  During Paladino's employment he had access to this software, as well as other trade secrets, which he is actively using or attempting to use in his employment at BigBear.

The results of Paladino's scheme have been immediate and dramatic.  DigitalGlobe recently entered a new contract year on the Project, and the Customer has budgeted millions of dollars less than expected for the next year of work due to the sudden shift of technical work on the Project from DigitalGlobe to BigBear.  Moreover, additional work DigitalGlobe

anticipated commencing, using data sources and methods of analysis distinct from but related to the existing Project, has not commenced and has also apparently been shifted from DigitalGlobe to BigBear.

**IV.**   **The Agreements**

Due to the sensitive nature of Paladino's position, the multimillion-dollar projects that Paladino oversaw, the complex and unique nature of the projects, and Paladino's access to the highest levels of DigitalGlobe's Confidential Information, DigitalGlobe required Paladino to sign several Agreements to protect its Confidential Information and business interests.  The provisions DigitalGlobe seeks to enforce within these Agreements can be summarized as (1) Non-Compete Covenants; (2) Non-Solicitation of Employees Covenants; and (3) Non-Disclosure Covenants.

**A.**   **The Non-Compete Covenants.**

The Non-Compete Covenants are contained within Section 6 of the Non-Competition Covenant (ECF # 1.1)[3], Section 24(d)(i) of the Stock Option Agreement (ECF # 1.2)[4], and

---

[3] The Non-Competition Agreement § 6 provides:
**"Non-competition**. I agree that I shall not, during the term of my employment by the Company and for a period of twelve months thereafter, compete for any reason with the Company in its direct business lines, including, but not limited to, satellite and aerial imagery operations, product distribution, mapping and other value added services, by directly or indirectly taking any of the following actions: (a) owning, managing, operating, joining, controlling or providing services to any entity, regardless of entity form or location, that engages in or is seeking to engage in the current or planned business activities of the Company; (b) serving as an employee, agent, consultant, officer, or director of any such entity; or (c) inducing or attempting to induce any customer, supplier, or business relation of the Company to cease doing business with the Company, or in any other way interfering with the relationship between any customer, supplier or business relation and the Company.  If, after termination of my employment with the Company, I violate the covenants contained in this paragraph, then the duration of the covenant shall be extended from the date I resume compliance with the covenant, reduced by the number of days following my termination that I was not in violation of the covenant."

[4] The Stock Option Agreement § 24(d)(i) provides:
"(d) By virtue of his or her relationship with the Company, each Participant will be introduced to and involved in the solicitation and servicing of existing customers of the Company and new customers obtained by the Company and agrees that all efforts expended in soliciting and servicing such customers shall be for the permanent benefit of the Company.  During each Participant's employment or other service relationship with the Company he or she will not

Section E of the Non-Disclosure Agreement (ECF # 1.3).[5]  These Covenants include both covenants not to compete and covenants not to solicit DigitalGlobe's customers.[6]

Paladino has breached the various Non-Compete Covenants within the Agreements in several ways.  During his employment at DigitalGlobe, Paladino devised a plan to divert a key DigitalGlobe Customer and the corresponding Project to DigitalGlobe's direct competitor, BigBear.  Paladino had intimate knowledge of this Customer and the Project because Paladino himself managed the Project.  Acting against DigitalGlobe's interests, Paladino conspired with BigBear to transfer the Project to BigBear.  Paladino followed through with his plan and is currently working at BigBear with DigitalGlobe's former Customer, doing similar if not identical work, in blatant violation of his Non-Compete Covenants.

      **B.**       **The Non-Solicitation of Employees Covenants.**

The Non-Solicitation of Employees Covenants are contained within Section 8 of the Non-Competition Covenant (ECF # 1.1)[7], Section 24(d)(ii) of the Stock Option Agreement (ECF # 1.2)[8], and Section D of the Non-Disclosure Agreement (ECF # 1.3).[9]

---

engage in any conduct which could in any way jeopardize or disturb any of the Company's customer relationships. Each Participant agrees that, to the extent not prohibited by Applicable Law, for a period beginning on the date of grant of each Award and ending (i) 1 year after termination of Continuous Service, regardless of the reason for such termination, he or she shall not, directly or indirectly, without the prior written consent of the Chairman of the Company, market, offer, sell or otherwise furnish any products or services similar to, or otherwise competitive with, those offered by the Company to any customer of the Company . . . ."

[5] The Non-Disclosure Agreement § E provides:

**"E.  Solicitation of Customers**.  For a one-year period after the termination of Employee's employment with the Company for any reason, Employee agrees not to solicit for advancing like products or services (or to assist with such solicitation) any customer or Customer of the Company with whom the Employee had dealings or about whom the Employee acquired proprietary information during his or her employment."

[6] Colorado courts have held that covenants not to solicit a former employer's customers (as opposed to covenants not to solicit other employees) are a form of covenant not to compete, subject to C.R.S. 8-2-113(2).  *See Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 844 (Colo. App. 2007).

[7] The Non-Competition Agreement provides:

**"Non-Solicitation.**  For a period of one year immediately following the termination of my employment with the Company, I shall not, directly or indirectly, recruit, solicit, attempt to persuade, or assist in the recruitment or solicitation of, any employee of the Company who was an employee, officer or agent of the Company during the

Paladino is violating the various Non-Solicitation of Employees Covenants within the Agreements because, in the execution of his plan to divert business from DigitalGlobe to BigBear, Paladino has actively solicited and recruited current DigitalGlobe employees to leave DigitalGlobe and join Paladino at BigBear or at his own competing venture.  Paladino told multiple DigitalGlobe employees that he intended to start his own company after working for BigBear for a short time, and that he intended to perform the United States government work that was previously performed by DigitalGlobe at both BigBear and then his new company.  Paladino has solicited and attempted to recruit a number of DigitalGlobe employees to leave DigitalGlobe and work on the DIA Project at BigBear or at Paladino's anticipated competing venture.  Five former DigitalGlobe employees have recently left DigitalGlobe's employment and have told DigitalGlobe that they intend to begin work with Paladino at BigBear.

