**DIGITALGLOBE, INC.**
**2007 EMPLOYEE STOCK OPTION PLAN**

**Amended and Restated Effective February 17, 2016**

1. **Establishment, Purpose, and Types of Awards**

DigitalGlobe (the "**Company**") hereby amends and restates the "**2007 Employee Stock Option Plan**" (hereinafter referred to as the "**Plan**"), effective as of the date first set forth above (the "**Effective Date**"), in order to provide equity-based incentives and awards to select employees, directors, consultants, and advisors of the Company and its Affiliates. The Plan permits the granting of the following types of awards ("**Awards**"), Options (Section 6), Stock Appreciation Rights (Section 7), and Restricted Shares, Restricted Share Units and Unrestricted Shares (Section 8).

Except as provided in an Award Agreement, the Plan shall not affect any stock options, equity-based compensation, or other compensation or benefits that the Company or its Affiliates may have provided, or may separately provide in the future pursuant to any agreement, plan, or program that is independent of this Plan, or pursuant to any other authority that the Company or the applicable Affiliate may have to award such compensation.

2. **Defined Terms**

Terms in the Plan that begin with an initial capital letter have the defined meaning set forth in *Appendix A*, unless defined elsewhere in this Plan or the context of their use clearly indicates a different meaning.

3. **Shares Subject to the Plan**

(a) *Share Limit*. Subject to the provisions of Section 12 of the Plan, the maximum number of Shares that the Company may issue under the Plan is 9,550,000 Shares. Shares that are subject to an Award that for any reason expires, is forfeited, is cancelled, or becomes unexercisable, and Shares that are for any other reason not paid or delivered under this Plan shall again, except to the extent prohibited by Applicable Law, be available for subsequent Awards under the Plan. In addition, the Committee may make future Awards with respect to Shares that the Company retains from otherwise delivering pursuant to an Award under this Plan either (i) as payment of the exercise price of an Award, or (ii) in order to satisfy the withholding or employment taxes due upon grant, exercise, vesting or distribution of an Award.

(b) *ISO Limit.* Subject to the provisions of Section 12 of the Plan, the maximum number of Shares that the Company may issue for all ISO Awards under this Plan is 9,550,000 Shares. Such limit is in addition to, and not in lieu of, the share limit of Section 3(a) and any Shares that the Company may issue in respect of an ISO Award shall also count against the limit of Section 3(a). The number of Shares that are available for ISO Awards pursuant to this Section 3(b) shall be determined, to the extent required under applicable tax laws, by reducing the number of Shares designated in the first sentence of this paragraph by the number of Shares granted pursuant to Awards (whether or not Shares are issued pursuant to such Awards), provided that any Shares that are either issued or purchased under the Plan and forfeited back to the Plan, or surrendered in payment of the Exercise Price for an Award shall be available for issuance pursuant to future ISO Awards.

4. **Administration**

(a) *General*. The Committee shall administer the Plan in accordance with its terms, provided that the Board may act in lieu of the Committee on any matter. The Committee shall hold meetings at such times and places as it may determine and shall make such rules and regulations for the conduct of its business as it deems advisable. In the absence of a duly appointed Committee, the Board shall function as the Committee for all purposes of the Plan.

(b) *Committee Composition*. The Board shall appoint the members of the Committee. If and to the extent permitted by Applicable Law, the Committee may authorize one or more Reporting Persons (or other officers) to

EXHIBIT 2

make Awards to Eligible Persons who are not Reporting Persons (or other officers whom the Committee has specifically authorized to make Awards). The Board may at any time appoint additional members to the Committee, remove and replace members of the Committee with or without cause, and fill vacancies on the Committee.

(c) *Powers of the Committee*. Subject to the provisions of the Plan, the Committee shall have the authority, in its sole discretion:

(i) to grant Awards;

(ii) to determine Eligible Persons to whom Awards shall be granted from time to time and the number of Shares, to be covered by each Award;

(iii) to determine, from time to time, the Fair Value of Shares;

(iv) to determine the terms and conditions of all Awards, including any applicable exercise or purchase price, any applicable installments and conditions under which an Award shall become vested (which may be based on performance), terminated, expired, cancelled, or replaced, and any circumstances for vesting acceleration or waiver of forfeiture restrictions, and any other restrictions and limitations;

(v) to approve the forms of Award Agreements and all other documents, notices and certificates in connection therewith which need not be identical either as to type of Award or among Participants;

(vi) to construe and interpret the terms of the Plan and any Award Agreement, to determine the meaning of their terms, and to prescribe, amend, and rescind rules and procedures relating to the Plan and its administration;

(vii) to modify, to cancel, or to waive the Company's rights with respect to any Awards, to adjust or to modify Award Agreements for changes in Applicable Law, and to recognize differences in foreign law, tax policies, or customs; and

(viii) to make all other interpretations and to take all other actions that the Committee may consider necessary or advisable to administer the Plan or to effectuate its purposes.

Subject to Applicable Law and the restrictions set forth in the Plan, the Committee may delegate administrative functions to individuals who are Reporting Persons, officers, or Employees of the Company or its Affiliates.

(d) *Deference to Committee Determinations*. The Committee shall have the discretion to interpret or construe ambiguous, unclear, or implied (but omitted) terms in any fashion it deems to be appropriate in its sole discretion, and to make any findings of fact needed in the administration of the Plan or Award Agreements. The Committee's prior exercise of its discretionary authority shall not obligate it to thereafter exercise its authority in a like fashion. The Committee's interpretation and construction of any provision of the Plan, or of any Award or Award Agreement, shall be final, binding, and conclusive on all persons. The validity of any such interpretation, construction, decision or finding of fact shall not be given *de novo* review if challenged in court, by arbitration, or in any other forum, and shall be upheld unless clearly made in bad faith or materially affected by fraud.

(e) *No Liability; Indemnification*. Neither the Board nor any Committee member, nor any Person acting at the direction of the Board or the Committee, shall be liable for any act, omission, interpretation, construction or determination made in good faith with respect to the Plan, any Award or any Award Agreement. The Company and its Affiliates shall pay or reimburse any member of the Committee, as well as any Director, Employee, or Consultant who takes action on behalf of the Plan, for all expenses incurred with respect to the Plan, and to the full extent allowable under Applicable Law shall indemnify each and every one of them for any claims, liabilities, and costs (including reasonable attorney's fees) arising out of their good faith performance of duties on behalf of the Plan.

## 5. **Eligibility**

(a) *General Rule*. Subject to the express provisions of the Plan, the Committee shall determine from the class of Eligible Persons those individuals to whom Awards under the Plan may be granted, the number of Shares subject to each Award, the price (if any) to be paid for the Shares or the Award. The Committee may grant ISOs only to Employees (including officers who are Employees) of the Company or any Affiliate that is a "parent

corporation" or "subsidiary corporation" within the meaning of Section 424 of the Code, and may grant all other Awards to any Eligible Person. A Participant who has been granted an Award may be granted an additional Award or Awards if the Committee shall so determine, if such person is otherwise an Eligible Person and if otherwise in accordance with the terms of the Plan.

(b) *Documentation of Awards*. Each Award shall be evidenced by an Award Agreement signed by the Company and, if required by the Committee, by the Participant. The Award Agreement shall set forth the material terms and conditions of the Award established by the Committee, and each Award shall be subject to the terms and conditions set forth in this Plan unless otherwise specifically provided in an Award Agreement, as permitted by this Plan.

(c) *Limits on Awards*. Subject to adjustments pursuant to Section 12, the maximum aggregate number of Shares subject to Awards granted to a Participant in a calendar year may not exceed 2,000,000 shares.

