**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No.: 1:17-CV-01636-WJM-MJW**

DIGITALGLOBE, INC., a Delaware corporation, and
DIGITALGLOBE INTELLIGENCE SOLUTIONS, INC., a Delaware corporation,

      Plaintiffs,

v.

LOU PALADINO, an individual,

      Defendant.

---

**PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**

---

John V. McDermott, Colo. Atty. Reg. No. 11854
Van Aaron Hughes, Colo. Atty. Reg. No. 19812
Craig M. Finger, Colo. Atty. Reg. No. 50134
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO  80202
Phone:  303.223.1100
Emails:  jmcdermott@bhfs.com
        vhughes@bhfs.com
        cfinger@bhfs.com

*Attorneys for Plaintiffs DigitalGlobe, Inc. and*
*DigitalGlobe Intelligence Solutions, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 2

I.   DIGITALGLOBE IS THE WORLDWIDE LEADER IN HIGH-RESOLUTION EARTH IMAGERY ................................................................ 2

II.  MR. PALADINO'S EMPLOYMENT AT DIGITALGLOBE ....................... 3

III. MR. PALADINO'S BREACH ...................................................................... 4

IV.  THE AGREEMENTS .................................................................................. 6

ARGUMENT ....................................................................................................... 7

I.   MR. PALADINO'S BREACH OF THE AGREEMENTS IRREPARABLY HARMS DIGITALGLOBE. ......................................................................... 8

II.  DIGITALGLOBE IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ......................................................................... 11

     A.   Paladino Is Subject to Valid and Enforceable Contracts ................... 11

         1.   The Non-Compete Covenants Are Valid and Enforceable .................... 12

             a.   The Executive and Management Personnel Exception Applies ..................................................................................... 12

             b.   The Trade Secret Exception Applies .......................................... 12

             c.   The One-Year Covenants Are Reasonable in Duration and Scope. ......................................................................................... 14

         2.   The Non-Disclosure and Non-Solicitation of Employees Covenants Are Not "Covenants Not to Compete" and Thus Are Independently Valid and Enforceable ........................................... 15

     B.   DigitalGlobe Performed under the Non-Competition and Non-Disclosure Agreements ................................................................ 16

     C.   Mr. Paladino Has Breached the Agreements. ..................................... 16

     D.   Mr. Paladino's Breach Has Caused and Is Causing DigitalGlobe Damage. ....... 17

III. GRANTING THE PRELIMINARY INJUNCTION WILL NOT DISSERVE THE PUBLIC INTEREST. ............................................................................ 17

IV.  THE BALANCE OF EQUITIES FAVORS AN INJUNCTION. .................. 18

V.   DIGITALGLOBE SHOULD NOT BE REQUIRED TO POST BOND ......... 19

CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Television & Commc'ns Corp. v. Manning*,
  651 P.2d 440 (Colo. App. 1982) ...........................................................................11

*Atmel Corp. v. Vitesse Semiconductor Corp.*,
  30 P.3d 789 (Colo. App. 2001) ..............................................................................16

*Bray v. QFA Royalties LLC*,
  486 F. Supp. 2d 1237 (D. Colo. 2007)...................................................................11

*Brumfiel v. U.S. Bank*,
  No. 12-cv-02716-WJM, 2013 WL 1874186 (D. Colo. May 6, 2013) ....................20

*Cocona, Inc. v. Singtex Indus. Co.*,
  No. 14-cv-01593-MJW, 2014 WL 5072730 (D. Colo. Oct. 9, 2014)....................16

*Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech. Inc.*,
  492 F. Supp. 2d 600 (E.D. Tex. 2007)...................................................................17

*CPI Card Grp.--Colorado, Inc. v. Lehouck*,
  No. Civ. A. 14-13435, 2014 WL 5025356 (D. Mass. Oct. 8, 2014)......................12

*DBA Enters., Inc. v. Findlay*,
  923 P.2d 298 (Colo. App. 1996) ..............................................................................9

*DISH Network Corp. v. Altomari*,
  224 P.3d 362 (Colo. App. 2009) ............................................................................12

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
  269 F.3d 1149 (10th Cir. 2001) ...............................................................................7

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
  356 F.3d 1256 (10th Cir. 2004) ..........................................................................8, 9

*Doubleclick Inc. v. Paikin*,
  402 F. Supp. 2d 1251 (D. Colo. 2005)..............................................................18, 19

*Elec. Distrib., Inc. v. SFR, Inc.*,
  166 F.3d 1074 (10th Cir. 1999) .............................................................................15

*Energex Enters, Inc. v. Anthony Doors, Inc.*,
  250 F. Supp. 2d 1278 (D. Colo. 2003)...................................................................15

*Equifax Servs., Inc. v. Hitz*,
   905 F.2d 1355 (10th Cir. 1990) .............................................................................9

*First Western Capital Mgmt. Co. v. Malamed*,
   No. 16-CV-1961-WJM, 2016 WL 8358549 (D. Colo. Sept. 30, 2016)..................................10

*Gold Messenger, Inc. v. McGuay*,
   937 P.2d 907 (Colo. App. 1997) ...........................................................................13

*Greater Yellowstone Coal. v. Flowers*,
   321 F.3d 1250 (10th Cir. 2003) .............................................................................8

*Harrison v. Albright*,
   577 P.2d 302 (Colo. App. 1977) ...........................................................................15

*Heatron, Inc. v. Shackelford*,
   898 F. Supp. 1491 (D. Kan. 1995) .........................................................................17

*Heideman v. South Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003) .............................................................................8

*I Can't Believe It's Yogurt v. Gunn*,
   No. CIV.A.94-OK-2109-TL, 1997 WL 599391 (D. Colo. Apr. 15, 1997) ...........................17

