IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No.: 1:17-CV-01636-WJM-MJW**

DIGITALGLOBE, INC., a Delaware corporation, and
DIGITALGLOBE INTELLIGENCE SOLUTIONS, INC., a Delaware corporation,

    Plaintiff,

v.

LOU PALADINO, an individual,

    Defendant.

## DECLARATION OF LEON ANTHONY FRAZIER

I, Leon Anthony (Tony) Frazier, hereby declare:

1. All statements in this Declaration are based upon information and knowledge that are known personally to me.

2. I am the current Senior Vice President, General Manager of the "Services" business unit of DigitalGlobe, Inc., which includes DigitalGlobe Intelligence Solutions, Inc. ("DGIS").

3. DGIS is a subsidiary of DigitalGlobe, Inc., and is part of the "Services" business unit of DigitalGlobe's business.

4. The Services business at DigitalGlobe assists the United States Government and other strategic customers with products and services to leverage geospatial

1

intelligence—combining imagery, intelligence expertise, satellite tasking, imagery processing, data analytics, and machine learning.

5. The nature of DigitalGlobe's work with the United States government is sensitive and complex. DigitalGlobe relies upon its confidential and proprietary information, including trade secrets (the "Confidential Information"), to obtain and maintain its multimillion dollar governmental contracts.

6. One example of DigitalGlobe's Confidential Information is its patented software Signature Analyst. Signature Analyst enables DigitalGlobe's analysts to examine thousands of geospatial data layers to discover spatial relationships, patterns, and preferences associated with different forms of human activity. This confidential and proprietary intelligence tool can be leveraged in a variety of ways to support commercial, military, and intelligence requirements. DigitalGlobe's Confidential Information has supported counter-terrorism, counter-proliferation, surveillance, and reconnaissance optimization, and counter-drug trafficking, as well as identifying areas most susceptible to radicalization.

7. DigitalGlobe's trade secrets also include detailed client information, including client concerns, preferences, information, and business plans that are not available to the public.

8. DigitalGlobe takes great efforts to maintain the secrecy of its Confidential Information, such as requiring its employees to sign non-disclosure agreements, non-compete agreements, and non-solicitation agreements; housing proprietary software and

technology on secure, user-accessed services; and restricting access to such information to certain employees.

9. Mr. Paladino signed non-disclosure, non-compete, and non-solicitation agreements with DigitalGlobe as a condition of his employment and as a condition of receiving DigitalGlobe stock. At all times, DigitalGlobe has performed under these various agreements by employing Mr. Paladino, paying Mr. Paladino his agreed-upon salary, and providing Mr. Paladino with benefits.

10. As of June 30, 2017, DigitalGlobe employed 670 employees in its Services business, including 93 employees at the management level with titles ranging from Manager to Senior Vice President.

11. Mr. Paladino was a management level employee within DGIS, holding the title Director of Geospatial. In this position, Mr. Paladino managed a team of approximately 30 high-level data analysts and developers performing a multimillion-dollar technical project for the United States government's Defense Intelligence Agency ("DIA"). On this DIA project, Mr. Paladino directly supervised five high-level management employees, including two Geospatial Managers, a Senior Staff Software Engineer, a Principal Data Scientist, and a Senior Intelligence Analyst. Each of these employees in turn supervised other employees.

12. Mr. Paladino played a critical role in DigitalGlobe's procurement of this multimillion-dollar DIA project and he utilized DigitalGlobe's Confidential Information, including trade secrets and patented technology, to secure this contract.

13. As the Director of Geospatial, Mr. Paladino held a wide range of high-level, strategic, and dynamic responsibilities. Specifically, Mr. Paladino's duties included managing and coordinating departmental and cross-functional teams; developing, defining, and executing project plans, schedules, budgets, and deliverables; identifying, defining, and assigning major project roles; monitoring the project from initiation through delivery, including scope of work, scheduling, and monitoring budgets; and ensuring completion of a project on schedule and within budget constraints. Paladino was compensated at one of the highest compensation levels within DigitalGlobe and had the authority to hire and fire those he supervised.

14. Mr. Paladino was also entrusted with the highest access to DigitalGlobe's Confidential Information.

15. In February 2017, it was announced that MacDonald, Dettwiler and Associates, Ltd. ("MDA") would be acquiring DigitalGlobe. As part of this acquisition, DigitalGlobe will retain its name and its Colorado headquarters. The acquisition has not yet been finalized. The announcement of the acquisition did not have any immediate effect on Mr. Paladino's employment.