Paladino has also taken advantage of the present dispute for purposes of soliciting DigitalGlobe employees.  For example, by correspondence from its counsel dated June 23, 2017, DigitalGlobe advised Paladino that his conduct was in breach of his contractual agreements not to compete with DigitalGlobe and not to solicit other DigitalGlobe employees.  Within two business days of that correspondence, Paladino communicated again with DigitalGlobe

---

three month period immediately preceding the date of termination of my employment, for the purpose of employing him or her or obtaining his or her services or otherwise causing him or her to leave his or her employment with the Company."

[8] The Stock Option Agreement provides:

" . . .  (ii) 2 years after termination of Continuous Service, regardless of the reason for such termination, he or she shall not, directly or indirectly, solicit, offer employment to, hire or otherwise retain the services of any employee or other service provider of the Company."

[9] The Non-Disclosure Agreement provides:

**"D.  Solicitation of Employees**.  The Employee agrees not to solicit for employment (or to assist with such solicitation), or to hire (including employment as a full-time or part-time employee or as a consultant) any employee of the Company for a one-year period after the termination of Employee's employment with the Company for any reason.  The restrictions set forth in this paragraph apply to the solicitation or hiring of any person who is, or within the six months before the termination of Employee's employment, was an employee or consultant of the Company."

employees and referred to the present dispute for the purpose of encouraging those DigitalGlobe employees to leave the company and join Paladino at BigBear.  All of this conduct violates the Agreements' Non-Solicitation of Employees Covenants.

### C.    The Non-Disclosure Covenants.

The Non-Disclosure Covenants are contained within Section 2 of the Non-Competition Covenant (ECF # 1.1)[10], Section 24(b) of the Stock Option Agreement (ECF # 1.2)[11], and Section B of the Non-Disclosure Agreement (ECF # 1.3).[12]

---

[10] The Non-Competition Agreement provides:
"**Nondisclosure of Business Confidential Information**. Except as may be necessary to perform my work with the Company, I agree that neither during the term of my employment nor at any time after my employment is terminated (until such time, as ever, as the Business Confidential Information becomes part of the public domain other than by my breach of this Agreement), I shall not: (i) disclose or furnish to any person any Business Confidential Information; (ii) use any Business Confidential Information for my own benefit or the benefit of others, or (iii) remove any Business Confidential Information from the Company facilities. Any Business Confidential Information, including all hard copies and electronic storage, that I receive shall be returned to the Company upon request or, in any event, immediately upon termination of my employment with the Company.

[11] The Stock Option Agreement provides:
"(b) Each Participant acknowledges that by virtue of his or her employment or other service relationship with the Company, he or she will be granted otherwise prohibited access to confidential information and proprietary data including but not limited to such information described in those or other similar terms in any applicable patent, confidentiality, inventions, secrecy, or other agreement between the Participant and the Company, which are not known, and not readily accessible to the Company's competitors. This information (the "Confidential Information") includes, but is not limited to, current and prospective customers; the identity of key contacts at such customers; customers' particularized preferences and needs; marketing strategies and plans; financial data; personnel data; compensation data; proprietary procedures and processes; and other unique and specialized practices, programs and plans of the Company and its customers and prospective customers. Each Participant recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a significant period of time and at substantial expense. Accordingly, each Participant, by accepting any Award under this Plan, agrees that he or she shall not, at any time during or after his or her employment or other service relationship with the Company, divulge such Confidential Information or make use of it for his or her own purposes or the purposes of any person or entity other than the Company.

[12] The Non-Disclosure Agreement provides:
"**B.   Non-Disclosure**. The Employee agrees that during and for the period of three years after his or her employment with the Company, the Employee shall hold in confidence and not disclose (directly or indirectly) any Proprietary Information to any person or entity, or use any Proprietary Information for any purpose, except as authorized by the Company.  The foregoing restrictions shall not apply to information that becomes known to and available for use by the public other than as a result of the Employee's unauthorized acts or failures to act.  The Employee acknowledges that all materials that in any way contain or reflect Proprietary Information including, but not limited to, documents, reports, plans, notes, memoranda, sketches, drawings, discs and records (including electronic records), shall belong exclusively to the Company.  The Employee agrees to deliver to the Company, at the date of his or her termination of employment with the Company or at any other time the Company may request, all copies of such materials that

Paladino has breached the Non-Disclosure Covenants within his various Agreements by performing the work for DigitalGlobe's competitor that he previously performed at DigitalGlobe. The nature of DigitalGlobe's Confidential Information, as outlined in the various Agreements, includes information obtained as a result of Paladino's relationship with DigitalGlobe and relates to DigitalGlobe's current and prospective customers, the identity of key contacts at such customers, and customers' particularized preferences and needs.  Paladino acknowledged in the Agreements that by virtue of competing with DigitalGlobe in its direct business lines, Confidential Information would be inevitably disclosed.  Paladino agreed not to use or disclose in any way DigitalGlobe's Confidential Information.  In breach of those Agreements, Paladino has used and disclosed DigitalGlobe's Confidential Information, including trade secrets, in his employment at BigBear and his continuing work for DIA.

DigitalGlobe bargained for these Covenants to protect DigitalGlobe's Confidential Information.  DigitalGlobe seeks preliminary injunctive relief to enforce these Agreements and to prevent irreparable harm pending a trial on the merits.

## **ARGUMENT**

The purpose of a preliminary injunction is "to preserve the status quo pending a final determination of the parties' rights."  *Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*, No. 07-cv-02324-WYD-MEH, 2008 WL 2185882, at *13 (D. Colo. May 23, 2008).  "The status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing."  *Id.* (internal citations and quotations omitted).  The decision to grant a preliminary injunction is within the Court's sound discretion.  *Lundgrin v. Claytor*, 619

---

the Employee may possess or have under his or her control. The Employee also agrees to execute a certificate of compliance with the provisions of this Section B."