(d) *Replacement Awards*. Subject to Applicable Laws (including any associated Shareholder approval requirements), the Committee may, in its sole discretion and upon such terms as it deems appropriate, require as a condition of the grant of an Award to a Participant that the Participant surrender for cancellation some or all of the Awards that have previously been granted to the Participant under this Plan or otherwise. An Award that is conditioned upon such surrender may or may not be the same type of Award, may cover the same (or a lesser or greater) number of Shares as such surrendered Award, may have other terms that are determined without regard to the terms or conditions of such surrendered Award, and may contain any other terms that the Committee deems appropriate. In the case of Options, these other terms may not involve an Exercise Price that is lower than the exercise price of the surrendered Option unless the Company's shareholders approve the grant itself or the program under which the grant is made pursuant to the Plan. Except in connection with a corporate transaction involving the company (including, without limitation, any stock dividend, stock split, extraordinary cash dividend, recapitalization, reorganization, merger, consolidation, split-up, spin-off, combination, or exchange of shares), the terms of outstanding awards may not be amended to reduce the exercise price of outstanding Options or SARs or cancel, exchange, replace, buyout or surrender outstanding Options or SARS in exchange for cash, other awards or Options or SARs with an exercise price that is less than the exercise price of the original Options or SARs without stockholder approval.

## 6. Option Awards

(a) *Types; Documentation*. Subject to Section 5(a), the Committee may in its discretion grant Options pursuant to Award Agreements that are delivered to Participants. Each Option shall be designated in the Award Agreement as an ISO or a Non-ISO, and the same Award Agreement may grant both types of Options. At the sole discretion of the Committee but subject to Section 6(g), any Option may be exercisable, in whole or in part, immediately upon the grant thereof, or only after the occurrence of a specified event, or only in installments, which installments may vary. Options granted under the Plan may contain such terms and provisions not inconsistent with the Plan that the Committee shall deem advisable in its sole and absolute discretion.

(b) *ISO $100,000 Limitation*. To the extent that the aggregate Fair Value of Shares with respect to which Options designated as ISOs first become exercisable by a Participant in any calendar year (under this Plan and any other plan of the Company or any Affiliate) exceeds $100,000, such excess Options shall be treated as Non-ISOs. For purposes of determining whether the $100,000 limit is exceeded, the Fair Value of the Shares subject to an ISO shall be determined as of the Grant Date. In reducing the number of Options treated as ISOs to meet the $100,000 limit, the most recently granted Options shall be reduced first. In the event that Section 422 of the Code is amended to alter the limitation set forth therein, the limitation of this Section 6(b) shall be automatically adjusted accordingly.

(c) *Term of Options*. Each Award Agreement shall specify a term at the end of which the Option automatically expires, subject to earlier termination provisions contained in Section 6(h) hereof; provided, that, the term of any Option may not exceed ten years from the Grant Date. In the case of an ISO granted to an Employee who is a Ten Percent Holder on the Grant Date, the term of the ISO shall not exceed five years from the Grant Date.

(d) *Exercise Price*. The exercise price of an Option shall be determined by the Committee in its sole discretion and shall be set forth in the Award Agreement, provided that —

(i) the per Share exercise price shall not be less than the Fair Value per Share on the Grant Date, and

3

(ii) the per Share exercise price shall not be less than 110% of the Fair Value per Share on the Grant Date for any ISO granted to an Employee who is a Ten Percent Holder on the Grant Date.

(e) *Exercise of Option*. The times, circumstances and conditions under which an Option shall be exercisable shall be determined by the Committee in its sole discretion and set forth in the Award Agreement. The Committee shall have the discretion to determine whether and to what extent the vesting of Options shall be tolled during any unpaid leave of absence; provided, however, that in the absence of such determination, vesting of Options shall be tolled during any such leave approved by the Company.

(f) *Methods of Exercise*. Prior to its expiration pursuant to the terms of the applicable Award Agreement, and subject to the times, circumstances and conditions for exercise contained in the applicable Award Agreement, each Option may be exercised, in whole or in part (provided that the Company shall not be required to issue fractional shares), by delivery of written notice of exercise to the secretary of the Company (in the form approved by the Committee) accompanied by the full exercise price of the Shares being purchased. In the case of an ISO, the Committee shall determine the acceptable methods of payment on the Grant Date and it shall be included in the applicable Award Agreement The methods of payment that the Committee may in its discretion accept or commit to accept in an Award Agreement include:

(i) cash or check payable to the Company (in U.S. dollars);

(ii) other Shares that (A) are owned by the Participant who is purchasing Shares pursuant to an Option, (B) have a Fair Value on the date of surrender equal to the aggregate exercise price of the Shares as to which the Option is being exercised, (C) were not acquired by such Participant pursuant to the exercise of an Option, unless such Shares have been owned by such Participant for at least six months or such other period as the Committee may determine, (D) are all, at the time of such surrender, free and clear of any and all claims, pledges, liens and encumbrances, or any restrictions which would in any manner restrict the transfer of such Shares to or by the Company (other than such restrictions as may have existed prior to an issuance of such Shares by the Company to such Participant), and (E) are duly endorsed for transfer to the Company;

(iii) a cashless exercise program that the Committee may approve, from time to time, pursuant to which a Participant may concurrently provide irrevocable instructions (A) to such Participant's broker or dealer to effect the immediate sale of the purchased Shares and remit to the Company, out of the sale proceeds available on the settlement date, sufficient funds to cover the exercise price of the Option plus all applicable taxes required to be withheld by the Company by reason of such exercise, and (B) to the Company to deliver the certificates for the purchased Shares directly to such broker or dealer in order to complete the sale; or

(iv) any combination of the foregoing methods of payment.

The Company shall not be required to deliver Shares pursuant to the exercise of an Option until payment of the full exercise price therefore is received by the Company.

(g) *Vesting*. As to any Option or SAR granted under this Plan after the Effective Date, the Option or SAR shall be subject to a minimum vesting requirement of one year after the date of grant of the Award, and no portion of any such Award may vest earlier than the first anniversary of the grant date of the Award (the "**Minimum Vesting Requirement**").   Notwithstanding the preceding sentence, the Minimum Vesting Requirement shall not apply to 5% of the maximum number of shares available for issuance under this Plan, and shall not limit or restrict the Committee's discretion to accelerate the vesting of any Award in circumstances it determines to be appropriate.

(h) *Termination of Continuous Service*. The Committee may establish and set forth in the applicable Award Agreement the terms and conditions on which an Option shall remain exercisable, if at all, following termination of a Participant's Continuous Service. The Committee may waive or modify these provisions at any time. To the extent that a Participant is not entitled to exercise an Option at the date of his or her termination of Continuous Service, or if the Participant (or other person entitled to exercise the Option) does not exercise the Option to the extent so entitled within the time specified in the Award Agreement or below (as applicable), the Option shall terminate and the Shares underlying the unexercised portion of the Option shall revert to the Plan and become available for future Awards. In no event may any Option be exercised after the expiration of the Option term as set forth in the Award Agreement.

The following provisions shall apply to the extent an Award Agreement does not specify the terms and

conditions upon which an Option shall terminate when there is a termination of a Participant's Continuous Service:

(i) <u>Termination other than Upon Disability or Death or for Cause</u>. In the event of termination of a Participant's Continuous Service (other than as a result of Participant's death, disability, or termination for Cause), the Participant shall have the right to exercise an Option at any time within three months following such termination (or such earlier date on which the Option expires) to the extent the Participant was entitled to exercise such Option at the date of such termination.

(ii) <u>Disability</u>. In the event of termination of a Participant's Continuous Service as a result of his or her being Disabled, the Participant shall have the right to exercise an Option at any time within six months following such termination (or such earlier date on which the Option expires) to the extent the Participant was entitled to exercise such Option at the date of such termination.

(iii) <u>Death</u>. In the event of the death of a Participant during the period of Continuous Service since the Grant Date of an Option, or within 12 months following termination of the Participant's Continuous Service, the Option may be exercised, at any time within 12 months following the date of the Participant's death (or such earlier date on which the Option expires), by the Participant's estate or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent the right to exercise the Option had vested at the date of death or, if earlier, the date the Participant's Continuous Service terminated.