*Joseph Brazier, Ltd. v. Specialty Bar Prod. Co.*,
   No. 06-cv-01416-WDM-KLM, 2008 WL 791942 (D. Colo. Mar. 21, 2008) ........................13

*Kodekey Elecs., Inc. v. Mechanex Corp.*,
   486 F.2d 449 (10th Cir. 1973) ..............................................................................13

*In Re Marriage of Fischer*,
   834 P.2d 270 (Colo. App. 1992) ...........................................................................15

*Mgmt. Recruiters of Boulder, Inc. v. Miller*,
   762 P.2d 763 (Colo. App. 1988) ......................................................................15, 18

*Miller v. Kendall*,
   541 P.2d 126 (Colo. App. 1975) ............................................................................8

*Modern Env'ts, Inc. v. Stinnett*,
   561 S.E.2d 694 (Va. 2002)..................................................................................12

*Phoenix Capital, Inc. v. Dowell*,
   176 P.3d 835 (Colo. App. 2007).............................................................................16

*Reed Mill & Lumber Co., Inc. v. Jensen*,
   165 P.3d 733 (Colo. App. 2006) ...........................................................................14

*Rocky Mountain Chocolate Factory, Inc. v. SDMS, Inc.*,
No. 06-CV-1212-WYD, 2006 WL 8251823 (D. Colo. Dec. 8, 2006)......................................8

*Saturn Systems v. Militare*,
252 P.3d 516 (Colo. App. 2011) ...............................................................................................14

*Shred–It USA, Inc. v. Mobile Data Shred, Inc.*,
202 F. Supp. 2d 228 (S.D.N.Y. 2002)..............................................................................9, 11

*W. Distrib. Co. v. Diodosio*,
841 P.2d 1053 (Colo. 1992)....................................................................................................11

*Winnebago Tribe of Nebraska v. Stovall*,
341 F.3d 1202 (10th Cir.2002) ...............................................................................................19

*Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*,
No. 07-cv-02324-WYD-MEH, 2008 WL 2185882 (D. Colo. May 23, 2008) ......13, 14, 19, 20

*Zeff, Farrington & Assocs., Inc. v. Farrington*,
449 P.2d 813 (Colo. 1969) ................................................................................................15, 18

**Statutes**

C.R.S. § 8-2-113 ...........................................................................................................12, 15, 16

Plaintiffs DigitalGlobe, Inc. and DigitalGlobe Intelligence Solutions, Inc. ("DGIS") (collectively "DigitalGlobe") respectfully move this Court to enter a preliminary injunction enjoining Defendant Lou Paladino ("Paladino") from: (i) competing with DigitalGlobe by working with DigitalGlobe customers or on DigitalGlobe direct lines of business for a period of one year; (2) soliciting any of DigitalGlobe's employees for a period of one year; and (3) using, disclosing, disseminating, or otherwise releasing DigitalGlobe's confidential and proprietary information to any party.  In support of its motion, DigitalGlobe states as follows.

### Certificate of Conferral Pursuant to D.C. Colo. L. Civ. R. 7.1(a)

Undersigned counsel conferred with Paladino's counsel on August 2, 2017.  Paladino opposes this motion.

### INTRODUCTION

DigitalGlobe supplies high-resolution Earth imagery, data, and analysis to the United States government and other nations and businesses world-wide.  Lou Paladino managed a team of DigitalGlobe's high-level data analysts and developers on a multimillion-dollar project for the U.S. Defense Intelligence Agency ("DIA" or the "Customer").  In February 2017, DigitalGlobe announced it was merging with MacDonald, Dettwiler and Associates Ltd. ("MDA"), a global communications and information company.  Paladino worried for his personal future with the company after the merger, believing MDA was unhappy with him due to a past incident. Instead of working through any potential issues from the merger, Paladino decided to use it as an opportunity to seize personal gains at DigitalGlobe's expense.

Paladino conceived a scheme to divert work from DigitalGlobe to BigBear, Inc. ("BigBear"), which had previously partnered with DigitalGlobe on an aspect of the DIA work.

Paladino engineered an expansion of BigBear's role in the work for DIA so it could compete directly with DigitalGlobe.  While still at DigitalGlobe, Paladino slowed his team's productivity so he could resume the work after moving to BigBear.  He also deliberately neglected a major DigitalGlobe growth opportunity related to the DIA work so he could instead pursue it with BigBear.  Paladino now works for BigBear, from the same desk where he used to do work for DigitalGlobe, and has been actively soliciting DigitalGlobe employees to join him at BigBear.

These factual circumstances create an imminent threat of irreparable harm to DigitalGlobe.  As a matter of law, breach of a non-compete agreement generally causes irreparable harm, because it undermines the plaintiff's competitive position and results in injuries that are difficult to quantify.  That is the case here.  Paladino's conduct creates an imminent threat of harm to DigitalGlobe that goes beyond simple economic losses, including: (i) loss of key DigitalGlobe employees, whom Paladino continues to recruit; (ii) diminishment of DigitalGlobe's competitive position in the marketplace, due to Paladino enabling BigBear to compete with DigitalGlobe in the area of technical analysis; (iii) loss of business for DIA through the existing project; (iv) loss of opportunities to do related work for other government agencies, including a specific project Paladino hopes to usurp from DigitalGlobe to pursue with BigBear; (v) lost business with other current and prospective customers; and (vi) theft of DigitalGlobe's trade secrets, including its proprietary Signature Analyst software.