16. Shortly after the announcement, I met with Mr. Paladino one-on-one to discuss his thoughts about the acquisition. I knew that Mr. Paladino had a conflicted history with MDA. Specifically, MDA previously filed a protest over a lost contract against Mr. Paladino because MDA felt Mr. Paladino had improperly shared pricing information with a competitor. At this time, Mr. Paladino knew MDA does other business with DIA. He knew that Terry Busch, the decision-maker for the DIA project,

4

was scheduled to leave his position and would soon cease to be the decision-maker on that project. Paladino also knew the MDA acquisition would not have a major impact on the existing contractual and personal relationships between DigitalGlobe and DIA.

17. I learned after Mr. Paladino's departure that Paladino had been actively recruiting and soliciting DigitalGlobe employees to leave DigitalGlobe and join Paladino at BigBear. This solicitation occurred both while Paladino was still employed by DigitalGlobe and after Paladino left. Mr. Paladino has even used this lawsuit as a basis for encouraging more DigitalGlobe employees to leave. As of today, five of DigitalGlobe's high-level employees performing data analysis and software development services have left DigitalGlobe and joined Mr. Paladino at BigBear. These employees include Shane Cleary, Thomas Burk, Chad Parvis, Bob Moreland, and Sean Stuekerjuergen.

18. At BigBear, Mr. Paladino is working in the exact same DIA workspace as he was while employed by DigitalGlobe. Moreover, the project on which Mr. Paladino is working at BigBear had been socialized as a pipeline opportunity for DigitalGlobe in late 2016.

19. Significantly, Mr. Paladino's transition to BigBear is enabling BigBear to directly compete with DigitalGlobe's lines of service, inhibiting DigitalGlobe's competitive position in this unique market. In the past, BigBear and DigitalGlobe partnered on certain work for DIA. In broad terms, BigBear performed data collection services for DIA, and DigitalGlobe performed data analysis services and software development services for the DIA project. DigitalGlobe was capable of processing and

analyzing this voluminous data in part due to its Signature Analyst software and other confidential and proprietary technology and information that was unavailable to BigBear or other competitors.  Due to Mr. Paladino's significant involvement with and knowledge about the DIA customer and his very recent access to DigitalGlobe's cutting edge technology, Mr. Paladino has enabled BigBear to directly compete with DigitalGlobe on the data analysis and software development fronts.  This is undermining DigitalGlobe's position as the industry leader.

20.     Due to Paladino's conduct, DIA has already shifted software development services on the DIA project from DigitalGlobe to BigBear.

21.     Additionally, BigBear is now performing data analysis work through Mr. Paladino and his former DigitalGlobe team for another major U.S. government client. BigBear would have been unable to perform this data analysis work without Mr. Paladino and his team.

22.     DigitalGlobe is in imminent danger of losing additional DIA business. Specifically, because the DIA project has already shifted the software development services previously done by DigitalGlobe to BigBear, there is an imminent threat that the DIA project will also soon transfer the data analysis services over to BigBear.  This threat is particularly concerning in light of Mr. Paladino's relationship with DIA (a relationship Mr. Paladino was able to maintain as a result of his employment with DigitalGlobe) and the fact that BigBear is currently performing similar data analysis services for other U.S. government clients (as facilitated by Mr. Paladino and his team

using the skills, expertise, and Confidential Information obtained while at DigitalGlobe).

23.     DigitalGlobe is also in imminent danger of losing other current and prospective customers.  The nature of the projects DigitalGlobe is awarded from both current and prospective customers is unique and constantly changing.  DigitalGlobe will have no way to identify all of the future projects and potential clients that will be diverted. Because Mr. Paladino has intimate knowledge of DigitalGlobe's services, pricing, and procurement process of new projects, BigBear will have an incredible advantage in bidding for and procuring projects to DigitalGlobe's detriment.  At that point, it will be impossible to accurately calculate which future BigBear projects will be awarded to BigBear because of Mr. Paladino, whether those projects would have been awarded to DigitalGlobe absent any breach by Mr. Paladino, or whether the price and scope of those projects would have been identical at DigitalGlobe versus BigBear.

24.     DigitalGlobe's investment into its confidential and proprietary research and technology is significant. Mr. Paladino sits on the cutting edge of DigitalGlobe's Confidential Information.  Of course, as time passes, Paladino's intimate knowledge of DigitalGlobe's Confidential Information will become more attenuated and less threatening to DigitalGlobe's business interests.  However, as it stands today, Paladino's recent involvement in the highest levels of DigitalGlobe's proprietary technology directly threatens DigitalGlobe's competitive position in the marketplace.

25.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of August, 2017.

>*/s/ Leon Anthony Frazier* \
>Leon Anthony Frazier

8