F.2d 61, 63 (10th Cir. 1980).  The movant need only "make a *prima facie* showing of a probable right to the ultimate relief and a probable danger of injury if the motion is denied." *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1221 (D. Colo. 2001).

The party seeking relief must demonstrate: "(1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest."  *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).[13]

DigitalGlobe satisfies all four elements.

## I.      **DigitalGlobe Is Substantially Likely to Succeed on the Merits of its Claims.**

DigitalGlobe is substantially likely to succeed on the merits of its claims for breach of contract because the evidence at the hearing will establish: (1) existence of a valid contract; (2) that DigitalGlobe performed under the contract; (3) that Paladino breached the contract; and (4) resulting damages.  *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992); *Emerson v. Wembly USA, Inc.*, 433 F. Supp. 2d 1200, 1215 (D. Colo. 2006).

### A.      **Paladino Is Subject to Valid and Enforceable Contracts.**

As a condition of Mr. Paladino's employment and his receipt of DigitalGlobe stock, Mr. Paladino executed three separate binding and enforceable Agreements.  The Non-Competition

---

[13] For purposes of these factors, "[t]he Tenth Circuit has adopted a modified likelihood of success requirement." *Harvey Barnett, Inc. v. Shidler*, 143 F. Supp. 2d 1247, 1251 (D. Colo. 2001).  This means that "'[i]f the plaintiff can establish that the latter three requirements tip strongly in his favor, the test is modified, and the plaintiff may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.'"  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1255–56 (10th Cir. 2003) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir.2002)).

Agreement and the Stock Option Agreement are expressly subject to Colorado law.[14]  Within

each of these Agreements Mr. Paladino agreed to various Non-Compete, Non-Solicitation of

Employees, and Non-Disclosure Covenants.  Each of these Covenants is valid and enforceable

under Colorado law.

1.  **The Non-Compete Covenants Are Valid and Enforceable.**

Although Colorado generally disfavors covenants not to compete, the legislature has

explicitly codified certain instances when such covenants are binding.  C.R.S. § 8-2-113(2).

Specifically, any non-competition covenant is valid "for the protection of trade secrets" and as

applied to "[e]xecutive and management personnel."  C.R.S. § 8-2-113(2)(b), (d).  Here, the

various Non-Compete Covenants within the Agreements are valid and enforceable both under

the "executive and management personnel" exception and the "trade secret" exception.

*a.     The Executive and Management Personnel Exception Applies.*

Although the statute does not define the terms "executive" or "management personnel,"

Colorado courts apply the ordinary and common usage of those terms to determine whether the

"executive and management personnel" exception applies:

> "Management" and "personnel" are ordinary words of common usage that have
> unambiguous meanings.  "Personnel" means a body of persons employed in
> some service, such as an office.  "Management" has been defined as the
> conducting or supervising of something, such as a business.  Thus, persons who
> conduct or supervise a business would be considered "management personnel."

*DISH Network Corp. v. Altomari*, 224 P.3d 362, 366 (Colo. App. 2009) (citing WEBSTER'S

THIRD NEW INTERNATIONAL DICTIONARY 1687, 1372 (2002)).  This definition "undoubtedly

---

[14] The Non-Disclosure Agreement is subject to Virginia law, which, to the extent it differs from Colorado law, appears to be more permissive in the areas discussed below than Colorado law.  In particular, Virginia does not have Colorado's statutory scheme under C.R.S. § 8-2-113, in which non-compete covenants are void unless they fit within a specific exception.  *See generally Modern Env'ts, Inc. v. Stinnett*, 561 S.E.2d 694, 695 (Va. 2002) (describing legal standard for restrictive covenants under Virginia law).

encompasses" not only those "key personnel" who are "in charge" and at the "heart of the business," but also those mid-level managers who "direct, control, and supervise" employees within the company. *Id.* For example, a "mid-level manager" with supervisory authority, "at the top of the compensation scheme," with "decision-making capacity," and with at least some "level of autonomy" is considered "management personnel" under C.R.S. § 8-2-113(2)(d). *Id.* at 368; *see also Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1258–59 (D. Colo. 2005) ("look[ing] beyond mere job titles to see what the job actually entails," and enforcing a non-compete covenant under the management personnel exception because defendant was in charge of a significant part of the company's business and involved in company strategy).

Paladino's former position with DigitalGlobe easily satisfies the "management personnel" exception. Paladino managed a team of some thirty employees on projects generating multimillion-dollar annual revenues. He was paid near the top of DigitalGlobe's compensation scheme. He was granted valuable stock options. He had authority to make binding decisions for DigitalGlobe. Moreover, Paladino had a high level of autonomy in all aspects of his position. Thus, he was "management personnel" within the meaning of C.R.S. § 8-2-113(2)(d).

> b.    *The Trade Secret Exception Applies.*

In Colorado, a covenant not to compete is also enforceable "for the protection of trade secrets." C.R.S. § 8-2-113(2)(b). For the trade secret exception to apply, the purpose of the non-compete covenant must be to protect trade secrets "and the covenant must be reasonably limited in scope to the protection of those trade secrets." *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. App. 1997). The express purpose of the restrictive covenants within

the various Agreements is to protect DigitalGlobe's Confidential Information, including trade

secrets, and those Agreements are reasonably limited in scope for that purpose.

(1)   The Agreements Were Executed for the Express Purpose of
Protecting DigitalGlobe's Trade Secrets

In determining whether a non-competition clause was executed to protect trade secrets,

Colorado courts look to the agreement's plain language.  *CPI Card Grp.--Colorado, Inc. v.