(iv) <u>Cause</u>. If the Committee determines that a Participant's Continuous Service terminated due to Cause or that the Company had Cause to terminate the Participant's Continuous Service or would have had Cause if the Company had then known all of the relevant facts, the Participant shall forfeit the right to exercise any Option as of the time that the Committee determines that Cause first existed, and it shall be considered immediately null and void.

If there is a Securities and Exchange Commission blackout period that prohibits the buying or selling or Shares during any part of the ten (10) day period before the expiration of any Option based on the termination of a Participant's Continuous Service (as described above), the period for exercising the Options shall be extended until ten (10) days beyond when such blackout period ends. Notwithstanding any provision hereof or within an Award Agreement, no Option shall ever be exercisable after the expiration date of its original term as set forth in the Award Agreement.

**7. Share Appreciation Rights (SARs)**

(a) *Grants*. The Committee may in its discretion grant Share Appreciation Rights to any Eligible Person in any of the following forms:

(i) <u>SARs related to Options</u>. The Committee may grant SARs either concurrently with the grant of an Option or with respect to an outstanding Option, in which case the SAR shall extend to all or a portion of the Shares covered by the related Option. An SAR shall entitle the Participant who holds the related Option, upon exercise of the SAR and surrender of the related Option, or portion thereof, to the extent the SAR and related Option each were previously unexercised, to receive payment of an amount determined pursuant to Section 7(e) below. Any SAR granted in connection with an ISO will contain such terms as may be required to comply with the provisions of Section 422 of the Code and the regulations promulgated thereunder.

(ii) <u>SARs Independent of Options</u>. The Committee may grant SARs which are independent of any Option subject to such conditions as the Committee may in its discretion determine and set forth in the applicable Award Agreement.

(iii) <u>Limited SARs</u>. The Committee may grant SARs exercisable only upon or in respect of a Change in Control or any other specified event, and such limited SARs may relate to or operate in tandem or combination with or substitution for Options or other SARs, or on a stand-alone basis, and may be payable in cash or Shares based on the spread between the exercise price of the SAR, and (A) a price based upon or equal to the Fair Value of the Shares during a specified period, at a specified time within a specified period before, after or including the date of such event, or (B) a price related to consideration payable to Company's shareholders generally in connection with the event.

(b) *Exercise Price*. The per Share exercise price of an SAR shall be determined in the sole discretion of the

5

Committee, shall be set forth in the applicable Award Agreement, and shall be no less than the Fair Value of one Share. The exercise price of an SAR related to an Option shall be the same as the exercise price of the related Option.

(c) *Exercise of SARs*. An SAR may not have a term exceeding ten years from its Grant Date. Unless the Award Agreement otherwise provides, an SAR related to an Option will be exercisable at such time or times, and to the extent, that the related Option will be exercisable; provided that the Award Agreement shall not, without the approval of the shareholders of the Company, provide for a vesting period for the exercise of the SAR that is more favorable to the Participant than the exercise period for the related Option. An SAR granted independently of any other Award will be exercisable pursuant to the terms of the Award Agreement. Notwithstanding the preceding two sentences, SARs granted under this Plan after the Effective Date are subject to the minimum vesting provisions of Section 6(g).   Whether an SAR is related to an Option or is granted independently, the SAR may only be exercised when the Fair Value of the Shares underlying the SAR exceeds the exercise price of the SAR.

(d) *Effect on Available Shares*. All SARs that may be settled in Shares shall be counted in full against the number of Shares available for awards under the Plan, regardless of the number of Shares actually issued upon settlement of the SARs.

(e) *Payment*. Upon exercise of an SAR related to an Option and the attendant surrender of an exercisable portion of any related Award, the Participant will be entitled to receive payment of an amount determined by multiplying —

(i) the excess of the Fair Value of a Share on the date of exercise of the SAR over the exercise price per Share of the SAR, by

(ii) the number of Shares with respect to which the SAR has been exercised.

(iii) Notwithstanding the foregoing, an SAR granted independently of an Option (i) may limit the amount payable to the Participant to a percentage, specified in the Award Agreement but not exceeding one-hundred percent (100%), of the amount determined pursuant to the preceding sentence, and (ii) shall be subject to any payment or other restrictions that the Committee may at any time impose in its discretion, including restrictions intended to conform the SARs with Section 409A of the Code.

(f) *Form and Terms of Payment*. Unless otherwise provided in an Award Agreement, all SARs shall be settled in Shares as soon as practicable after exercise. Subject to Applicable Law, the Committee may, in its sole discretion, provide in an Award Agreement that the amount determined under Section 7(e) above shall be settled solely in cash, solely in Shares (valued at their Fair Value on the date of exercise of the SAR), or partly in cash and partly in Shares, with cash paid in lieu of fractional shares.

(g) *Termination of Employment or Consulting Relationship*. The Committee shall establish and set forth in the applicable Award Agreement the terms and conditions under which an SAR shall remain exercisable, if at all, following termination of a Participant's Continuous Service. The provisions of Section 6(h) above shall apply to the extent an Award Agreement does not specify the terms and conditions upon which an SAR shall terminate when there is a termination of a Participant's Continuous Service.

8. **Restricted Shares, Restricted Share Units and Unrestricted Shares**

(a) *Grants*. The Committee may in its sole discretion grant restricted shares ("**Restricted Shares**") to any Eligible Person and shall evidence such grant in an Award Agreement that is delivered to the Participant and that sets forth the number of Restricted Shares, the purchase price for such Restricted Shares (if any), and the terms upon which the Restricted Shares may become vested. In addition, the Company may in its discretion grant to any Eligible Person the right to receive Shares after certain vesting requirements are met ("**Restricted Share Units**"), and shall evidence such grant in an Award Agreement that is delivered to the Participant which sets forth the number of Shares (or formula, that may be based on future performance or conditions, for determining the number of Shares) that the Participant shall be entitled to receive upon vesting and the terms upon which the Shares subject to a Restricted Share Unit may become vested. The Committee may condition any Award of Restricted Shares or Restricted Share Units to a Participant on receiving from the Participant such further assurances and documents as the Committee may require to enforce the restrictions. In addition, the Committee may grant

Awards hereunder in the form of unrestricted shares or unrestricted share units ("**Unrestricted Shares**"), which shall vest in full upon the date of grant or such other date as the Committee may determine or which the Committee may issue pursuant to any program under which one or more Eligible Persons (selected by the Committee in its sole discretion) elect to pay for such Shares or to receive Unrestricted Shares in lieu of cash bonuses that would otherwise be paid.

(b) *Vesting and Forfeiture*. The Committee shall set forth in an Award Agreement granting Restricted Shares or Restricted Share Units, the terms and conditions under which the Participant's interest in the Restricted Shares or the Shares subject to Restricted Share Units will become vested and non-forfeitable. Except as set forth in the applicable Award Agreement or as the Committee otherwise determines, upon termination of a Participant's Continuous Service for any reason, the Participant shall forfeit his or her Restricted Shares and Restricted Share Units; provided that if a Participant purchases the Restricted Shares and forfeits them for any reason, the Company shall return the purchase price to the Participant only if and to the extent set forth in an Award Agreement.

(c) *Issuance of Restricted Shares Prior to Vesting*. The Company shall issue stock certificates that evidence Restricted Shares pending the lapse of applicable restrictions, and that bear a legend making appropriate reference to such restrictions. Except as set forth in the applicable Award Agreement or as the Committee otherwise determines, the Company or a third party that the Company designates shall hold such Restricted Shares and any dividends that accrue with respect to Restricted Shares pursuant to Section 8(e) below.