## FACTUAL BACKGROUND

I.   **DigitalGlobe is the Worldwide Leader in High-Resolution Earth Imagery.**

Based in Westminster, Colorado, DigitalGlobe, Inc. has developed the most sophisticated constellation of Earth imaging satellites in the world.  It is the industry leader in

2

providing high-resolution satellite images, aerial photographs, and geospatial content. Its subsidiary DGIS, part of DigitalGlobe's "services" business unit, is an industry leader in processing and analyzing satellite imagery and other forms of geospatial data.

DigitalGlobe relies upon its confidential and proprietary information, including its trade secrets (the "Confidential Information"), to maintain and expand its market position. DigitalGlobe analysts use its patented software Signature Analyst to examine thousands of geospatial data layers to map human activity. DigitalGlobe's Confidential Information supports the U.S. government's counter-terrorism, counter-proliferation, surveillance, and counter-drug trafficking efforts. Decl. of Leon Anthony Frazier ("Frazier Decl."), ¶¶ 5–6.

## II.   Mr. Paladino's Employment at DigitalGlobe.

Mr. Paladino was Director of Geospatial at DigitalGlobe, managing a team of some thirty employees on projects generating multimillion-dollar annual revenues. Paladino was compensated at one of the top levels at DigitalGlobe and was authorized to hire and fire his employees. He had access to DigitalGlobe Confidential Information. Frazier Decl., ¶¶ 11–14.

As a condition of his employment, Paladino signed several agreements with DigitalGlobe, including: (i) the 2013 Employee Invention, Confidential Information, Noncompetition and Non-Solicitation Agreement (the "Non-Competition Agmt") (ECF # 21.1); (ii) the DigitalGlobe, Inc. 2007 Employee Stock Option Plan, as restated on February 17, 2016 (the "Stock Option Plan") (ECF # 21.2); and (iii) the 2010 Employee Non-Disclosure Agreement (the "Non-Disclosure Agmt") (ECF # 21.3)[1] (collectively, the "Agreements"). The

---

[1] The Non-Disclosure Agreement was executed between Paladino and DigitalGlobe's predecessor, GeoEye Analytics, Inc. ("GeoEye"). DigitalGlobe acquired GeoEye in 2012 and succeeded GeoEye as to its rights as Paladino's employer under the Non-Disclosure Agreement.

Agreements each contain non-compete, non-solicitation, and non-disclosure covenants.

### III.    **Mr. Paladino's Breach**

Mr. Paladino's improper conduct began no later than February 2017, when it was announced that MDA would acquire DigitalGlobe (the "Acquisition").  After the Acquisition was announced Paladino implemented a scheme to leave DigitalGlobe and take with him DigitalGlobe's employees, customers, and Confidential Information.  Less than a week after the announcement Paladino began expressing his discontent about the Acquisition to DigitalGlobe customers and his employees, stating that he intended to start his own business.  Decl. of Dallas Smith ("Smith Decl."), ¶¶ 6–7; Decl. of Jeffrey Watkins ("Watkins Decl."), ¶¶ 4–5.

While still employed at DigitalGlobe, Paladino told Terry Busch he was going to leave or was considering leaving DigitalGlobe.  Busch was the decision-maker at that time for DIA on a confidential, multimillion-dollar project Paladino was managing (the "Project") for DigitalGlobe.  *Id.*  Mr. Busch had a previous experience with MDA which caused him concerns about working more extensively with MDA.  Rather than leverage his close relationship with Mr. Busch to assuage his concerns about the Acquisition, Paladino urged Mr. Busch to divert DIA business from DigitalGlobe to BigBear.

Paladino knew that MDA does other business with DIA.  He knew Mr. Busch was scheduled to leave his position and would soon cease to be DIA's decision-maker on the Project.  He also knew the Acquisition would likely not have a major impact on the existing contractual agreements and personal relationships between DigitalGlobe and DIA on the Project.  Frazier Decl., ¶ 16.  Nevertheless, he encouraged DIA to transfer its business from

DigitalGlobe to BigBear for his own personal protection and benefit.

For months, while still employed by DigitalGlobe, Paladino executed his plan to divert DigitalGlobe employees to BigBear or to his new business.  *Id.*, ¶ 17.  Paladino encouraged Shane Cleary, Thomas Burk, Chad Parvis, Bob Moreland, Sean Stuekerjuergen, Andrew Jenkins, and Arni Sumarlidason to leave DigitalGlobe.  *Id.*  Five of these employees (all but Mr. Jenkins and Mr. Sumarlidason) have since left DigitalGlobe to join Paladino.  *Id.*  While still working for DigitalGlobe, Paladino met with DigitalGlobe employees at his home to strategize about his planned transition. Decl. of Andrew Jenkins ("Jenkins Decl."), ¶ 11.  Paladino and BigBear Chief Technology Officer Brian Levy also met with DigitalGlobe employees at a brewery to recruit them to BigBear.

While still employed at DigitalGlobe, Paladino delayed progress on certain work for the Project.  He directed Jeffrey Watkins to slow his work while Paladino contemplated leaving DigitalGlobe.  Watkins Decl., ¶¶ 6–7.  Paladino also stopped work related to the Project for another government agency, an important growth opportunity for DigitalGlobe, so he could instead develop that opportunity for himself or for BigBear.  Jenkins Decl., ¶ 12.

Paladino entered into an agreement with BigBear where Paladino would join BigBear, bring with him the development work for DigitalGlobe's key government Customer, and perform that same work as well as some related work.  Paladino told DigitalGlobe employees he would remain with BigBear for one year and then form his own company where he would continue doing the exact work for the Customer that he had previously done at DigitalGlobe. As part of his plan, Paladino directed DigitalGlobe employees to transfer computer code used in the Project to infrastructure controlled by BigBear.  Jenkins Decl., ¶ 7.