Lehouck*, No. Civ. A. 14-13435, 2014 WL 5025356, at *4 (D. Mass. Oct. 8, 2014) ("Colorado

courts have looked to the preamble and the substantive provisions of the contract to determine

whether a restriction was drafted with the purpose of protecting trade secrets.").  For example,

in *Saturn Sys., Inc. v. Militare*, the Colorado Court of Appeals determined from the "plain and

unambiguous language" of the non-competition covenant that it was "designed to protect the

confidentiality of [plaintiff's] . . . proprietary information."  252 P.3d at 527–28 (Colo. App.

2011).  Similarly, in *Haggard v. Spine*, the court "review[ed] . . . the written documents" to

determine that "the primary purpose behind the Non-Competition Covenant was the protection

of information that [the former employer] considered to be trade secrets." No. 09-cv-00721-

CMA-KMT, 2009 WL 1655030, at *5 (D. Colo. June 12, 2009).

Moreover, Colorado courts have held categorically that "[a] non-disclosure agreement

is a contract to protect trade secrets."  *Joseph Brazier, Ltd. v. Specialty Bar Prod. Co.*, No. 06-

cv-01416-WDM-KLM, 2008 WL 791942, at *9 (D. Colo. Mar. 21, 2008); *see also Kodekey

Elecs., Inc. v. Mechanex Corp.*, 486 F.2d 449, 455 (10th Cir. 1973) ("An employee's express

agreement 'not to disclose any of the processes and methods' of his employer is a positive

acknowledgement of the fact that some of such processes and methods are secret; the

stipulation would otherwise be meaningless.") (quoting CALLMAN, UNFAIR COMPETITION,

18

TRADE & MONOPOLIES, § 52.2, p. 390 (1968)); *Energex Enters., Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1282 (D. Colo. 2003) (explaining that the non-disclosure agreement at issue "both on its face and based on the context in which it was entered . . . is a contract for the protection of trade secrets").

The plain and unambiguous language of the Agreements demonstrates that the purpose of the Non-Compete Covenants is to protect valid trade secrets. In particular, the Non-Competition Agreement specifies:

1.    **Business Confidential Information**.  In the course of my employment with the Company, I acknowledge that I will have access to certain information, including, but not limited to, business plans, customer lists, marketing programs, price lists, salary and human resource information, technology development information, drawings, reports, inventions, and other material that contain, embody or disclose trade secrets, confidential business and technical information and proprietary business information of the Company, its shareholders, customers, or third parties to whom the Company owes obligations of confidentiality (collectively, the "Business Confidential Information").

2.    **Nondisclosure of Business Confidential Information**.  . . . I shall not: (i) disclose or furnish to any person any Business Confidential Information; (ii) use any Business Confidential Information for my own benefit or the benefit of others . . . [quoted in full, *supra*, at footnote 10]

7.    **Reasonableness**.  I acknowledge that the restrictions stated in Section 6 [the Non-competition provision] above are reasonable and that the covenants are necessary to protect the Company's interest in Business Confidential Information, which would be inevitably disclosed if were to compete, directly or indirectly, with the Company in its direct product lines. . . .

The Stock Option Plan also recites the participant's duty not to divulge Confidential Information, which is carefully defined.  (ECF # 1.2, § 24(b)).  Finally, the Non-Disclosure Agreement similarly defines "Proprietary Information," which

Paladino promised not to disclose.  (ECF # 1.3, §§ A, B).  Paladino further agreed that

disclosure of Proprietary Information would warrant injunctive relief:

> **F.  Injunctive Relief**.  Because of the unique nature of the Proprietary
> Information and employee and customer relationships, the Employee
> understands and agrees that the Company will suffer irreparable harm in the
> event that the Employee fails to comply with any of his or her obligations under
> Sections B, C, D [the Non-Solicitation of Employees provision], and E [the
> Non-Solicitation of Customers provision] above and that monetary damages will
> be inadequate to compensate the Company for such breach.  Accordingly, the
> Employee agrees that the Company will, in addition to any other remedies
> available to them at law or equity, be entitled to injunctive relief to enforce the
> terms of Sections B, C, D, and E.

From the plain and unambiguous language of these Agreements, Paladino agreed that

the Non-Compete Covenants were reasonable to protect DigitalGlobe's Confidential

Information, including trade secrets.

(2)     The Agreements Address Valid and Protectable Trade
Secrets Under Colorado Law.

The plain language of the Agreements demonstrates that the Confidential Information

DigitalGlobe reasonably seeks to protect includes valid and protectable trade secrets under

Colorado law.  The Colorado Uniform Trade Secrets Act defines a trade secret as:

> [T]he whole or any portion or phase of any scientific or technical
> information, design, process, procedure, formula, improvement, confidential
> business or financial information, listing of names, addresses, or telephone
> numbers, or other information relating to any business or profession which is
> secret and of value. To be a "trade secret" the owner thereof must have taken
> measures to prevent the secret from becoming available to persons other
> than those selected by the owner to have access thereto for limited purposes.

C.R.S. § 7-74-102(4).  What constitutes a trade secret is a question of fact for the trial court.

*Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1341 (Colo. App. 1984).  A trade secret can have

publicly-known elements.  *See Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir.

2003) ("[I]nformation can be a trade secret notwithstanding the fact that some of its components are well-known.") (citation omitted).; *Rivendell Forest Prods., Ltd v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1046 (10th Cir. 1994) ("a trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage"). "In short, a trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Gold Messenger*, 937 P.2d at 911 (quotations omitted).

In particular, "[d]etailed customer information is a trade secret." *Xantrex*, 2008 WL 2185882, at *18; *Saturn Systems*, 252 P.3d at 527 (holding a company's confidential information consisting of "client lists, customer contracts, pricing information, detailed debtor information, client information and customer log-in codes" qualified as trade secrets). In *Xantrex*, the court found that the defendant's "significant exposure to customer concerns and inside information about customer issues that would be useful to a competitor that did not know those concerns" constituted trade secrets. 2008 WL 2185882, at *18.