(d) *Issuance of Shares upon Vesting*. As soon as practicable after vesting of a Participant's Restricted Shares (or of the right to receive Shares underlying Restricted Share Units) and the Participant's satisfaction of applicable tax withholding requirements, the Company shall release to the Participant, free from the vesting restrictions, one Share for each vested Restricted Share (or issue one Share free of the vesting restriction for each vested Restricted Share Unit), unless an Award Agreement provides otherwise. No fractional shares shall be distributed, and cash shall be paid in lieu thereof.

(e) *Dividends Payable on Vesting*. Whenever Shares are released to a Participant or duly-authorized transferee pursuant to Section 8(d) above as a result of the vesting of Restricted Shares or the Shares underlying Restricted Share Units are issued to a Participant pursuant to Section 8(d) above, such Participant or duly authorized transferee shall also be entitled to receive (unless otherwise provided in the Award Agreement), with respect to each Share released or issued a number of Shares equal to the sum of (i) any stock dividends, which were declared and paid to the holders of Shares between the Grant Date and the date such Share is released from the vesting restrictions in the case of Restricted Shares or issued in the case of Restricted Share Units, and (ii) a number of Shares equal to the Shares that the Participant could have purchased at Fair Value on the payment date of any cash dividends for Shares if the Participant had received such cash dividends with respect to each Restricted Share or Share subject to a Restricted Share Unit Award between its Grant Date and its settlement date. For the avoidance of doubt, no amount shall be paid with respect to dividends for Restricted Shares or Shares underlying Restricted Share Units that are subject to performance-based vesting except to the extent that the applicable performance goals are satisfied.

(f) *Section 83(b) Elections*. A Participant may make an election under Section 83(b) of the Code (the "**Section 83(b) Election**") with respect to Restricted Shares. If a Participant who has received Restricted Share Units promptly provides the Committee with written notice of his or her intention to make a Section 83(b) Election with respect to the Shares subject to such Restricted Share Units, the Committee may in its discretion convert the Participant's Restricted Share Units into Restricted Shares, on a one-for-one basis, in full satisfaction of the Participant's Restricted Share Unit Award. The Participant may then make a Section 83(b) Election with respect to those Restricted Shares.

9. **Taxes**

(a) *General*. As a condition to the issuance or distribution of Shares pursuant to the Plan, the Participant (or in the case of the Participant's death, the person who succeeds to the Participant's rights) shall make such arrangements as the Company may require for the satisfaction of any applicable federal, state, local or foreign withholding tax obligations that may arise in connection with the Award and the issuance of Shares. The Company shall not be required to issue any Shares until such obligations are satisfied, and may unilaterally

withhold Shares for this purpose. If the Committee allows or effectuates the withholding or surrender of Shares to satisfy a Participant's tax withholding obligations, the Committee shall not allow Shares to be withheld in an amount that exceeds the minimum statutory withholding rates for federal and state tax purposes, including payroll taxes.

(b) *Default Rule for Employees*. In the absence of any other arrangement authorized by the Committee or set forth in the Award Agreement, and to the extent permitted under Applicable Law, each Participant shall be deemed to have elected to have the Company withhold from the Shares or cash to be issued pursuant to an Award that number of Shares having a Fair Value determined as of the applicable Tax Date (as defined below) or cash equal to the minimum applicable tax withholding and employment tax obligations associated with an Award. If such withholding of Shares is not permitted for any reason, the Company shall satisfy any required withholding through withholding from cash compensation otherwise payable to the Participant. For purposes of this Section 9, the Fair Value of the Shares to be withheld shall be determined on the date that the amount of tax to be withheld is to be determined under the Applicable Law (the "**Tax Date**").

(c) *Surrender of Shares*. If permitted by the Committee, in its discretion, a Participant may satisfy the minimum applicable tax withholding and employment tax obligations associated with an Award by surrendering Shares to the Company (including Shares that would otherwise be issued pursuant to the Award) that have a Fair Value determined as of the applicable Tax Date equal to the amount required to be withheld. In the case of Shares previously acquired from the Company that are surrendered under this Section 9, such Shares must have been owned by the Participant for more than six months on the date of surrender (or such longer period of time the Company may in its discretion require).

(d) *Income Taxes and Deferred Compensation*. Participants are solely responsible and liable for the satisfaction of all taxes and penalties that may arise in connection with Awards (including any taxes arising under Section 409A of the Code), and the Company shall not have any obligation to indemnify or otherwise hold any Participant harmless from any or all of such taxes. The Committee shall have the discretion to organize any deferral program, to require deferral election forms, and to grant or to unilaterally modify any Award in a manner that (i) conforms with the requirements of Section 409A of the Code, (ii) that voids any Participant election to the extent it would violate Section 409A of the Code, and (iii) for any distribution election that would violate Section 409A of the Code, to make distributions pursuant to the Award at the earliest to occur of a distribution event that is allowable under Section 409A of the Code or any distribution event that is both allowable under Section 409A of the Code and is elected by the Participant, subject to any valid second election to defer, provided that the Committee permits second elections to defer in accordance with Section 409A(a)(4)(C). The Committee shall have the sole discretion to interpret the requirements of the Code, including Section 409A, for purposes of the Plan and all Awards.

## 10. **Performance Criteria**

(a) *General*. The Committee may establish performance criteria and level of achievement versus such criteria that shall determine the number of Awards to be granted, retained, vested, issued or issuable under or in settlement of or the amount payable pursuant to an Award, which criteria may be based on Qualifying Performance Criteria or other standards of financial performance and/or personal performance evaluations. In addition, the Committee may specify that an Award or a portion of an Award is intended to satisfy the requirements for "performance-based compensation" under Section 162(m) of the Code, provided that the performance criteria for such Award or portion of an Award that is intended by the Committee to satisfy the requirements for "performance-based compensation" under Section 162(m) of the Code shall be a measure based on one or more Qualifying Performance Criteria selected by the Committee and specified at the time the Award is granted. The Committee shall (other than in the case of an Option or SAR) certify the extent to which any Qualifying Performance Criteria has been satisfied, and the amount payable as a result thereof, prior to payment, settlement or vesting of any Award that is intended to satisfy the requirements for "performance-based compensation" under Section 162(m) of the Code. Notwithstanding satisfaction of any performance goals, the number of Shares issued under or the amount paid under an Award may, to the extent specified in the Award Agreement, be reduced by the Committee on the basis of such further considerations as the Committee in its sole discretion shall determine.

(b) *Qualifying Performance Criteria.* For purposes of this Plan, the term "Qualifying Performance Criteria"

shall mean any one or more of the following performance criteria, either individually, alternatively or in any combination, applied to either the Company as a whole or to a business unit or subsidiary, either individually, alternatively or in any combination, and measured either annually or cumulatively over a period of years, on an absolute basis or relative to a pre-established target, to previous years' results or to a designated comparison group, in each case as specified by the Committee: (i) cash flow including either operating cash flow, cash flow from operations or free cash flow (before or after dividends), (ii) net income, earnings per share or net income growth or earnings per share growth, (iii) earnings before interest, taxes, depreciation and amortization (EBITDA) or earnings or EBITDA margin percentage, (iv) stock price on an absolute or relative basis, (v) return on equity, (vi) total stockholder return, (vii) return on capital or investment (including return on total capital, return on invested capital, or return on investment), (viii) return on assets or net assets, (ix) market capitalization, (x) economic value added, (xi) debt leverage (debt to capital) or reduction in debt leverage, (xii) revenue, (xiii) operating income, (xiv) operating profit or net operating profit, (xv) operating profit margin or net profit margin, (xvi) return on operating revenue, (xvii) cash from operations, (xviii) operating ratio, (xix) operating revenue of (xx) operating revenue growth. The terms of the Award may specify the manner, if any, in which performance targets (or the applicable measure of performance) shall be adjusted: to mitigate the unbudgeted impact of material, unusual or nonrecurring gains and losses; to exclude restructuring and/or other nonrecurring charges; to exclude the effects of financing activities; to exclude exchange rate effects; to exclude the effects of changes to accounting principles; to exclude the effects of any statutory adjustments to corporate tax rates; to exclude the effects of any items of an unusual nature or of infrequency of occurrence; to exclude the effects of acquisitions or joint ventures; to exclude the effects of discontinued operations; to assume that any business divested achieved performance objectives at targeted levels during the balance of a performance period following such divestiture or to exclude the effects of any divestiture; to exclude the effect of any event or transaction referenced in Section 12; to exclude the effects of stock-based compensation; to exclude the award of bonuses; to exclude amortization of acquired intangible assets; to exclude the goodwill and intangible asset impairment charges; to exclude the effect of any other unusual, non-recurring gain or loss, non-operating item or other extraordinary item; to exclude the costs associated with any of the foregoing or any potential transaction that if consummated would constitute any of the foregoing; or to exclude other items specified by the Administrator at the time of establishing the targets.