Paladino is also using or attempting to obtain DigitalGlobe's Confidential Information for himself or BigBear.  During the same week in which Paladino said he was going to leave DigitalGlobe, Terry Busch, DIA's decision-maker, approached Dallas Smith, a DigitalGlobe Senior Intelligence Analyst who worked under Paladino.  Mr. Busch asked Mr. Smith if he knew anyone who could reverse engineer DigitalGlobe's proprietary software, Signature Analyst.  Smith Decl., ¶¶ 8–12.  This patented, proprietary software was developed exclusively for DigitalGlobe and is a primary reason DigitalGlobe was awarded the Project.  Mr. Busch's inquiry into replicating that proprietary software the very week Paladino stated his intention to leave DigitalGlobe creates at least the threat that Paladino intends to duplicate and use DigitalGlobe's Confidential Information to continue his DIA work at BigBear.

Whereas BigBear previously only provided data collection on the Project, with the addition of Paladino and his team, suddenly BigBear is positioned to compete directly with DigitalGlobe both in the area of application development and data analysis (as contrasted with mere data collection).  Frazier Decl., ¶ 19.  DIA has already shifted software development work on the Project away from DigitalGlobe to BigBear.  *Id.*, ¶ 20.  A significant related project for another government agency is apparently in the process of being diverted to BigBear, which BigBear would not have been able to perform without Paladino and his recruits.  *Id.*, ¶¶ 21–23.  Indeed, Paladino's conduct places DGIS's entire market position at risk. *Id.*  DGIS faces the loss to Paladino of further work for DIA under the Project, work for other U.S. government agencies, and existing and potential work for other customers.  *Id.*

## IV.   **The Agreements**

The contractual provisions DigitalGlobe seeks to enforce against Paladino can be

summarized as three sets of covenants: (1) <u>Non-Compete Covenants.</u>  These appear at Section 6 of the Non-Competition Agmt (ECF # 21.1), Section 24(d)(i) of the Stock Option Plan (ECF # 21.2), and Section E of the Non-Disclosure Agmt (ECF # 21.3).[2]  (2) <u>Non-Solicitation of Employees Covenants.</u>  These are found at Section 8 of the Non-Competition Agmt, Section 24(d)(ii) of the Stock Option Plan, and Section D of the Non-Disclosure Agmt.[3]  (3) <u>Non-Disclosure Covenants.</u>  The Non-Disclosure Covenants are at Section 2 of the Non-Competition Agmt, Section 24(b) of the Stock Option Plan, and Section B of the Non-Disclosure Agmt.[4]

## <u>ARGUMENT</u>

For a *prima facie* showing, the movant must demonstrate: "(1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

---

[2]  In particular, Section 6 of the Non-Competition Agreement provides:
**Non-competition.** I agree that I shall not, during the term of my employment by the Company and for a period of twelve months thereafter, compete for any reason with the Company in its direct business lines, including . . . by directly or indirectly taking any of the following actions: (a) owning, managing, operating, joining, controlling or providing services to any entity, regardless of entity form or location, that engages in or is seeking to engage in the current or planned business activities of the Company; (b) serving as an employee, agent, consultant, officer, or director of any such entity; or (c) inducing or attempting to induce any customer, supplier, or business relation of the Company to cease doing business with the Company, or in any other way interfering with the relationship between any customer, supplier or business relation and the Company . . . .
[3]  For instance, Section 8 of the Non-Competition Agreement specifies:
**Non-Solicitation.**  For a period of one year immediately following the termination of my employment with the Company, I shall not, directly or indirectly, recruit, solicit, attempt to persuade, or assist in the recruitment or solicitation of, any employee of the Company . . . for the purpose of employing him or her or obtaining his or her services or otherwise causing him or her to leave his or her employment with the Company.
[4]  For example, Section 2 of the Non-Competition Agreement states:
**Nondisclosure of Business Confidential Information.** . . . at any time after my employment is terminated (until such time, as ever, as the Business Confidential Information becomes part of the public domain other than by my breach of this Agreement), I shall not: (i) disclose or furnish to any person any Business Confidential Information; (ii) use any Business Confidential Information for my own benefit or the benefit of others, or (iii) remove any Business Confidential Information from the Company facilities. . . .

DigitalGlobe will first address the element of irreparable injury.

**I.        Mr. Paladino's Breach of the Agreements Irreparably Harms DigitalGlobe.**

The Court has directed DigitalGlobe to address what facts reflect a threatened harm of such imminence as to require injunctive relief to prevent irreparable harm.  As a matter of law, breach of a non-compete covenant usually warrants a finding of irreparable injury.  That is because of the difficulty of calculating monetary damages and the likelihood that monetary damages will not compensate for the permanent harm when a business loses its competitive position.  Those are precisely the factual circumstances here. Paladino's breach of the Agreements threatens irreparable injury to DigitalGlobe by dramatically undermining its competitive advantage, by causing actual and imminent losses of its customers and employees, and by devaluing its Confidential Information.

The "irreparable harm requirement is met if a plaintiff demonstrates a significant *risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (emphasis added) (citations omitted).  The risk must be an actual danger, "not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).  "Where there is a noncompetition agreement, breach is the controlling factor and injunctive relief follows almost as a matter of course.  Damage is presumed to be irreparable and the remedy at law is considered inadequate."  *Miller v. Kendall*, 541 P.2d 126, 128 (Colo. App. 1975); *accord*, *Rocky Mountain Chocolate Factory, Inc. v. SDMS, Inc.*, No. 06-CV-1212-WYD, 2006 WL 8251823, \*4 (D. Colo. Dec. 8, 2006); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004) (observing the general rule that breach of

an exclusivity clause "almost always warrants the award of injunctive relief").