There can be no legitimate dispute that DigitalGlobe possesses trade secrets and that the purpose of the Agreements is to protect those trade secrets. Paladino had the highest levels of exposure to the U.S. government Customer's concerns, preferences, information, and business plans that are not available to the public. *See Xantrex*, 2008 WL 2185882, at *18. Additionally, DigitalGlobe obtained and maintained the Customer and the corresponding multimillion-dollar Project *because of* DigitalGlobe's confidential and proprietary software.

Indeed, Mr. Busch, the Customer's decision-maker on the Project, after conferring with Mr. Paladino, expressly sought to reverse-engineer DigitalGlobe's proprietary software while he was considering terminating the relationship with DigitalGlobe.  This conduct illustrates the critical importance to DigitalGlobe in keeping this software and other related technology confidential.  Without DigitalGlobe's Confidential Information, and without Paladino's access to that information, including his intimate knowledge of the Customer's preferences and the details of the Project, BigBear would not have been in a position to expand its working relationship with DIA and assume much of DigitalGlobe's role.

DigitalGlobe takes great efforts to protect this Confidential Information by requiring its employees to sign non-disclosure agreements, housing proprietary software and technology on secure, user-accessed servers, and restricting access to such information to certain employees.

The trade secrets that Paladino had access to at DigitalGlobe and which he is using at BigBear are among the trade secrets described in each of the Agreements.  The "Confidential Business Information" as defined within the Non-Competition Agreement expressly protects any "trade secrets," including confidential business plans, customer lists, price lists, technology development information, drawings, reports, and inventions.  Similarly, the "Confidential Information" as defined within the Stock Option Agreement includes "current and prospective customers; the identity of key contacts at such customers; customers' particularized preferences and needs."  Finally, the "Proprietary Information" as defined within the Non-Disclosure Agreement includes "concepts, software, designs, drawings, specifications, techniques, models, data, diagrams, flow charts, processes, programs, procedures, 'know-how,' marketing and development plans, strategic plans, pricing and cost information and financial

information."  Indeed, the Agreements' description of DigitalGlobe's Confidential Information

mirrors the definition of "trade secret" in the Trade Secrets Act.  C.R.S. § 7-74-101, *et seq*.

Thus, on their face the purpose of those Agreements is to protect DigitalGlobe's

Confidential Information, including trade secrets.  *See*, *e.g.*, *Gold Messenger*, 937 P.2d at 911;

*Saturn Systems*, 252 P.3d at 527–28; *Haggard*, 2009 WL 1655040, at *5; *AMG Nat'l Trust

Bank v. Ries*, No. 06-CV-4337, 2011 WL 6840586, at *2 (E.D. Pa. Dec. 29, 2011) (under

Colorado law, the plain language of the non-compete covenant demonstrated the purpose of the

restrictive covenant was to protect trade secrets).

> c.      *The One-Year Covenants Are Reasonable in Duration and Scope.*

A covenant not to compete is enforceable under C.R.S. § 8-2-113(2) if it is reasonable

in duration and scope.  *See Reed Mill & Lumber Co., Inc. v. Jensen*, 165 P.3d 733, 736 (Colo.

App. 2006).  "To be reasonable, a noncompete agreement must not be broader than necessary

to protect the promisee's legitimate interests, and it must not impose hardship on the

promisor."  *Id.*  "The reasonableness of the restraints in a restrictive covenant is determined on

a case-by-case basis, taking into account the particular facts and circumstances surrounding the

case and the subject covenant."  *Elec. Distrib., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1085 (10th

Cir. 1999) (quotations omitted).  "Of primary importance in the determination of

reasonableness are the location and nature of the employer's clientele."  *Id.* (quotations

omitted); *see also Energex*, 250 F. Supp. 2d at 1283 (the central concern in determining the

reasonableness of a restrictive covenant is "whether the restrictive provision is necessary to

safeguard the plaintiff's business") (citing *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762

P.2d 763, 766 (Colo. App. 1988)).  "Colorado courts applying this fact-driven test have

enforced non-competition agreements with durations extending from six months to perpetuity and geographic scopes ranging from county to nation-wide." *Energex*, 250 F. Supp. 2d at 1283. "[T]he burden of proof as to the reasonableness of [a covenant] rests on the party challenging its enforcement." *Harrison v. Albright*, 577 P.2d 302, 305 (Colo. App. 1977).

The restrictive covenants within the Agreements are reasonable. Each of the non-compete provisions is limited to one year, and the non-disclosure covenant within the Non-Disclosure Agreement is limited to three years. Paladino acknowledged in the Non-Competition Agreement that the restrictive covenants are reasonable and necessary to protect DigitalGlobe's Confidential Information. Even without Paladino's acknowledgment, Colorado law agrees that a one- to three-year restriction is reasonable. *See*, *e.g.*, *Zeff, Farrington & Assocs., Inc. v. Farrington*, 449 P.2d 813, 814 (Colo. 1969) (upholding a three-year restriction); *In Re Marriage of Fischer*, 834 P.2d 270, 273 (Colo. App. 1992) (upholding three-year non-compete clause); *Harrison*, 577 P.2d at 305 (upholding a five-year non-compete). Moreover, the Non-Compete Covenants are expressly limited in scope to competition with companies in DigitalGlobe's "direct business lines." (ECF # 1.1, § 6). The restrictions in the Non-Compete Covenants are plainly limited as "necessary to safeguard the plaintiff's business." *Energex*, 250 F. Supp. 2d at 1283.

2.   **The Non-Disclosure and Non-Solicitation of Employees Covenants Are Not "Covenants Not to Compete" and Thus Are Independently Valid and Enforceable.**

Even in the unlikely event the Court finds that neither the "management personnel" nor the "protection of trade secret" exception applies, the Non-Disclosure and Non-Solicitation of Employee's Covenants within the various Agreements are independently valid and enforceable.