## 11. **Non-Transferability of Awards**

(a) *General*. Except as set forth in this Section 11, or as otherwise approved by the Committee, Awards may not be sold, pledged, assigned, hypothecated, transferred or disposed of in any manner other than by will or by the laws of descent or distribution. The designation of a beneficiary by a Participant will not constitute a transfer. An Award may be exercised, during the lifetime of the holder of an Award, only by such holder, the duly-authorized legal representative of a Participant who is Disabled, or a transferee permitted by this Section 11.

(b) *Limited Transferability Rights*. Notwithstanding anything else in this Section 11, the Committee may in its discretion provide in an Award Agreement that an Award in the form of a Non-ISO, or Restricted Shares may be transferred, on such terms and conditions as the Committee deems appropriate, either (i) by instrument to the Participant's "Immediate Family" (as defined below), or (ii) by instrument to an inter vivos or testamentary trust (or other entity) in which the Award is to be passed to the Participant's designated beneficiaries. Any transferee of the Participant's rights shall succeed and be subject to all of the terms of the applicable Award Agreement and the Plan. "**Immediate Family**" means any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, and shall include adoptive relationships.

## 12. **Adjustments Upon Changes in Capitalization, Merger or Certain Other Transactions**

(a) *Changes in Capitalization*. The Committee shall equitably adjust the number of Shares covered by each outstanding Award, and the number of Shares that have been authorized for issuance under the Plan but as to which no Awards have yet been granted or that have been returned to the Plan upon cancellation, forfeiture, or expiration of an Award, the Share limit of Section 5(c), as well as the price per Share covered by each such outstanding Award, to reflect any increase or decrease in the number of issued Shares resulting from a stock-split, reverse stock-split, stock dividend, combination, recapitalization or reclassification of the Shares, or any other increase or decrease in the number of issued Shares effected without receipt of consideration by the Company. In the event of any such transaction or event, the Committee may provide in substitution for any or all outstanding

Awards under the Plan such alternative consideration (including securities of any surviving entity) as it may in good faith determine to be equitable under the circumstances and may require in connection therewith the surrender of all Awards so replaced. In any case, such substitution of securities shall not require the consent of any person who is granted Awards pursuant to the Plan. Except as expressly provided herein, or in an Award Agreement, if the Company issues for consideration shares of stock of any class or securities convertible into shares of stock of any class, the issuance shall not affect, and no adjustment by reason thereof shall be required to be made with respect to the number or price of Shares subject to any Award.

(b) *Change in Control*.

(i)     Upon any Change in Control event in which the Company does not survive, or does not survive as a public company in respect of its common stock, or upon a dissolution or liquidation of the Company, then the Committee may make provision for the assumption, substitution or exchange of any or all outstanding Awards or the cash, securities or property deliverable to the holder of any or all outstanding Awards, based upon, to the extent relevant under the circumstances, the distribution or consideration payable to holders of the Company's common stock upon or in respect of such event.   In addition, upon the occurrence of any event described in the preceding sentence in connection with which the outstanding Awards are not to be substituted for, assumed, exchanged or otherwise continued: (1) unless otherwise provided in the applicable Award Agreement, each then-outstanding Option and SAR with time- and/or service-based vesting requirements shall become fully vested as to such requirements, all Restricted Shares and Restricted Share Units then outstanding with time- and/or service-based vesting requirements shall become fully vested as to such requirements, and each then-outstanding Option, SAR, Restricted Share and Restricted Share Unit award with performance-based vesting requirements shall become vested as to such requirements assuming the higher of (i) achievement of all relevant performance goals at the "target" level or (ii) actual achievement as of the date of such event; and (2) each Award shall terminate upon the related event; provided that the holder of an Option or SAR shall, unless provision has been made for a cash payment in settlement of such Awards as provided in the next sentence, be given reasonable advance notice of the impending termination and a reasonable opportunity to exercise his or her outstanding vested Options and SARs (after giving effect to any accelerated vesting required in the circumstances) in accordance with their terms before the termination of such Awards (except that in no case shall more than ten days' notice of the impending termination be required and any acceleration of vesting and any exercise of any portion of an Award that is so accelerated may be made contingent upon the actual occurrence of the event).   The Committee may make provision for a cash payment in settlement of any Awards that are to be terminated in connection with any such event.

(ii)     For purposes of this Section 12(b), an Award shall be deemed to have been "assumed" if (without limiting other circumstances in which an Award is assumed) the Award continues after an event referred to above in this Section 12(b), and/or is assumed and continued by the surviving entity following such event (including, without limitation, an entity that, as a result of such event, owns the Company or all or substantially all of the Company's assets directly or through one or more subsidiaries (a "**Parent**")), and confers the right to purchase or receive, as applicable and subject to vesting and the other terms and conditions of the Award, for each Share subject to the Award immediately prior to the event, the consideration (whether cash, shares, or other securities or property) received in the event by the stockholders of the Company for each Share sold or exchanged in such event (or the consideration received by a majority of the stockholders participating in such event if the stockholders were offered a choice of consideration); provided, however, that if the consideration offered for a Share in the event is not solely the ordinary common stock of a successor corporation or a Parent, the Committee may provide for the consideration to be received upon exercise or payment of the Award, for each Share subject to the Award, to be solely ordinary common stock of the successor corporation or a Parent equal in fair market value to the per share consideration received by the stockholders participating in the event.

(iii)     The Committee may adopt such valuation methodologies for outstanding Awards as it deems reasonable in the event of a cash or property settlement and, in the case of Options, SARs or similar rights, but without limitation on other methodologies, may base such settlement solely upon the excess if any of the per share amount payable upon or in respect of such event over the exercise or base price of the Award.   In the case of an Option, SAR or similar right as to which the per share amount payable upon or in respect of such event is less than or equal to the exercise or base price of the Award, the Committee may terminate such

10

Award in connection with an event referred to in this Section 12(b) without any payment in respect of such Award.

(iv) In any of the events referred to in this Section 12(b), the Committee may take such action contemplated by this Section 12(b) prior to such event (as opposed to on the occurrence of such event) to the extent that the Committee deems the action necessary to permit the participant to realize the benefits intended to be conveyed with respect to the underlying shares. Without limiting the generality of the foregoing, the Committee may deem an acceleration and/or termination to occur immediately prior to the applicable event and, in such circumstances, will reinstate the original terms of the Award if an event giving rise to an acceleration and/or termination does not occur. The foregoing provisions of this Section 12(b) shall apply to Awards granted on or after the Effective Date, and the prior version of Section 12 of the Plan (as in effect immediately prior to the Effective Date) shall apply to Awards granted under the Plan prior to the Effective Date.

(c) *Certain Distributions*. In the event of any distribution to the Company's shareholders of securities of any other entity or other assets (other than dividends payable in cash or stock of the Company) without receipt of consideration by the Company, the Committee may, in its discretion, appropriately adjust the price per Share covered by each outstanding Award to reflect the effect of such distribution.