Violation of a non-compete clause requires injunctive relief because "it is very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Shred–It USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 233 (S.D.N.Y. 2002).  In *Dominion Video*, *supra*, the Tenth Circuit identified the type of factors that typically support a finding of irreparable harm in the context of an exclusivity provision, such as a non-compete agreement: "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products."  356 F.3d at 1263.  Some or all of those factors nearly always result from a breach of a covenant not to compete.  *See, e.g.*, *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (finding irreparable harm where damages from breach of a non-compete covenant were difficult to calculate); *DBA Enters., Inc. v. Findlay*, 923 P.2d 298, 302 (Colo. App. 1996) (in non-compete situations, injunctions are appropriate remedy).

All of the *Dominion Video* factors (other than "impact of state law") are present here.

**"Loss of employees' unique services."**  Paladino has recruited to date five members of his team at DigitalGlobe, and his recruiting efforts continue unabated; indeed, he has used this very lawsuit as a basis for encouraging more employees to leave.  Frazier Decl., ¶ 17.

**"Harm to goodwill, diminishment of competitive positions in marketplace."**

• Paladino's disregard of his Non-Compete and Non-Solicitation Covenants is enabling BigBear to compete directly with DigitalGlobe in its technical analysis services, which is undermining DigitalGlobe's position as the industry leader.  *Id.*, ¶¶ 19–23.

- Paladino's conduct is also harming DigitalGlobe's goodwill and diminishing its competitive position by placing its Confidential Information in imminent jeopardy.  Paladino has instructed former employees to move DigitalGlobe computer code to platforms controlled by BigBear and he has apparently, directly or indirectly, sought to reverse engineer the Signature Analyst software, creating an imminent threat to DigitalGlobe's competitive position in the marketplace.  Jenkins Decl., ¶ 7; Smith Decl., ¶ 8.  This threat by itself excuses any need to show irreparable harm, since it constitutes a violation of the Uniform Trade Secrets Act, which provides for injunctive relief.  *See First Western Capital Mgmt. Co. v. Malamed*, No. 16-CV-1961-WJM, 2016 WL 8358549, *11–12 (D. Colo. Sept. 30, 2016) ("irreparable harm presumptively exists if [defendant] has misused, or is likely to misuse, trade secrets").

**"Lost opportunities to distribute unique products."**  DigitalGlobe offers unique services, performing high-level technical data analysis in highly sensitive areas.  Paladino is disrupting DigitalGlobe's ability to distribute these services to its clientele in multiple respects:

- First, DigitalGlobe has already seen a substantial reduction in work contracted on its Project for DIA.  Frazier Decl., ¶ 20.

- Second, DigitalGlobe is in imminent danger of losing additional DIA business, as BigBear positions itself to fill DigitalGlobe's role, including algorithm development and related analysis.  This is work BigBear could not have competed for without Paladino and his team of former DigitalGlobe personnel.  *Id.*, ¶ 22.

- Third, DigitalGlobe is in imminent danger of losing opportunities to perform related work for other government agencies, including in particular the growth opportunity Paladino usurped for BigBear.  *Id.*, ¶ 21–22.

- Fourth, DigitalGlobe faces the imminent danger of losing other current and prospective customers.  *Id.*, ¶ 23.

**"Inability to calculate damages."**  If Paladino's conduct is allowed to continue, DigitalGlobe will have no way to identify with certainty all of the business projects that will be diverted, or to quantify the resulting monetary losses.  *Id.*, ¶ 23.  *See Am. Television & Commc'ns Corp. v. Manning*, 651 P.2d 440, 446 (Colo. App. 1982) ("It has been held in a situation involving a breach of covenant not to compete that difficulty in measuring the monetary value of a lost customer raises a presumption that legal damages are inadequate.").

All of these factors amount to a potential "loss of customer base and community goodwill going beyond 'simple economic loss.'"  *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1249 (D. Colo. 2007).  Paladino's recent involvement in the highest levels of DigitalGlobe's trailblazing, proprietary technology directly threatens DigitalGlobe's competitive position in the marketplace.  *See Shred-it, USA*, 202 F. Supp. 2d at 233 ("If the unique services of the party are available to a competitor, the employer obviously suffers irreparable harm.").  There is nothing "theoretical" about the threat of injury here.  Without immediate Court intervention, DigitalGlobe may never be able to recoup its competitive losses.

## II.      DigitalGlobe Is Substantially Likely to Succeed on the Merits of its Claims.

DigitalGlobe is substantially likely to succeed on the merits of its claims for breach of contract because the evidence at the hearing will establish: (1) the existence of a valid contract; (2) DigitalGlobe performed under the contract; (3) Paladino breached the contract; and (4) resulting damages.  *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

### A.      Paladino Is Subject to Valid and Enforceable Contracts.

The Non-Competition Agreement and the Stock Option Agreement are expressly subject to Colorado law.[5]  Within each of the Agreements Mr. Paladino agreed to various Non-Compete, Non-Solicitation of Employees and Non-Disclosure Covenants, all enforceable by Colorado law.

1.      **The Non-Compete Covenants Are Valid and Enforceable.**

Non-compete covenants are valid in Colorado to protect trade secrets and as applied to executive and management personnel.  C.R.S. § 8-2-113(2)(b), (d).  Both rules apply here.

a.      *The Executive and Management Personnel Exception Applies.*

Colorado courts apply the common usage of the terms "executive" and "management":

> "Management" and "personnel" are ordinary words of common usage that have unambiguous meanings.  "Personnel" means a body of persons employed in some service, such as an office.  "Management" has been defined as the conducting or supervising of something, such as a business.  Thus, persons who conduct or supervise a business would be considered "management personnel."