24

C.R.S. 8-2-113(2) only applies to "covenants not to compete."  Non-Disclosure Agreements do not impact a former employee's ability to compete with the former company or make a living in any way.  *See, e.g.*, *Cocona, Inc. v. Singtex Indus. Co.*, No. 14-cv-01593-MJW, 2014 WL 5072730, at *4 (D. Colo. Oct. 9, 2014) (analyzing a non-compete covenant under C.R.S. § 8-2-113(2) and separately analyzing a non-disclosure covenant under general contract principles).

Moreover, Colorado courts have concluded that where "an agreement not to solicit employees would not impair the former employee's ability to make a living," that agreement is not a "covenant not to compete."  *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 844 (Colo. App. 2007).  Specifically, "[w]here a nonsolicitation provision is limited to prohibiting only initiating contacts or 'active' solicitation of the employer's employees, it is enforceable, despite the invalidity of an accompanying noncompetition provision."  *Id.* (citing *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 796 (Colo. App. 2001)).[15]

DigitalGlobe seeks injunctive relief for Paladino's active solicitation of its current employees.  While employed at DigitalGlobe and after his termination, Paladino has actively solicited DigitalGlobe employees to terminate their employment with DigitalGlobe and begin employment at BigBear.  Indeed, Paladino has initiated contact with DigitalGlobe employees for the sole purpose of recruiting those employees.  His promises not to do that are independently valid and enforceable under Colorado law.

---

[15] A non-solicitation provision might be subject to C.R.S. § 8-2-113 if it sought to prevent indirect solicitation, for example, where a former employer seeks to prevent a former employee from participating in any hiring practices of his/her new employer.  *See Atmel*, 30 P.3d at 796.  Here, there is no "inactive" or "indirect" solicitation of employees at issue.  Paladino is not alleged to have breached the Non-Solicitation of Employees Covenants solely due to an attempt to participate in BigBear's general hiring processes.

**B.      DigitalGlobe Performed under the Non-Competition and Non-Disclosure Agreements.**

DigitalGlobe has performed its obligations under the various Agreements. DigitalGlobe employed Paladino, paid Paladino his agreed-upon salary, and provided Paladino with DigitalGlobe benefits.  DigitalGlobe has not breached any of the Agreements. Accordingly, DigitalGlobe has satisfied the second element of its contract claims.

**C.      Mr. Paladino Has Breached the Agreements.**

In light of all the circumstances recited above, DigitalGlobe is substantially likely to succeed in demonstrating that Mr. Paladino has breached all of the Agreements.

As detailed in Sections III and IV-A of the Background section above, Paladino has competed in DigitalGlobe's direct business lines by providing services to a competitor, serving as an employee of that competitor, and interfering with the relationship between DigitalGlobe and its Customer.  This conduct breaches the Non-Compete Covenants (Non-Competition Covenant, § 6; Stock Option Agreement, § 24(d)(i); Non-Disclosure Agreement, § E).

As detailed in Sections III and IV-B of the Background section, Paladino has repeatedly solicited other DigitalGlobe employees to leave DigitalGlobe and to join him at BigBear.  This conduct breaches the Non-Solicitation of Employees Covenants (Non-Competition Covenant, § 8; Stock Option Agreement, § 24(d)(ii); Non-Disclosure Agreement, § D).

As detailed in Sections III and IV-C of the Background section, Paladino has used or disclosed DigitalGlobe trade secrets and Confidential Information in his work with BigBear. This conduct breaches the Non-Disclosure Covenants (Non-Competition Covenant, § 2; Stock Option Agreement, § 24(b); Non-Disclosure Agreement, § B).

26

**D.      Mr. Paladino's Breach Has Caused and Is Causing DigitalGlobe Damage.**

The general measure of damages in a breach of contract action is the amount that would place the non-defaulting party in the position that party would have enjoyed absent the breach. *See Smith v. Hoyer*, 697 P.2d 761, 765 (Colo. App. 1984).  Paladino's breach of the Agreements has caused and is causing DigitalGlobe damages, including lost profits from the government Project that Paladino diverted to BigBear, loss of DigitalGlobe employees caused by Paladino's solicitation and recruitment of those employees, and the inevitable disclosure and use of DigitalGlobe's Confidential Information, causing reputational damages which cannot be reasonably ascertained.  The damage to DigitalGlobe's business relationships and reputation is irreparable because a monetary award cannot adequately compensate DigitalGlobe for Paladino's breach, and there is no legal remedy that provides full relief. "[A]n injunction is available as equitable relief if there is no legal remedy that provides full, complete, and adequate relief."  *Gitlitz v. Bellock*, 171 P.3d 1274, 1279 (Colo. App. 2007).

Moreover, the existence of damages and irreparable harm to DigitalGlobe can be ascertained from the face of the Agreements.  Paladino specifically agreed that DigitalGlobe would be entitled to an injunction restraining Paladino from breaching the Agreements.  *See* Non-Competition Agreement (ECF # 1.1), § 9(e); Non-Disclosure Agreement (ECF # 1.3), § F. Additionally, the Non-Competition Agreement expressly provides that DigitalGlobe "shall be entitled to recover legal fees and all other expenses of litigation." (ECF # 1.1, § 9(f)).

Accordingly, DigitalGlobe has incurred damages proximately caused by Paladino's breach, and DigitalGlobe has established all of the elements for its breach of contract claims.

II.     **Mr. Paladino's Breach of the Agreements Irreparably Harms DigitalGlobe.**

"An irreparable harm requirement is met if a plaintiff demonstrates a *significant risk*

that he or she will experience harm that cannot be compensated after the fact by monetary

damages." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)

(emphasis added) (citations omitted).  Paladino's breach of the Agreements is inflicting real,

immediate, and irreparable harm on DigitalGlobe by devaluing DigitalGlobe's Confidential

Information, destroying its competitive advantage, and causing an actual and imminent loss of

its customers and employees.  As a matter of law, breach of a non-compete covenant nearly

always warrants a finding of irreparable harm, and Paladino's conduct certainly fits within that

rule.