## 13. Time of Granting Awards.

The date of grant ("**Grant Date**") of an Award shall be the date on which the Committee makes the determination granting such Award or such other date as is determined by the Committee, provided that in the case of an ISO, the Grant Date shall be the later of the date on which the Committee makes the determination granting such ISO or the date of commencement of the Participant's employment relationship with the Company.

## 14. Modification of Awards and Substitution of Options.

(a) *Modification, Extension, and Renewal of Awards*. Within the limitations of the Plan, the Committee may modify an Award to accelerate the rate at which an Option or SAR may be exercised (including without limitation permitting an Option or SAR to be exercised in full without regard to the installment or vesting provisions of the applicable Award Agreement or whether the Option or SAR is at the time exercisable, to the extent it has not previously been exercised), to accelerate the vesting of any Award, to extend or renew outstanding Awards or to accept the cancellation of outstanding Awards to the extent not previously exercised. However, the Committee may not cancel an outstanding Option whose exercise price is greater than Fair Value at the time of cancellation for the purpose of reissuing the Option to the Participant at a lower exercise price or granting a replacement award of a different type. Notwithstanding the foregoing provision, no modification of an outstanding Award shall materially and adversely affect such Participant's rights thereunder (with such an affect being presumed to arise from a modification that would trigger a violation of Section 409A of the Code), unless either (i) the Participant provides written consent, or (ii) before a Change in Control, the Committee determines in good faith that the modification is not materially adverse to the Participant. Nothing in this Section shall prohibit the Committee from taking any action authorized pursuant to Section 12. Furthermore, neither the Company nor the Committee shall, without shareholder approval, allow for a "repricing" within the meaning of federal securities laws applicable to proxy statement disclosures.

(b) *Substitution of Options*. Notwithstanding any inconsistent provisions or limits under the Plan, in the event the Company or an Affiliate acquires (whether by purchase, merger or otherwise) all or substantially all outstanding capital stock or assets of another corporation or in the event of any reorganization or other transaction qualifying under Section 424 of the Code, the Committee may, in accordance with the provisions of that Section, substitute Options for options under the plan of the acquired company provided (i) the excess of the aggregate fair value of the shares subject to an option immediately after the substitution over the aggregate option price of such shares is not more than the similar excess immediately before such substitution, and (ii) the new option does not give persons additional benefits, including any extension of the exercise period.

## 15. Term of Plan.

The authority to grant new Awards under the Plan shall continue in effect until, and shall expire on, the day immediately preceding the tenth annual anniversary of the Effective Date, unless the Plan is sooner terminated

under Section 16 below.

16. **Amendment and Termination of the Plan.**

(a) *Authority to Amend or Terminate*. Subject to Applicable Laws, the Board may from time to time amend, alter, suspend, discontinue, or terminate the Plan.

(b) *Effect of Amendment or Termination*. No amendment, suspension, or termination of the Plan shall materially and adversely affect Awards already granted (with such an affect being presumed to arise from a modification that would trigger a violation of Section 409A of the Code) unless either it relates to an adjustment pursuant to Section 12 or modification pursuant to Section 14(a) above, or it is otherwise mutually agreed between the Participant and the Committee, which agreement must be in writing and signed by the Participant and the Company. Notwithstanding the foregoing, the Committee may amend the Plan to eliminate provisions which are no longer necessary as a result of changes in tax or securities laws or regulations, or in the interpretation thereof.

17. **Conditions Upon Issuance of Shares.**

Notwithstanding any other provision of the Plan or any agreement entered into by the Company pursuant to the Plan, the Company shall not be obligated, and shall have no liability for failure, to issue or deliver any Shares under the Plan unless such issuance or delivery would comply with Applicable Law, with such compliance determined by the Company in consultation with its legal counsel.

18. **Reservation of Shares.**

The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

19. **Effective Date.**

This amended and restated version of the Plan shall become effective on the date which it has received approval by a vote of a majority of the votes cast at a duly held meeting of the Company's shareholders (or by such other shareholder vote that the Committee determines to be sufficient for the issuance of Shares or stock options according to the Company's governing documents and applicable state law), which shall occur no later than 12 months after the Effective Date.

20. **Controlling Law.**

All disputes relating to or arising from the Plan shall be governed by the internal substantive laws (and not the laws of conflicts of laws) of the State of Colorado, to the extent not preempted by United States federal law. If any provision of this Plan is held by a court of competent jurisdiction to be invalid and unenforceable, the remaining provisions shall continue to be fully effective.

21. **Laws And Regulations.**

(a) *U.S. Securities Laws*. This Plan, the grant of Awards, and the exercise of Options and SARs under this Plan, and the obligation of the Company to sell or deliver any of its securities (including, without limitation, Options, Restricted Shares, Restricted Share Units, Unrestricted Shares and Shares) under this Plan shall be subject to all Applicable Law. In the event that the Shares are not registered under the Securities Act of 1933, as amended (the "**Act**"), or any applicable state securities laws prior to the delivery of such Shares, the Company may require, as a condition to the issuance thereof, that the persons to whom Shares are to be issued represent and warrant in writing to the Company that such Shares are being acquired by him or her for investment for his or her own account and not with a view to, for resale in connection with, or with an intent of participating directly or indirectly in, any distribution of such Shares within the meaning of the Act, and a legend to that effect may be placed on the certificates representing the Shares.

(b) *Other Jurisdictions*. To facilitate the making of any grant of an Award under this Plan, the Committee may provide for such special terms for Awards to Participants who are foreign nationals or who are employed by the Company or any Affiliate outside of the United States of America as the Committee may consider necessary or appropriate to accommodate differences in local law, tax policy or custom. The Company may adopt rules and

procedures relating to the operation and administration of this Plan to accommodate the specific requirements of local laws and procedures of particular countries. Without limiting the foregoing, the Company is specifically authorized to adopt rules and procedures regarding the conversion of local currency, taxes, withholding procedures and handling of stock certificates which vary with the customs and requirements of particular countries. The Company may adopt sub-plans and establish escrow accounts and trusts as may be appropriate or applicable to particular locations and countries.

22. **No Shareholder Rights.**

Neither a Participant nor any transferee of a Participant shall have any rights as a shareholder of the Company with respect to any Shares underlying any Award until the date of issuance of a share certificate to a Participant or a transferee of a Participant for such Shares in accordance with the Company's governing instruments and Applicable Law. Prior to the issuance of Shares pursuant to an Award, a Participant shall not have the right to vote or to receive dividends or any other rights as a shareholder with respect to the Shares underlying the Award, notwithstanding its exercise in the case of Options and SARs. No adjustment will be made for a dividend or other right that is determined based on a record date prior to the date the stock certificate is issued, except as otherwise specifically provided for in this Plan.

23. **No Employment Rights.**

The Plan shall not confer upon any Participant any right to continue an employment, service or consulting relationship with the Company, nor shall it affect in any way a Participant's right or the Company's right to terminate the Participant's employment, service, or consulting relationship at any time, with or without Cause. By accepting any Award under this Plan a Participant confirms his or her at-will status (except as otherwise provided in a written employment agreement signed by an officer of the Company) and that such relationship only can be changed by a written agreement signed by an officer of the Company.

24. **Termination, Rescission and Recapture of Awards.**

(a) Each Award under the Plan is intended to align the Participant's long-term interest with those of the Company. If the Participant engages in certain activities discussed below, either during employment or any other service relationship or after employment or such service relationship with the Company terminates for any reason, the Participant is acting contrary to the long-term interests of the Company. Accordingly, to the extent not prohibited by Applicable Law, the Company may terminate any outstanding, unexercised, unexpired, unpaid, or deferred Awards ("**Termination**"), rescind any exercise, payment or delivery pursuant to the Award ("**Rescission**"), or recapture any Common Stock (whether restricted or unrestricted) or proceeds from the Participant's sale of Shares issued pursuant to the Award ("**Recapture**"), if the Participant does not comply with the conditions of subsections (b), (c), and (d) hereof (collectively, the "**Conditions**").