*DISH Network Corp. v. Altomari*, 224 P.3d 362, 366 (Colo. App. 2009) (citations omitted).

Paladino managed thirty employees on projects generating multimillion-dollar revenues.  He was paid near the top of DigitalGlobe's compensation scheme.  He made binding decisions for DigitalGlobe.  He had substantial autonomy in all aspects of his position.  Thus, Paladino was "management personnel" under C.R.S. § 8-2-113(2)(d).

b.      *The Trade Secret Exception Applies.*

Colorado courts look to the agreement's plain language to determine whether a non-compete clause was executed to protect trade secrets.  *CPI Card Grp.--Colorado, Inc. v. Lehouck*, 2014 WL 5025356, at *4 (D. Mass. Oct. 8, 2014) ("Colorado courts have looked to the

---

[5] The Non-Disclosure Agreement is subject to Virginia law, which, to the extent it differs from Colorado law, appears to be more permissive in the areas discussed below than Colorado law.  In particular, Virginia does not have Colorado's statutory scheme under C.R.S. § 8-2-113, in which non-compete covenants are void unless they fit within a specific exception.  *See generally Modern Env'ts, Inc. v. Stinnett*, 561 S.E.2d 694, 695 (Va. 2002) (describing legal standard for restrictive covenants under Virginia law).

preamble and the substantive provisions of the contract to determine whether a restriction was drafted with the purpose of protecting trade secrets."). The Agreements' plain language demonstrates that the purpose of the Non-Compete Covenants is to protect trade secrets.

In the Non-Competition Agreement, Paladino acknowledged his access to "Business Confidential Information" and promised not to furnish that information to others or to use it for his own benefit. (ECF # 21.1, ¶¶ 1, 2.) He agreed his non-compete restrictions "are necessary to protect the Company's interest in Business Confidential Information, which would be inevitably disclosed" if Paladino competed in DigitalGlobe's "direct product lines." *Id.*, ¶ 7. The Stock Option Plan also recites the participant's duty not to divulge Confidential Information. (ECF # 21.2, § 24(b)). Finally, the Non-Disclosure Agreement defines "Proprietary Information," which Paladino promised not to disclose. (ECF # 21.3, §§ A, B). Paladino also agreed that disclosure of Proprietary Information would warrant injunctive relief. *Id.*, § F. Colorado courts have held categorically that such a "non-disclosure agreement is a contract to protect trade secrets." *Joseph Brazier, Ltd. v. Specialty Bar Prod. Co.*, No. 06-cv-01416-WDM-KLM, 2008 WL 791942, at *9 (D. Colo. Mar. 21, 2008); *see also Kodekey Elecs., Inc. v. Mechanex Corp.*, 486 F.2d 449, 455 (10th Cir. 1973).

The plain language of the Agreements demonstrates that the Confidential Information DigitalGlobe seeks to protect includes valid and protectable trade secrets under Colorado law. "[A] trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors." *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 911 (Colo. App. 1997). In particular, "[d]etailed customer information is a trade secret." *Xantrex Tech. Inc. v. Advanced*

*Energy Indus., Inc.*, No. 07-cv-02324-WYD-MEH, 2008 WL 2185882, at *18 (D. Colo. May 23, 2008); *Saturn Systems v. Militare*, 252 P.3d 516, 527 (Colo. App. 2011) (confidential information consisting of "client lists, customer contracts, pricing information, detailed debtor information, client information and customer log-in codes" qualified as trade secrets).  In *Xantrex*, the court found that the defendant's "significant exposure to customer concerns and inside information about customer issues that would be useful to a competitor that did not know those concerns" constituted trade secrets.  2008 WL 2185882, at *18.

It is beyond serious dispute that DigitalGlobe possesses trade secrets and the purpose of the Agreements is to protect those trade secrets. Paladino had the highest levels of exposure to the U.S. government Customer's concerns, preferences, information, and business plans that are not available to the public.  *See Xantrex*, 2008 WL 2185882, at *18.  DigitalGlobe obtained and maintained the Customer and the corresponding multimillion-dollar Project *because of* DigitalGlobe's confidential and proprietary software.  Indeed, Mr. Busch, the Customer's decision-maker on the Project, after conferring with Mr. Paladino, expressly sought to reverse engineer DigitalGlobe's proprietary software as part of the shift of work to BigBear.  This conduct illustrates the critical importance to DigitalGlobe in keeping this software and other related technology confidential.  Without DigitalGlobe's Confidential Information, and without Paladino's access to that information, including his intimate knowledge of the Customer's preferences and the details of the Project, BigBear would not have been positioned to expand its working relationship with DIA and assume much of DigitalGlobe's role.

        *c.*     *The One-Year Covenants Are Reasonable in Duration and Scope.*

A covenant not to compete must be reasonable in duration and scope.  *See Reed Mill &*

*Lumber Co., Inc. v. Jensen*, 165 P.3d 733, 736 (Colo. App. 2006).  "The reasonableness of the restraints in a restrictive covenant is determined on a case-by-case basis, taking into account the particular facts and circumstances surrounding the case and the subject covenant," *Elec. Distrib., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1085 (10th Cir. 1999), particularly "whether the restrictive provision is necessary to safeguard the plaintiff's business."  *Energex Enters, Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1283(D. Colo. 2003) (citing *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 766 (Colo. App. 1988)).  "[T]he burden of proof as to the reasonableness of [a covenant] rests on the party challenging its enforcement." *Harrison v. Albright*, 577 P.2d 302, 305 (Colo. App. 1977).