"Where there is a noncompetition agreement, breach is the controlling factor and

injunctive relief follows almost as a matter of course.  Damage is presumed to be irreparable

and the remedy at law is considered inadequate."  *Miller v. Kendall*, 541 P.2d 126, 128 (Colo.

App. 1975); *see also Dominion*, 356 F.3d at 1262 (explaining the general rule that breach of an

exclusivity clause, such as a covenant not to compete, "almost always warrants the award of

injunctive relief").  Violation of a non-compete clause requires injunctive relief because "it is

very difficult to calculate monetary damages that would successfully redress the loss of a

relationship with a client that would produce an indeterminate amount of business in years to

come."  *Shred–It USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 233 (S.D.N.Y.

2002).  Courts have identified the following factors to support a finding of irreparable harm:

"inability to calculate damages, harm to goodwill, diminishment of competitive positions in

marketplace, loss of employees' unique services, the impact of state law, and lost opportunities

to distribute unique products." *Dominion*, 356 F.3d at 1263.  Some or all of those factors nearly always result from a breach of a covenant not to compete.  *See*, *e.g.*, *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (upholding a finding of irreparable harm where damages from breach of a non-compete covenant were difficult to calculate); *DBA Enters., Inc. v. Findlay*, 923 P.2d 298, 302 (Colo. App. 1996) (finding that in non-compete situations, injunctions are an appropriate remedy).

Paladino is working in an identical position at DigitalGlobe's direct competitor, where Paladino has diverted DigitalGlobe's previous business and clientele.  Moreover, Paladino expressly agreed that he would refrain from competing with DigitalGlobe for a period of one year after his termination so as to protect DigitalGlobe's Confidential Information.  That Confidential Information will inevitably be disclosed through Paladino's employment at BigBear, and the use of that Confidential Information severely diminishes DigitalGlobe's competitive position in the marketplace.  *See Dominion*, 356 F.3d at 1263.  This alone constitutes irreparable harm.  *See Am. Television & Commc'ns Corp. v. Manning*, 651 P.2d 440, 446 (Colo. App. 1982) ("It has been held in a situation involving a breach of covenant not to compete that difficulty in measuring the monetary value of a lost customer raises a presumption that legal damages are inadequate.").  Paladino sits on the cutting edge of DigitalGlobe's Confidential Information.  Of course, as time passes, Paladino's intimate knowledge of DigitalGlobe's Confidential Information will become more attenuated and less threatening to DigitalGlobe's business interests.  However, as it stands today, Paladino's recent involvement in the highest levels of DigitalGlobe's trailblazing, proprietary technology directly threatens DigitalGlobe's competitive position in the marketplace.

Not enforcing the Agreements would strip DigitalGlobe of the ability to capitalize upon an employee's unique service. *Id.* Indeed, DigitalGlobe invested greatly in Paladino's employment and entrusted him with its Confidential Information. Due to the unique and complex nature of DigitalGlobe's business, there are few individuals with the experience and expertise necessary to perform the duties previously entrusted to Paladino. The loss of his services combined with BigBear's gain of his services constitutes unquantifiable irreparable harm. *See Shred-it, USA*, 202 F.Supp.2d at 233 ("If the unique services of the party are available to a competitor, the employer obviously suffers irreparable harm.") (quotations omitted). Without immediate court intervention prohibiting Paladino from working in the same or similar capacity at BigBear, DigitalGlobe may never be able to recoup its competitive losses.

III.   <u>**Granting the Preliminary Injunction Will Not Disserve the Public Interest.**</u>

Granting the preliminary injunction here will not disserve the public interest, but rather, will promote the public interest. "There is a public interest in the enforcement of a valid covenant not to compete." *I Can't Believe It's Yogurt v. Gunn*, No. CIV.A.94-OK-2109-TL, 1997 WL 599391, at *20 (D. Colo. Apr. 15, 1997). The public also has an interest in "restraining unfair competitive practices," *Heatron, Inc. v. Shackelford*, 898 F. Supp. 1491, 1502 (D. Kan. 1995), and in "encouraging investment by research organizations into future technologies and serves to promote the progress of science and the useful arts." *Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 601 (E.D. Tex. 2007).

The public interest is benefitted by an injunction here because it reinforces that trade secrets are protectable, that fair competition is valued, and that private contracts are respected and enforced.  DigitalGlobe invests substantially in the development of its Confidential Information.  Further, protecting DigitalGlobe's Confidential Information, such as its confidential and proprietary software, promotes investment into research and development of new technology.  DigitalGlobe does not seek to stymie the free movement of workers or prevent the public from benefiting from existing technology; rather, it seeks to enforce a limited restriction on the ability of one person to work within a small and narrowly-tailored industry, and to restrict one entity from taking a short-cut to success by using another's valuable information.  Without the ability of DigitalGlobe to negotiate for and eventually enforce its Non-Compete, Non-Solicitation of Employees, and Non-Disclosure Covenants, DigitalGlobe would have no reason to invest in developing new technologies.  Indeed, the fact that Colorado statutes enforce non-compete agreements as to management personnel and to protect trade secrets demonstrates that enforcing the Agreements in these circumstances would not be against the public interest.  *See Doubleclick*, 402 F. Supp. 2d at 1260.