(b) Each Participant acknowledges that by virtue of his or her employment or other service relationship with the Company, he or she will be granted otherwise prohibited access to confidential information and proprietary data including but not limited to such information described in those or other similar terms in any applicable patent, confidentiality, inventions, secrecy, or other agreement between the Participant and the Company, which are not known, and not readily accessible to the Company's competitors. This information (the "**Confidential Information**") includes, but is not limited to, current and prospective customers; the identity of key contacts at such customers; customers' particularized preferences and needs; marketing strategies and plans; financial data; personnel data; compensation data; proprietary procedures and processes; and other unique and specialized practices, programs and plans of the Company and its customers and prospective customers. Each Participant recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a significant period of time and at substantial expense. Accordingly, each Participant, by accepting any Award under this Plan, agrees that he or she shall not, at any time during or after his or her employment or other service relationship with the Company, divulge such Confidential Information or make use of it for his or her own purposes or the purposes of any person or entity other than the Company.

(c) Pursuant to any agreement between the Participant and the Company with regard to intellectual property (including but not limited to patents, trademarks, copyrights, trade secrets, inventions, developments, improvements, proprietary information, confidential business and personnel information), a Participant shall

promptly disclose and assign to the Company or its designee all right, title, and interest in such intellectual property, and shall take all reasonable steps necessary to enable the Company to secure all right, title and interest in such intellectual property in the United States and in any foreign country.

(d) By virtue of his or her relationship with the Company, each Participant will be introduced to and involved in the solicitation and servicing of existing customers of the Company and new customers obtained by the Company and agrees that all efforts expended in soliciting and servicing such customers shall be for the permanent benefit of the Company. During each Participant's employment or other service relationship with the Company he or she will not engage in any conduct which could in any way jeopardize or disturb any of the Company's customer relationships. Each Participant agrees that, to the extent not prohibited by Applicable Law, for a period beginning on the date of grant of each Award and ending (i) 1 year after termination of Continuous Service, regardless of the reason for such termination, he or she shall not, directly or indirectly, without the prior written consent of the Chairman of the Company, market, offer, sell or otherwise furnish any products or services similar to, or otherwise competitive with, those offered by the Company to any customer of the Company; and (ii) 2 years after termination of Continuous Service, regardless of the reason for such termination, he or she shall not, directly or indirectly, solicit, offer employment to, hire or otherwise retain the services of any employee or other service provider of the Company.

(e) Upon exercise, payment, or delivery of cash or Common Stock pursuant to an Award, the Participant shall certify on a form acceptable to the Company that he or she is in compliance with the terms and conditions of the Plan and, if a severance of Continuous Service has occurred for any reason, shall state the name and address of the Participant's then-current employer or any entity for which the Participant performs business services and the Participant's title, and shall identify any organization or business in which the Participant owns a greater-than-five-percent equity interest.

(f) If the Company determines, in its sole and absolute discretion, that (i) a Participant has violated any of the Conditions, or (ii) during his or her Continuous Service has rendered services to or otherwise directly or indirectly engaged in or assisted, any organization or business that, in the judgment of the Company in its sole and absolute discretion, is or is working to become competitive with the Company; or (iii) during his or her Continuous Service, or within one year after its termination for any reason, a Participant (a) has solicited any non-administrative employee of the Company to terminate employment with the Company; or (b) has engaged in activities which are materially prejudicial to or in conflict with the interests of the Company, including any breaches of fiduciary duty or the duty of loyalty, or taken any action or inaction that resulted in a restatement to the Company's audited financial statements, then, except to the extent prohibited by Applicable Law, the Company may, in its sole and absolute discretion, impose a Termination, Rescission or Recapture with respect to any or all of the Participant's relevant Awards, Shares, and the proceeds thereof.

(g) Within ten days after receiving notice from the Company of any such activity described in Section 24(f) above, the Participant shall deliver to the Company the Shares acquired pursuant to the Award, or, if Participant has sold the Shares, the gain realized, or payment received as a result of the rescinded exercise, payment, or delivery; provided, that if the Participant returns Shares that the Participant purchased pursuant to the exercise of an Option (or the gains realized from the sale of such Common Stock), the Company shall promptly refund the exercise price, without earnings, that the Participant paid for the Shares. Any payment by the Participant to the Company pursuant to this Section 24 shall be made either in cash or by returning to the Company the number of Shares that the Participant received in connection with the rescinded exercise, payment, or delivery. It shall not be a basis for Termination, Rescission or Recapture if after termination of a Participant's Continuous Service, the Participant purchases, as an investment or otherwise, stock or other securities of such an organization or business, so long as (i) such stock or other securities are listed upon a recognized securities exchange or traded over-the-counter, and (ii) such investment does not represent more than a five percent equity interest in the organization or business.

(h) Notwithstanding the foregoing provisions of this Section, the Company has sole and absolute discretion not to require Termination, Rescission or Recapture, and its determination not to require Termination, Rescission or Recapture with respect to any particular act by a particular Participant or Award shall not in any way reduce or eliminate the Company's authority to require Termination, Rescission or Recapture with respect to any other act or Participant or Award. Nothing in this Section shall be construed to impose obligations on the Participant to

14

refrain from engaging in lawful competition with the Company after the termination of employment that does not violate subsections (b), (c), or (d) of this Section, other than any obligations that are part of any separate agreement between the Company and the Participant or that arise under Applicable Law.

(i) All administrative and discretionary authority given to the Company under this Section shall be exercised by the most senior human resources executive of the Company or such other person or committee (including without limitation the Committee) as the Committee may designate from time to time.

(j) Notwithstanding any provision of this Section, if any provision of this Section is determined to be unenforceable or invalid under any Applicable Law, such provision will be applied to the maximum extent permitted by Applicable Law, and shall automatically be deemed amended in a manner consistent with its objectives to the extent necessary to conform to any limitations required under Applicable Law. Furthermore, if any provision of this Section is illegal under any Applicable Law, such provision shall be null and void to the extent necessary to comply with Applicable Law.

(k)  Without limiting the preceding provisions of this Section 24, the Awards granted under the Plan are also subject to the terms of any Company recoupment, clawback or similar policy as it may be in effect from time to time, as well as any similar provisions of applicable law, any of which could in certain circumstances require repayment or forfeiture of awards or any Shares or other cash or property received with respect to the Awards (including any value received from a disposition of the Shares acquired upon payment of the Awards)

## Appendix A: Definitions

As used in the Plan, the following definitions shall apply:

"**Affiliate**" means, with respect to any Person (as defined below), any other Person that directly or indirectly controls or is controlled by or under common control with such Person. For the purposes of this definition, "**control**," when used with respect to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person or the power to elect directors, whether through the ownership of voting securities, by contract or otherwise; and the terms "**Affiliated**," "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Applicable Law**" means the legal requirements relating to the administration of options and share-based plans under applicable U.S. federal and state laws, the Code, and any applicable stock exchange or automated quotation system rules or regulations (to the extent the Committee determines in its discretion that compliance with such rules or regulations is desirable) and the applicable laws of any other country or jurisdiction where Awards are granted or that apply to the Company's or a Participant's rights and obligations under this Plan or any Award Agreement, as such laws, rules, regulations and requirements shall be in place from time to time.

"**Award**" means any award made pursuant to the Plan, including awards made in the form of an Option, an SAR, a Restricted Share, a Restricted Share Unit, an Unrestricted Share, or any combination thereof, whether alternative or cumulative, authorized by and granted under this Plan.

"**Award Agreement**" means any written document setting forth the terms of an Award that has been authorized by the Committee. The Committee shall determine the form or forms of documents to be used, and may change them from time to time for any reason.

"**Board**" means the Board of Directors of the Company.