The restrictive covenants within the Agreements are reasonable.  Each of the non-compete provisions is limited to one year and the non-disclosure covenant within the Non-Disclosure Agreement is limited to three years.  Colorado courts agree that a one- to three-year restriction is reasonable.  *See, e.g.*, *Zeff, Farrington & Assocs., Inc. v. Farrington*, 449 P.2d 813, 814 (Colo. 1969) (upholding three-year restriction); *In Re Marriage of Fischer*, 834 P.2d 270, 273 (Colo. App. 1992) (upholding three-year non-compete clause); *Harrison*, 577 P.2d at 305 (upholding five-year non-compete).  The Non-Compete Covenants are also limited in scope to competition in DigitalGlobe's "direct business lines."  (ECF # 21.1, § 6).

2. **The Non-Disclosure and Non-Solicitation of Employees Covenants Are Not "Covenants Not to Compete" and Thus Are Independently Valid and Enforceable.**

The Non-Disclosure and Non-Solicitation of Employee's Covenants within the various Agreements are independently valid and enforceable.  C.R.S. 8-2-113(2) only applies to "covenants not to compete."  Non-Disclosure Agreements do not impact a former employee's

ability to compete with the former company or make a living in any way.  *See*, *e.g.*, *Cocona, Inc. v. Singtex Indus. Co*., No. 14-cv-01593-MJW, 2014 WL 5072730, at *4 (D. Colo. Oct. 9, 2014) (analyzing a non-compete covenant under C.R.S. § 8-2-113(2) and separately analyzing a non-disclosure covenant under general contract principles).

Colorado courts have concluded that where "an agreement not to solicit employees would not impair the former employee's ability to make a living," that agreement is not a "covenant not to compete." *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 844 (Colo. App. 2007).  "Where a nonsolicitation provision is limited to prohibiting only initiating contacts or 'active' solicitation of the employer's employees, it is enforceable, despite the invalidity of an accompanying noncompetition provision." *Id.* (citing *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 796 (Colo. App. 2001)).  DigitalGlobe seeks injunctive relief for Paladino's active solicitation of its current employees.  While employed at DigitalGlobe and after leaving, Paladino has actively solicited DigitalGlobe employees to terminate their employment with DigitalGlobe and begin employment at BigBear.  His promises not to do that are independently valid and enforceable.

**B.    DigitalGlobe Performed under the Non-Competition and Non-Disclosure Agreements.**

DigitalGlobe has performed its obligations under the various Agreements.  It employed Paladino, paid Paladino his agreed-upon salary, and provided Paladino with DigitalGlobe benefits.  DigitalGlobe has not breached any of the Agreements.  Frazier Decl., ¶ 9.

**C.    Mr. Paladino Has Breached the Agreements.**

For all the reasons recited above, DigitalGlobe is substantially likely to succeed in demonstrating that Mr. Paladino has breached all of the Agreements, as detailed in Sections III and IV of the Background section above.  Paladino has competed in DigitalGlobe's direct

business lines by providing services to a competitor, serving as an employee of that competitor, and interfering with the relationship between DigitalGlobe and its Customer. This conduct breaches the Non-Compete Covenants (Non-Competition Covenant, § 6; Stock Option Agreement, § 24(d)(i); Non-Disclosure Agreement, § E). Paladino has repeatedly solicited other DigitalGlobe employees to leave DigitalGlobe and to join him at BigBear. This conduct breaches the Non-Solicitation of Employees Covenants (Non-Competition Covenant, § 8; Stock Option Agreement, § 24(d)(ii); Non-Disclosure Agreement, § D). And Paladino has used or disclosed DigitalGlobe trade secrets and Confidential Information in his work with BigBear. This conduct breaches the Non-Disclosure Covenants (Non-Competition Covenant, § 2; Stock Option Agreement, § 24(b); Non-Disclosure Agreement, § B).

> **D.    Mr. Paladino's Breach Has Caused and Is Causing DigitalGlobe Damage.**

Paladino's breach of the Agreements has caused and is causing DigitalGlobe damages, including lost profits, lost market position, lost employees, and inevitable disclosure of its Confidential Information, as described in greater detail above. See discussion, *supra*, at 8–11.

### III.    Granting the Preliminary Injunction Will Not Disserve the Public Interest.

The requested injunction will promote, not disserve, the public interest. "There is a public interest in the enforcement of a valid covenant not to compete." *I Can't Believe It's Yogurt v. Gunn*, No. CIV.A.94-OK-2109-TL, 1997 WL 599391, at *20 (D. Colo. Apr. 15, 1997). The public also has an interest in "restraining unfair competitive practices," *Heatron, Inc. v. Shackelford*, 898 F. Supp. 1491, 1502 (D. Kan. 1995), and in "encouraging investment by research organizations into future technologies." *Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 601 (E.D. Tex. 2007).

DigitalGlobe does not seek to stymie the free movement of workers or prevent the public from benefiting from existing technology; rather, it seeks to enforce a limited restriction on the ability of one person to work within a small and narrowly-tailored industry, and to restrict one entity from taking a short-cut to success by using another's valuable information. Without the ability of DigitalGlobe to negotiate for and eventually enforce its Non-Compete, Non-Solicitation of Employees, and Non-Disclosure Covenants, DigitalGlobe would have no reason to invest in developing new technologies. Indeed, the fact that Colorado statutes enforce non-compete agreements as to management personnel and to protect trade secrets demonstrates that enforcing the Agreements in these circumstances would not be against the public interest. *See Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1260 (D. Colo. 2005).