**IV.    The Balance of Equities Favors an Injunction.**

Where the threatened injuries to a plaintiff outweigh the harm that a preliminary injunction may cause a defendant, the balance of equities favors a plaintiff.  *See, e.g.*, *Big O Tires v. JDV. LLC*, No. 08-cv-1046-WYD, 2008 WL 4787619, at *6 (D. Colo. Oct. 31, 2008).  The balance of equities tips decidedly in DigitalGlobe's favor.  Despite his straightforward promises in the Non-Compete, Non-Solicitation of Employees, and Non-Disclosure Covenants, Paladino deliberately and comprehensively violated his obligations.  Not enforcing these

Covenants would rob DigitalGlobe of its expressly bargained for protections.  Resolution of

these issues through litigation could take years.  At that point, the Agreements will have

expired, and DigitalGlobe will have been irreparably harmed.  Moreover, denying the proposed

injunction would allow Paladino to devalue DigitalGlobe's Confidential Information and

unfairly compete with DigitalGlobe, either with BigBear or through his own venture, profiting

upon his theft by using the knowledge, insight, and science that DigitalGlobe developed and

paid for.  Paladino should not be able to reap the benefit of DigitalGlobe's substantial

investments in its Confidential Information.  In this circumstance, "[t]he equities lie with the

plaintiff" such that an injunction is appropriate. *Miller*, 541 P.2d at 127–28; *see also Zeff*, 449

P.2d at 814 ("Defendant is deliberately doing what he plainly agreed [in the non-compete

agreement] not to do, and the equities are with plaintiff.  Plaintiff is therefore clearly entitled to

the injunctive relief sought.") (citations omitted); *Xantrex*, 2008 WL 2185882, at *16 (holding

threat of harm posed by plaintiff's "business strategies, marketing strategies and engineering

information being in the hands of a direct competitor" outweighed any possible harm to the

former employee and its new employer).

The proposed injunction would not prevent Paladino from pursuing gainful

employment.  Paladino is free to work for an employer that is not in the direct lines of business

as DigitalGlobe or for any employer after a single year.  As a highly educated and successful

businessman, Paladino is certainly capable of finding other employment that does not violate

the terms of the Agreements. *See Xantrex*, 2008 WL 2185882, at *16 (declining the former-

employee's argument that he could not gain new employment in the city of Fort Collins after

"uprooti[ing] his family" and holding that as a "highly educated successful businessman and engineer" the defendant "certainly appears capable of finding other employment").

Any prejudice suffered by Paladino does not approach the harm DigitalGlobe will suffer without an injunction. Accordingly, the public interest favors enforcement of the Agreements. *See Doubleclick, Inc.*, 402 F. Supp. 2d at 1260 (threat to defendant of loss of trade secrets and damage to business outweighs harm to plaintiff from enforcing non-compete).

## V.   **DigitalGlobe Should Not Be Required to Post Bond.**

The Court has "'wide discretion' . . . in determining whether to require security for an injunction." *Xantrex*, 2008 WL 2185882, at *18 (quoting *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir.2002)). "A bond is unnecessary absent proof of a likelihood of harm to [the defendant]." *Id.* As this Court has held, the broad discretion granted by Rule 65(c) includes "judicial discretion even in determining whether a bond need be posted at all." *Brumfiel v. U.S. Bank*, No. 12-cv-02716-WJM, 2013 WL 1874186, at *7–8 (D. Colo. May 6, 2013) (citations omitted).

In *Xantrex*, the court considered the potential harm to the defendant-employee in the enforcement of a non-compete. The defendant argued he had "uprooted his family and settled his children in new schools and that there are no power companies [the defendant's line of business] in Fort Collins where he could gain employment." 2008 WL 2185882, at *16–17. The court specifically disapproved this argument, stating that the defendant-employee "is a highly educated successful businessman and engineer. He certainly appears capable of finding other employment." *Id.* Thus, because the court found that the defendant "w[ould] not suffer any harm as the result of the injunction," no bond was necessary. *Id.* at *18.

Similarly, Paladino expressly agreed in the Non-Competition Agreement that injunctive relief would be necessary in the event of a breach of that agreement.  Paladino is highly educated and successful, capable of finding other employment.  This—coupled with the fact that Paladino has intended all along to start his own venture upon the expiration of his Non-Compete Covenants and that he has solicited DigitalGlobe employees by flaunting his significant "seed funding" to start that venture—demonstrates that Paladino will not suffer harm as a result of the injunction.  Accordingly, the Court should not require DigitalGlobe to post bond.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests this Court enter a preliminary injunction: (1) enjoining Paladino from competing with DigitalGlobe by working with DigitalGlobe customers or on DigitalGlobe direct lines of business for a period of one year; (2) enjoining Paladino from soliciting any DigitalGlobe employees for a period of one year; and (3) enjoining Paladino from using, disclosing, disseminating, or otherwise releasing DigitalGlobe's Confidential Information to any party.   DigitalGlobe further requests an evidentiary hearing on its Motion for Preliminary Injunction.

Respectfully submitted August 2nd, 2017.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

*/s/ John V. McDermott*
John V. McDermott, Colo. Atty. Reg. No. 11854
Van Aaron Hughes, Colo. Atty. Reg. No. 19812
Craig M. Finger, Colo. Atty. Reg. No. 50134
*Attorneys for Plaintiffs DIGITALGLOBE, INC. and*
*DIGITALGLOBE INTELLIGENCE SOLUTIONS,*
*INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2nd, 2017, I electronically filed a true and correct copy of the foregoing **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the clerk of court via the CM/ECF system which will send notification of such filing and service upon counsel of record listed below:

Christopher Toll
Holland & Hart
6380 S. Fiddlers Green Cir., Suite 500
Greenwood Village, CO 80111
303.295.1637                  `
ctoll@hollandhart.com

Claire E. Wells Hanson
Holland & Hart
555 17th Street, Suite 3200
Denver, CO 80202
303-290-1673
cewellshanson@hollandhart.com

Timothy J. McEvoy
Patrick J. McDonald
Cameron/McEvoy PLLC
4100 Monument Corner Drive
Suite 420
Fairfax, Virginia 22030
703.273.8898
tmcevoy@cameronmcevoy.com
pmcdonald@cameronmcevoy.com

*s/Kate M. Meade*
Kate M. Meade, Paralegal
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202
303-223-1100