"**Cause**" for termination of a Participant's Continuous Service will have the meaning set forth in any unexpired employment agreement between the Company and the Participant. In the absence of such an agreement and unless otherwise provided by the Committee, "Cause" will exist if the Participant is terminated from employment or other service with the Company or an Affiliate for any of the following reasons: (i) the Participant's willful failure to substantially perform his or her duties and responsibilities to the Company or deliberate violation of a material Company policy; (ii) the Participant's commission of any material act or acts of fraud, embezzlement, dishonesty, or other willful misconduct; (iii) the Participant's material unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other party to whom the Participant owes an obligation of nondisclosure as a result of his or her relationship with the Company; (iv) Participant's willful and material breach of any of his or her obligations under any written agreement or covenant with the Company or any of its Affiliates; (v) the Participant's conviction of, or plea of nolo contendere to a crime involving fraud, theft, or moral turpitude or any felony; or (vi) the Participant's misconduct, significant failure to perform the Participant's duties or engagement in any activity that constitutes a conflict of interest with the Company or its Affiliates.

The Committee shall in its discretion determine whether or not a Participant is being terminated for Cause. The Committee's determination shall, unless arbitrary and capricious, be final and binding on the Participant, the Company, and all other affected persons. The foregoing definition does not in any way limit the Company's ability to terminate a Participant's employment or consulting relationship at any time, and the term "**Company**" will be interpreted herein to include any Affiliate or successor thereto, if appropriate.

"**Change in Control**" means any of the following:

(i) *Acquisition of Controlling Interest*. Any Person (**other than Persons who are Employees at any time more than one year before a transaction**) becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing **50%** or more of the combined voting power of the Company's then outstanding securities. In applying the preceding sentence, (i) securities acquired directly from the Company or its Affiliates by or for the Person shall not be taken into account, and (ii) an agreement to vote securities shall be

disregarded unless its ultimate purpose is to cause what would otherwise be Change in Control, as reasonably determined by the Board.

(ii) *Merger*. The Company consummates a merger, or consolidation of the Company with any other corporation unless: (a) the voting securities of the Company outstanding immediately before the merger or consolidation would continue to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least *50%* of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; and (b) no Person *(other than Persons who are Employees at any time more than one year before a transaction)* becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing *50%* or more of the combined voting power of the Company's then outstanding securities.

(iii) *Sale of Assets*. The sale or disposition by the Company of all, or substantially all, of the Company's assets.

(iv) *Liquidation or Dissolution*. The liquidation or dissolution of the Company.

Notwithstanding the foregoing, a "Change in Control" shall not be deemed to have occurred by virtue of the consummation of any transaction or series of integrated transactions immediately following which the record holders of the common stock of the Company immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in an entity which owns all or substantially all of the assets of the Company immediately following such transaction or series of transactions.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Committee**" means one or more committees or subcommittees of the Board appointed by the Board to administer the Plan in accordance with Section 4 above. With respect to any decision involving an Award made at a time when the Company is publicly traded and that is intended to satisfy the requirements of Section 162(m) of the Code, the Committee shall consist of two or more Directors of the Company who, in the judgment of the Board, are "outside directors" within the meaning of Section 162(m) of the Code. With respect to any decision relating to a Reporting Person made at a time when the Company is publicly traded, the Committee shall consist of two or more Directors who, in the judgment of the Board, are disinterested within the meaning of Rule 16b-3.

"**Company**" means DigitalGlobe, Inc., a Delaware corporation; provided, however, that in the event the Company reincorporates to another jurisdiction, all references to the term "Company" shall refer to the Company in such new jurisdiction.

"**Consultant**" means any person, including an advisor, who is engaged by the Company or any Affiliate to render services and is compensated for such services.

"**Continuous Service**" means the absence of any interruption or termination of service as an Employee, Director, or Consultant. Continuous Service shall not be considered interrupted in the case of: (i) sick leave; (ii) military leave; (iii) any other leave of absence approved by the Committee, provided that such leave is for a period of not more than 90 days, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to Company policy adopted from time to time; or (iv) in the case of transfers between locations of the Company or between the Company, its Affiliates or their respective successors. Changes in status between service as an Employee, Director, and a Consultant will constitute an interruption of Continuous Service if the Committee determines that the individual has not continued or will not continue to perform *bona fide* services for the Company or determines that the relationship will or may result in adverse accounting consequences.

"**Director**" means a member of the Board, or a member of the board of directors of an Affiliate.

"**Disabled**" means that a Participant is contemporaneously receiving full disability benefits under a long-term disability plan maintained by the Company (but, if a Participant is awarded disability benefits as the result of such a disability plan's formal claims procedure process, prior to denial at the final level of administrative appeal, he or she shall be deemed to have contemporaneously received such benefits with respect to the period for which they were awarded). If a Participant is denied such benefits at the final level of appeal, or does not timely pursue his or her disability plan administrative remedies through the final level of appeal, he or she shall not be considered to be Disabled for purposes of the Plan.

A-2

"**Eligible Person**" means any Consultant, Director or Employee and includes non-Employees to whom an offer of employment has been or is being extended.

"**Employee**" means any person whom the Company or any Affiliate classifies as an employee (including an officer) for employment tax purposes, whether or not that classification is correct. The payment by the Company of a director's fee to a Director shall not be sufficient to constitute "employment" of such Director by the Company.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Fair Value**" means, as of any date (the "**Determination Date**") means: (i) the closing price of a Share on the New York Stock Exchange or the American Stock Exchange (collectively, the "**Exchange**"), on the Determination Date, or, if shares were not traded on the Determination Date, then on the nearest preceding trading day during which a sale occurred; or (ii) if such stock is not traded on the Exchange but is quoted on Nasdaq or a successor quotation system, (A) the last sales price (if the stock is then listed as a National Market Issue under The Nasdaq National Market System) or (B) the mean between the closing representative bid and asked prices (in all other cases) for the stock on the Determination Date as reported by Nasdaq or such successor quotation system; or (iii) if such stock is not traded on the Exchange or quoted on Nasdaq but is otherwise traded in the over-the-counter, the mean between the representative bid and asked prices on the Determination Date; or (iv) if subsections (i)-(iii) do not apply, the fair value established in good faith by the Board or the Committee.

"**Grant Date**" has the meaning set forth in Section 13 of the Plan.

"**Incentive Share Option or ISO**" means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code, as designated in the applicable Award Agreement.

"**Non-ISO**" means an Option not intended to qualify as an ISO, as designated in the applicable Award Agreement.

"**Option**" means any stock option granted pursuant to Section 6 of the Plan.

"**Participant**" means any holder of one or more Awards, or the Shares issuable or issued upon exercise of such Awards, under the Plan.

"**Person**" means any natural person, association, trust, business trust, cooperative, corporation, general partnership, joint venture, joint-stock company, limited partnership, limited liability company, real estate investment trust, regulatory body, governmental agency or instrumentality, unincorporated organization or organizational entity.

"**Plan**" means this DigitalGlobe, Inc. 2007 Employee Stock Option Plan, as amended and restated effective, February 17, 2016.

"**Reporting Person**" means an officer, Director, or greater than ten percent shareholder of the Company within the meaning of Rule 16a-2 under the Exchange Act, who is required to file reports pursuant to Rule 16a-3 under the Exchange Act.

"**Restricted Shares**" mean Shares subject to restrictions imposed pursuant to Section 8 of the Plan.

"**Restricted Share Units**" mean Awards pursuant to Section 8 of the Plan.

"**Rule 16b-3**" means Rule 16b-3 promulgated under the Exchange Act, as amended from time to time, or any successor provision.

"**SAR" or "Share Appreciation Right**" means Awards granted pursuant to Section 7 of the Plan.

"**Share**" means a share of common stock of the Company, as adjusted in accordance with Section 12 of the Plan.

"**Ten Percent Holder**" means a person who owns stock representing more than ten percent (10%) of the combined voting power of all classes of stock of the Company or any Affiliate.

"**Unrestricted Shares**" mean Shares awarded pursuant to Section 8 of the Plan.

A-3