## IV.    The Balance of Equities Favors an Injunction.

DigitalGlobe's threatened injuries substantially outweigh any harm to Paladino from an injunction. Despite his straightforward promises in the Agreements, Paladino deliberately and comprehensively violated his obligations. Not enforcing these Covenants would rob DigitalGlobe of its expressly bargained for protections. Resolution of these issues through litigation could take years. At that point, the Agreements will have expired, and DigitalGlobe will have been irreparably harmed. Moreover, denying the proposed injunction would allow Paladino to devalue DigitalGlobe's Confidential Information and unfairly compete with DigitalGlobe, either with BigBear or through his own venture, profiting upon his theft by using the knowledge, insight, and science that DigitalGlobe developed and paid for.

In this circumstance, "[t]he equities lie with the plaintiff" such that an injunction is appropriate. *Miller*, 541 P.2d at 127–28; *see also Zeff*, 449 P.2d at 814 ("Defendant is

deliberately doing what he plainly agreed [in the non-compete agreement] not to do, and the equities are with plaintiff.  Plaintiff is therefore clearly entitled to the injunctive relief sought.") (citations omitted); *Xantrex*, 2008 WL 2185882, at *16 (threat of harm from plaintiff's "business strategies, marketing strategies and engineering information being in the hands of a direct competitor" outweighed any possible harm to the former employee).

The proposed injunction would not prevent Paladino from pursuing gainful employment.  Paladino is free to work for an employer that is not in the direct lines of business as DigitalGlobe or for any employer after a single year.  As a highly educated and successful businessman, Paladino is certainly capable of finding other employment that does not violate the terms of the Agreements.  *See Xantrex*, 2008 WL 2185882, at *16 (declining the former-employee's argument that he could not gain new employment in the city of Fort Collins after "uprooti[ing] his family" and holding that as a "highly educated successful businessman and engineer" the defendant "certainly appears capable of finding other employment").

Any prejudice suffered by Paladino does not approach the harm DigitalGlobe will suffer without an injunction.  Accordingly, the public interest favors enforcement of the Agreements.  *See Doubleclick, Inc.*, 402 F. Supp. 2d at 1260 (threat to defendant of loss of trade secrets and damage to business outweighs harm to plaintiff from enforcing non-compete).

**V.      DigitalGlobe Should Not Be Required to Post Bond.**

The Court has "'wide discretion' . . . in determining whether to require security for an injunction."  *Xantrex*, 2008 WL 2185882, at *18 (quoting *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2002)).  "A bond is unnecessary absent proof of a likelihood of harm to [the defendant]."  *Id.*  The broad discretion of Rule 65(c) includes "judicial discretion

19

even in determining whether a bond need be posted at all." *Brumfiel v. U.S. Bank*, No. 12-cv-02716-WJM, 2013 WL 1874186, at *7–8 (D. Colo. May 6, 2013) (citations omitted).

In *Xantrex*, the court considered the potential harm to the defendant-employee in the enforcement of a non-compete. The defendant argued he had "uprooted his family and settled his children in new schools and that there are no power companies [the defendant's line of business] in Fort Collins where he could gain employment." 2008 WL 2185882, at *16–17. The court specifically disapproved this argument, stating that the defendant-employee "is a highly educated successful businessman and engineer. He certainly appears capable of finding other employment." *Id.* Thus, because the court found that the defendant "w[ould] not suffer any harm as the result of the injunction," no bond was necessary. *Id.* at *18.

Similarly, Paladino expressly agreed in the Non-Competition Agreement that injunctive relief would be necessary in the event of a breach of that agreement. (ECF # 21.1, § 9(e); ECF # 21.3, § F.) Paladino is highly educated and successful, capable of finding other employment. He will not suffer meaningful harm from being held to his Agreements for a single year. Accordingly, the Court should not require DigitalGlobe to post bond.

## CONCLUSION

Plaintiffs respectfully requests the Court enter a preliminary injunction: (1) enjoining Paladino from competing with DigitalGlobe by working with DigitalGlobe customers or on DigitalGlobe direct lines of business for one year; (2) enjoining Paladino from soliciting any DigitalGlobe employees for one year; and (3) enjoining Paladino from using, disclosing, disseminating, or otherwise releasing DigitalGlobe's Confidential Information to any party. DigitalGlobe further requests an evidentiary hearing on its Motion for Preliminary Injunction.

Respectfully submitted this 8th day of August, 2017.


BROWNSTEIN HYATT FARBER SCHRECK, LLP

_s/ John V. McDermott_
John V. McDermott, #11854
Van Aaron Hughes, #19812
Craig M. Finger, #50134
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO  80202
Telephone:  303.223.1100
Fax: 303.223.1111
Emails:  jmcdermott@bhfs.com
         vhughes@bhfs.com
         cfinger@bhfs.com
*Attorneys for Plaintiffs DIGITALGLOBE, INC. and DIGITALGLOBE INTELLIGENCE SOLUTIONS, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 8th, 2017, I electronically filed a true and correct copy of the foregoing **PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION** with the clerk of court via the CM/ECF system which will send notification of such filing and service upon counsel of record listed below:

Christopher Toll
Holland & Hart, LLP
6380 S. Fiddlers Green Cir., Suite 500
Greenwood Village, CO 80111
303.295.1637                    `
ctoll@hollandhart.com

Claire E. Wells Hanson
Holland & Hart, LLP
555 17th Street, Suite 3200
Denver, CO 80202
303-290-1673
cewellshanson@hollandhart.com

Timothy J. McEvoy
Patrick J. McDonald
Cameron McEvoy PLLC
4100 Monument Corner Drive
Suite 420
Fairfax, Virginia 22030
703.273.8898
tmcevoy@cameronmcevoy.com
pmcdonald@cameronmcevoy.com

*s/Paulette M. Chesson*
Paulette M. Chesson, Paralegal
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202
303-223-1100

15871972