**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-1636-WJM-MJW

DIGITALGLOBE, INC., a Delaware corporation, and
DIGITALGLOBE INTELLIGENCE SOLUTIONS, INC., a Delaware corporation,

      Plaintiffs,

v.

LOUIS PALADINO, an individual,

      Defendant.

---

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiffs DigitalGlobe, Inc. ("DigitalGlobe") and DigitalGlobe Intelligence Solutions, Inc. ("DGIS") (together, "Plaintiffs") sue a former employee, Defendant Louis Paladino ("Paladino"), for breach of contractual covenants of noncompetition, nonsolicitation of Plaintiffs' employees, and nondisclosure of Plaintiffs' trade secrets. Currently before the court is Plaintiffs' Renewed Motion for Preliminary Injunction. (ECF No. 25.) The Court has received and reviewed Paladino's response (ECF No. 26) and Plaintiffs' reply (ECF No. 29). The Court held an evidentiary hearing ("Preliminary Injunction Hearing") on August 30, 2017. (ECF No. 39.) The Court then called for simultaneous further briefing on certain lingering questions. (ECF No. 41.) The Court has received and reviewed the parties' supplemental briefs. (ECF Nos. 45, 46.) Having considered the record as a whole as it currently stands, the Court denies Plaintiffs' motion for a preliminary injunction for the reasons explained below.

# I. FINDINGS OF FACT

The preliminary injunction record supports the following findings of fact.

Plaintiffs are in the business of satellite mapping and a host of related services. DGIS in particular focuses heavily on providing services to the Department of Defense. DGIS's main business emphasis is geospatial predictive analysis, which involves gathering various data sets (mostly, satellite imagery and photos in social media posts) to more-or-less surveil the world, "extract[ing] information of military interest, to inform predictions of where and when events will occur." (ECF No. 46 at 3.)

Paladino began working in this field in 2006, when he joined a company that later merged with another company named GeoEye Analytics, Inc. ("GeoEye Inc."). In 2013, GeoEye Inc. went through a complicated series of transactions and emerged as a subsidiary of Plaintiff DigitalGlobe named GeoEye Analytics, LLC ("GeoEye LLC"). GeoEye LLC eventually changed its name to DigitalGlobe Intelligence Solutions— Plaintiff DGIS in this lawsuit. Despite the acquisitions, name changes, and so forth, Paladino's employers have always been based in Washington, D.C., or its suburbs, and that is where Paladino has lived and worked. The current parent entity, DigitalGlobe, is headquartered in Westminster, Colorado.

In 2009 (before GeoEye Inc. became a DigitalGlobe subsidiary), Paladino began leading a GeoEye Inc. team of 4–5 employees on a classified geospatial predictive analysis project for the Defense Intelligence Agency ("DIA") that went by the designation "DRI-7." Paladino's title at the time was "Senior Manager - Geospatial." His duties toward his subordinates were relatively limited. He delegated responsibilities to them and he contributed to their annual reviews, but they did not report directly to him and he

had no hiring or firing authority (although he participated in hiring interviews). Paladino had three layers of DGIS management above him.

A number of subcontractor employees from other companies also worked on DRI-7, including competitor firms named MDA, BigBear, and STR. All three of these firms will play a role in the events that led to Paladino's falling-out with DGIS, described below. But, at the time Paladino began work on DRI-7 in 2009, DGIS had yet to come into existence.

In December 2010, GeoEye Inc. required Paladino to sign an Employee Non-Disclosure Agreement ("GeoEye NDA"). (Plaintiff's Preliminary Injunction Hearing Exhibit ("PX") 3.)[1] The GeoEye NDA prohibits solicitation of employees, and of "any customer or client of the Company with whom the Employee had dealings or about whom the Employee acquired proprietary information," for one year after the end of the employee's employment with GeoEye. (*Id.* §§ D, E.) It also prohibits disclosure of "Proprietary Information" for three years after the end of the employee's employment. (*Id.* § B.) "'Proprietary Information' means information or material proprietary to the Company and not generally known by people not affiliated with the Company." (*Id.* § A.)

DRI-7 and Paladino's role in it continued after GeoEye Inc.'s 2013 acquisition and eventual name change to DGIS. Also in 2013, GeoEye LLC (soon to be DGIS) required Paladino to assent to the "Employee Invention, Confidential Information, Noncompetition and Non-Solicitation Agreement" ("2013 Agreement"). (PX 1.)[2] It contains a 1-year noncompetition clause with respect to "direct business lines,

---

[1] Also in the record at ECF No. 21-3.

[2] Also in the record at ECF No. 21-1.

including, but not limited to, satellite and aerial imagery operations, product distribution, mapping and other value added services" (*id.* § 6); a 1-year nonsolicitation-of-employees clause (*id.* § 8); and an indefinite nondisclosure agreement regarding "Business Confidential Information" (*id.* § 2), defined as "certain information, including, but not limited to, business plans, customer lists, marketing programs, price lists, salary and human resource information, technology development information, drawings, reports, inventions, and other material[s] that contain, embody or disclose trade secrets, confidential business and technical information and proprietary business information of the Company" (*id.* § 1).

Sometime between 2014 and 2016 (the evidence points in various directions), DGIS promoted Paladino to "Director of Geospatial," making him the "site lead [for DGIS] at DIA" (Preliminary Injunction Hearing Transcript ("Tr.") at 239) and responsible for about thirty DGIS employees. In this position, there was only one layer of management between him and DGIS's CEO.

In 2015, DGIS filed a patent application for certain technology that arose from the DRI-7 work. This upset Terry Busch, the DIA employee in charge of DRI-7. Busch believed that the technology in question had been developed with government dollars and therefore should not be proprietary to DGIS.

Apparently in 2016, DigitalGlobe required Paladino to sign an Employee Stock Option Plan ("Stock Option Plan"). (PX 2.)[3] Despite primarily governing stock options, the Stock Option Plan also contains a 1-year noncompete provision (*id.* § 24(d)(i)), a 2-year nonsolicitation provision (*id.* § 24(d)(ii)), and an indefinite nondisclosure provision

---

[3] Also in the record at ECF No. 21-2.

(*id.* § 24(b)).

Also in 2016, DIA awarded DGIS a "sole-source" (*i.e.*, no-bid) contract to continue developing a geospatial predictive analysis tool known as "Signature Analyst." This contract could last up to five years. Year one was guaranteed and years two through five are known as "option years." Whether to exercise those options is within DIA's discretion. Paladino was in charge of DGIS's performance under this contract.

At DIA's urging, part of what DGIS explored in the first year of this contract was "I&W," short for "indicators and warnings." I&W is a particular approach to geospatial predictive analysis. The parties have not explained how I&W differs from other approaches, because those details are classified. In any event, Paladino's team at DGIS diligently developed I&W.

There is some dispute—not relevant to the present proceedings—whether I&W was properly within the scope of DGIS's sole-source contract. Regardless, all parties agree that DIA frequently uses existing "contract vehicles" to explore potentially out-of-scope ideas, with an eye toward proving their feasibility and then establishing a new "contract vehicle" specifically focused on a proven-feasible idea. Whether or not I&W was out of the scope of DGIS's sole-source contract, the parties expected that DIA would eventually place I&W work under its own contract.

In January 2017, DIA exercised the first option year under DGIS's contract, but chose to fund only about $5.6 million of the $9.6 million available for that year. In February 2017, news leaked that MDA was planning to acquire DigitalGlobe. This further upset the DIA's Busch, due to an incident a few years previous in which a contract dispute allegedly prompted MDA to cut off a data stream that was highly

important to an in-progress, boots-on-the-ground military operation.  DIA had since

excluded MDA from DRI-7.

The MDA merger announcement caused concern for many DGIS employees,

who feared that DIA would terminate DGIS's participation in DRI-7.  Paladino was all the

more worried given his knowledge of Busch's lingering resentment over DGIS's patent

application.  Paladino's specific worries deepened in March 2017 when DGIS's patent

application was granted, and then, later in the month, DGIS began touting another

allegedly proprietary technology as if it had been developed in-house, although Busch

believed that it too had been developed with government dollars.

Around this time, Paladino began to consider leaving DGIS.  At first he explored

starting his own company.  He specifically discussed this idea with Frank Porcelli, CEO

of BigBear, who had co-founded BigBear and therefore had advice to offer on that

process.  He also organized meetings with certain DGIS employees to discuss forming

a new business.  Nonetheless, Paladino continued his attempts to solidify DGIS as

DIA's first choice for I&W work.

In May 2017, a DIA employee named Joe Hartenstine began assuming Busch's

role as DIA supervisor of DRI-7.  Paladino learned that Hartenstine planned to shift the

I&W exploratory work to a different "contract vehicle," namely, a sole-source contract

previously awarded to STR, with BigBear as the relevant subcontractor.  With an

interesting mix of metaphors, Paladino describes this revelation as the event that finally

prompted him to leave DGIS:

> And that was really, so to speak, the straw that broke the
> camel's back.  That, you know, after seeing that writing on
> the wall, which to me that writing on the wall appeared like a

> big neon sign on DRI-7's leadership's, you know, future
> direction, I decided to leave DGIS.

(Tr. at 263.)  Paladino gave notice to his DGIS superiors on June 1, 2017, and his last

day at DGIS was June 16, 2017.  In between those dates, he applied for a posted

position at BigBear.  The record does not reveal precisely when BigBear extended an

offer or when Paladino accepted it, but he started with BigBear in "late June" of 2017.

(Tr. at 193.)

On June 29, 2017, Hartenstine (or someone of similar authority at DIA) directed

DGIS to stop work on I&W, because that work was going to BigBear.  Paladino thus

continues to work for BigBear on the I&W development he had been doing for DGIS.

Five other DGIS employees have since joined Paladino at BigBear to work on I&W.

Three of those employees were persons whom he had met with a few months earlier to

explore the idea of starting a new company.

Plaintiffs filed this lawsuit on July 5, 2017.  (ECF No. 1.)  Paladino learned of the

lawsuit around that same time and reacted by sending an emotional group text

message to a number of his colleagues back at DGIS:

> DG is sueing [*sic*] me for violating my non-compete[.]  They
> are saying that I am in direct competition with them.  I have
> to return all my stock grants, including what I have sold, and
> [they] are threatening to continue to sue for lost future work
> amounts.  Even [DGIS CEO] Tony [Frazier] himself told me
> that [DGIS's sole-source contract with DIA] was [at] high risk
> for [dis]continuation after the MDA merger, and now he is
> coming after me and my family.  I wanted to stay close to
> [DRI-7], and now this.  By doing this DG is going to put fear
> in others leaving, but I think they are sending the message
> that their employees are being held hostage.

(PX 15.)

## II. REQUESTED INJUNCTION

Plaintiffs ask that Paladino be enjoined from

> (i) owning, managing, operating, joining, controlling,
> providing services to, or serving as an employee, agent,
> consultant, officer or director of BigBear, Inc. or any entity
> engaging in geospatial predictive analysis, including the use
> of machine learning to perform I&W analysis and automate
> object detection from satellite imagery and ground photos;
> (ii) directly recruiting, soliciting, or attempting to persuade
> any DGIS employee to leave employment with DGIS for the
> purpose of employing him or her at any such entity; [and]
> (iii) using or disclosing DGIS Business Confidential
> Information as defined in Paragraph 1 of the [2013
> Agreement].

(ECF No. 46 at 11–12.)

## III. PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary remedy; accordingly, the right to relief
must be clear and unequivocal. *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d
1110, 1117 (10th Cir. 2010). A movant must show: (1) a likelihood of success on the
merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the non-
moving party, and that (4) the injunction would not adversely affect the public interest.
*See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).

Until recently, the Tenth Circuit endorsed an alternate standard that relaxed the
likelihood of success requirement when the other three factors tipped strongly in the
movant's favor. *See, e.g.*, *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration
Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006). The Tenth Circuit abrogated this
standard last year, announcing that "any modified test which relaxes one of the prongs
for preliminary relief and thus deviates from the standard test is impermissible." *Diné
Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir.

8

2016).[4]

"The Federal Rules of Evidence do not apply to preliminary injunction hearings." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). The fact that evidence might be excludable goes to the weight of that evidence, not necessarily its admissibility. *See, e.g.*, *Pharmanex, Inc. v. HPF*, 221 F.3d 1352 (table), 2000 WL 703164, at *3 (10th Cir. 2000).

## IV. ANALYSIS

### A. Likelihood of Success

Plaintiffs sue Paladino for breach of contractual covenants of noncompetition, nonsolicitation of Plaintiffs' employees, and nondisclosure of Plaintiffs' trade secrets. Plaintiffs also sue for breach of the duty of loyalty, but that claim is not at issue in these preliminary injunction proceedings.

#### 1. Which of the Three Contracts Applies?

Before the Court can evaluate Plaintiffs' likelihood of success on any of their contract theories, the Court must first determine which contract applies. As noted above, Paladino has signed three similar agreements: the GeoEye NDA, the 2013 Agreement, and the Stock Option Plan.

---

[4] *Diné Citizens* abrogated any "relaxed" test, but said nothing about more stringent tests. For example, if the injunction will (1) alter the status quo, (2) mandate action by the defendant, or (3) afford the movant all the relief that it could recover at the conclusion of a full trial on the merits, the Tenth Circuit has held the movant must meet a heightened burden. *See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir.2004) (*en banc*). Specifically, the proposed injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course" and "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* But, neither Plaintiffs nor Paladino make any argument based on this higher standard. The Court therefore need not address it, nor whether *Diné Citizens* affected it in any way.

The 2013 Agreement specifically states that it supersedes any prior agreement between the employee and what was then GeoEye LLC (which later changed its name to DGIS). (PX 1 § 9(b).) Thus, there appears to be no circumstance under which the GeoEye NDA is still enforceable.

As for the Stock Option Plan, its covenants of noncompetition, nonsolicitation, and nondisclosure are stated as conditions for obtaining and keeping stock option awards, and violation of any of them allows DigitalGlobe to rescind and/or recapture those awards. (PX 2 § 24(a).) It is not clear that these provisions are enforceable apart from that purpose. (*Cf*. Tr. at 18 (Plaintiffs' counsel's acknowledgment that "the relief on the stock option agreement is that DigitalGlobe gets back the stock if he breaches").) The Court therefore finds the Stock Option Plan irrelevant for present purposes.

This leaves only the 2013 Agreement, and that is the focus of the Court's analysis below.

2.      Is the Noncompete Covenant Enforceable?

The 2013 Agreement's noncompete covenant states:

> I agree that I shall not, during the term of my employment by
> the Company and for a period of twelve months thereafter,
> compete for any reason with the Company in its direct
> business lines, including, but not limited to, satellite and
> aerial imagery operations, product distribution, mapping and
> other value added services, by directly or indirectly taking
> any of the following actions: (a) owning, managing,
> operating, joining, controlling or providing services to any
> entity, regardless of entity form or location, that engages in
> or is seeking to engage in the current or planned business
> activities of the Company; (b) serving as an employee,
> agent, consultant, officer, or director of any such entity; or
> (c) inducing or attempting to induce any customer, supplier,
> or business relation of the Company to cease doing
> business with the Company, or in any other way interfering
> with the relationship between any customer, supplier or

business relation and the Company. If, after termination of my employment with the Company, I violate the covenants contained in this paragraph, then the duration of the covenant shall be extended from the date I resume compliance with the covenant, reduced by the number of days following my termination that I was not in violation of the covenant.

(PX 1 § 6.)

In Colorado, "[a]ny covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void," subject to enumerated exceptions. Colo. Rev. Stat. § 8-2-113(2). "[T]he employer has the burden to establish that the covenant not to compete falls within one of those narrow exceptions." *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 840 (Colo. App. 2007).

Plaintiffs assert two exceptions: "[a]ny contract for the protection of trade secrets," Colo. Rev. Stat. § 8-2-113(2)(b); and "[e]xecutive and management personnel and officers and employees who constitute professional staff to executive and management personnel," *id.* § 8-2-113(2)(d). The Court will analyze each exception in turn.

a.   *Is the 2013 Agreement a "Contract for the Protection of Trade Secrets"?*

The 2013 Agreement requires the signatory to "acknowledge that the [noncompete] restrictions . . . are reasonable and that the covenants are necessary to protect the Company's interest in Business Confidential Information, which would be inevitably disclosed if were to compete, directly or indirectly, with the Company in its direct product lines." (PX 1 § 7.) Again, "Business Confidential Information" means certain information, including, but not limited to, business

11

> plans, customer lists, marketing programs, price lists, salary and human resource information, technology development information, drawings, reports, inventions, and other material that contain, embody or disclose trade secrets, confidential business and technical information and proprietary business information of the Company, its shareholders, customers, or third parties to whom the Company owes obligations of confidentiality . . . .

(*Id.* § 1.)  Given this, it is difficult *not* to characterize the 2013 Agreement as a "contract for the protection of trade secrets."  Colo. Rev. Stat. § 8-2-113(2)(b).

Paladino responds by invoking the statutory definition of "trade secret" under the Colorado Uniform Trade Secrets Act ("CUTSA"), Colo. Rev. Stat. §§ 7-74-101 to -110. That definition is as follows:

> "Trade secret" means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.  To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 7-74-102(4).  Having set forth this definition, Paladino argues that "Plaintiffs have failed to identify (1) any specific trade secrets, (2) what measures Plaintiffs took to keep the alleged trade secrets confidential, (3) why the information has competitive value, and (4) how Paladino is allegedly misappropriating the information in his job at BigBear."  (ECF No. 26 at 20.)

Plaintiffs counter that Paladino is confusing the elements of a trade secret misappropriation claim (the focus of CUTSA) with the question of whether a noncompete covenant is valid because it is intended to protect trade secrets.  (ECF No.

29 at 8.)  The Court agrees.  The plain language of the Colorado noncompete statute says that a "covenant not to compete . . . shall be void, but this [provision] shall not apply to * * * [a]ny contract for the protection of trade secrets."  Colo. Rev. Stat. § 8-2-113(2)(b).  Thus, the focus is *not* on whether any particular trade secret is at risk of disclosure, but whether the noncompete covenant is a "contract for the protection of trade secrets."  The 2013 Agreement fits that description, and therefore falls within the statutory exception.

  b. *Is Paladino Within the "Executive and Management Personnel" Exception?*

  The second exception Plaintiffs invoke is for "[e]xecutive and management personnel and officers and employees who constitute professional staff to executive and management personnel."  Colo. Rev. Stat. § 8-2-113(2)(d).  Surprisingly, the Colorado Court of Appeals interprets this exception to apply only when an individual holds the relevant position *at the time he or she signed the noncompete agreement.  Phoenix Capital*, 176 P.3d at 840–41.  How the court reached this interpretation does little to mitigate the surprise.

  The trial court whose judgment was under review in *Phoenix Capital* had apparently relied on three Court of Appeals decisions interpreting "void" in § 8-2-113(2) to mean "void *ab initio.*"  *See id.* (citing *In re Marriage of Fischer*, 834 P.2d 270, 272 (Colo. App.1992); *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (Colo. App. 1988) ("*Miller*"); and *Colo. Accounting Machs., Inc. v. Mergenthaler*, 609 P.2d 1125, 1127 (Colo. App. 1980) ("*Mergenthaler*")).  If "void" means "void *ab initio*," then logically a noncompete covenant is as if it never came into existence if no exception applies at the time of contracting.  *Id.* at 840.

13

Interestingly, however, none of the three cases relied upon by the trial court self-consciously held that "void" means "void *ab initio*"; they instead summarized § 8-2-113(2) and (in case of *Fischer* and *Miller*) used the phrase "void *ab initio*" instead of the lone statutory word "void"; or (in the case of *Mergenthaler*) stated without analysis that "void" meant something stronger than "voidable"—but in all three cases without reflection on whether these summaries accurately characterized the statute the Legislature had enacted. In addition, none of these three cases was faced with the question at issue in *Phoenix Capital*, namely, the time at which a person's status under the executive/management exception should be judged.

Nonetheless, the Court of Appeals in *Phoenix Capital* reasoned that "the trial court was obliged to follow [these] decisions" and therefore "perceive[d] no abuse of the trial court's discretion in concluding, consistent with those decisions, that the validity of a noncompetition provision is determined as of the time the agreement is entered into, and not as of any time thereafter." 176 P.3d at 840. Thus, if the employee signs such an agreement "while not qualifying as personnel as described in § 8-2-113(2)(d)" but is "later promoted to [a] key position[] in the company," it is the employer's obligation to enter into a new noncompete agreement with that employee. *Id.* at 841.

As this summary makes clear, *Phoenix Capital* did not actually hold that the trial court's interpretation was the correct interpretation as a matter of law, but rather that the trial court committed no abuse of discretion in interpreting prior Court of Appeals cases as it did. *Phoenix Capital* further stated that it "perceive[d] no persuasive reason to abandon or decline to follow that line of authority," referring to the three cases on which the trial court had relied, *id.*—as if they had already considered and resolved the

question at issue.

Federal courts sitting in diversity are not bound by the decisions of state intermediate appellate courts. *See Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1240–41 (10th Cir. 2003). Out of comity and practical expediency, such decisions are normally followed without comment, as if binding, but they may be ignored when the federal court concludes that the intermediate appellate court decided the question contrary to the likely holding of the state's highest court.

The Court is confident that the *Phoenix Capital* interpretation of the executive/management exception—which, again, is stated in terms of an affirmance under the circumstances, and not a holding—is contrary to the Colorado Supreme Court's likely future construction of that phrase. This is so for two reasons.

First, the Court *agrees* with the Court of Appeals that "[t]he determination of whether an employee is executive or management personnel, or professional staff, is a question of fact for the trial court." *Miller*, 762 P.2d at 765. But, particularly with respect to alleged managers, this factual question is often settled under a multifactorial analysis that examines

1. the number of employees under the alleged manager's supervision;

2. the number of management levels above the alleged manager;

3. whether the alleged manager supervised a particularly significant part of the company's business;

4. whether the alleged manager had any role in setting company strategy;

5. the amount of autonomy the alleged manager possessed to make business decisions; and

15

6.       where the alleged manager fit in the company's compensation scale.

*See Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1259 (D. Colo. 2005); *DISH Network Corp. v. Altomari*, 224 P.3d 362, 368 (Colo. App. 2009); *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 795 (Colo. App. 2001), *abrogated on other grounds by Ingold v. AIMCO/Bluffs, L.L.C. Apartments*, 159 P.3d 116 (Colo. 2007). Thus, no employer can ever be certain of a noncompete covenant's enforceability against an employee the employer sees as executive or management personnel until that noncompete covenant is litigated.

In this light, any employer attempting to comply with the burden announced by *Phoenix Capital*—to "enter into new employment agreements as its employees take on additional responsibilities," 176 P.3d at 841—has essentially no guidance on whether those new employment agreements will be effective, or will instead be further exercises in futility. The only safe course for an employer in these circumstances would be to require everyone in the company to repeatedly sign noncompete covenants at regular, frequent intervals, irrespective of promotions, raises, changes in team size, changes in supervisory reporting responsibilities, etc.

Second, and closely related to the foregoing, is the problem raised by the likelihood that the outcome under the various factors discussed above will fluctuate over the course of an employee's tenure, so an employee who might be a manager at the time of hiring might not meet that standard later. For example, some cases have found that supervising fifty employees, combined with other factors, confirms that an employee is a "manager" for purposes of § 8-2-113(2)(d). *Doubleclick*, 402 F. Supp. 2d at 1259; *Altomari*, 224 P.3d at 368. If an alleged manager supervises fifty employees

and then her team is broken into two teams of twenty-five and she remains the supervisor of only one of those teams, is she still a manager for purposes of the statute? If those two teams are later reconstituted as one and she is appointed the supervisor, is she a manager again? What if she remains a supervisor over fifty employees but an acquisition causes the company to restructure and she now has more layers of management over her than before? What if the manager supervises what began as a particularly significant part of the company's business, but over time it becomes less significant?

In all of these hypotheticals, there is a strong argument that an employee may *begin* as a manager for purposes of the statute, but then regress to some non-managerial role. Thus, the noncompete covenant could not be deemed void *ab initio*, but it might later be deemed void in some more-generic sense. *Cf. Black's Law Dictionary*, *s.v.* "void (*adj.*)" (10th ed. 2014) (definition 2: "Although ['of no effect whatsoever'] is the strict meaning of *void*, the word is often used and construed as bearing the more liberal meaning of 'voidable.'"). And indeed, two Colorado Court of Appeals decisions evaluate an employee's responsibilities *at the time of separation* precisely because of this scenario —regression from a supervisory to a non-supervisory role during the course of employment. *See Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 738–39 (Colo. App. 2006); *Atmel*, 30 P.3d at 795.

Paladino claims this shows an "elegant harmony [of] Colorado law on this issue." (ECF No. 45 at 10.) "Reading all of these cases together," he says,

> the principles are clear. If a noncompetition covenant is void when entered into, it remains void and (logically) cannot be resuscitated. However, if such a covenant is not void *ab*

*initio*, it can become voidable if the employee's circumstances change adversely.  This reading is consistent with Colorado public policy of putting the burden on employers to secure enforceable covenants in the first place, if possible, to secure updated or new ones upon a *bona fide* promotion, and to *protect employees* if the consideration permitting noncompetition restraints is taken away by the employer (demotion).

(*Id.* at 11 (emphasis in original).)  Far from displaying an "elegant harmony," this explanation reveals the various problems created by the Colorado Court of Appeals's various applications of the executive/management exception.

The first problem is that *Reed Mill* and *Atmel*—the two cases from which Paladino derives the possibility that noncompete covenants can become voidable, if they were not void *ab initio*—never use the word "voidable."

The second problem is that Paladino's proposed synthesis can really be reduced to the following: when the Colorado Legislature used the undefined word "void" in § 8-2-113(2), it actually meant something like "'void *ab initio*' if the employee began as a non-manager but later became a manager, but 'voidable' if the employee began as a manager and later became a non-manager."  The Court will not impute to the Legislature such a complicated and non-obvious meaning, particularly when the word "void" comes in the general statement of the rule and not in the sub-part announcing the executive/ management exception—thus weakening any inference that the Legislature was consciously considering how "void" might be interpreted in the specific context of that exception.

The third problem is that the supposed "Colorado public policy of putting the burden on employers to secure enforceable covenants in the first place, if possible, [and] to secure updated or new ones upon a *bona fide* promotion" (ECF No. 45 at 11)

18

cannot fairly be considered Colorado public policy.  It is, rather, *Phoenix Capital*'s statement of an employer's burden in light of *Phoenix Capital*'s choice to affirm the trial court.  It is not at all a fair reading of what the Colorado Legislature actually intended on this issue.

The fourth problem has already been highlighted by the hypotheticals posed above.  If Paladino's interpretation is correct, then some noncompete covenants are void *ab initio*, but others float in and out of enforceability depending on numerous factors.  At any given moment, an employer has no way of knowing whether an employee in an arguable management position will actually be restrained from competing if that employee separates from the company.

Finally, *Phoenix Capital* and Paladino overlook the clearly obvious, namely, that a post-separation noncompete covenant is meant to apply *when the employee separates*.  Thus, the Court can see no reason why the Colorado Legislature would not want a noncompete covenant's validity judged at the time of separation.  Given this, it makes no sense to say that an employee who "started in the mailroom" and then rose to a senior position may nonetheless join a competing firm because the employer miscalculated precisely when the employee was required to sign a noncompete agreement.

Considering the foregoing, the Court predicts that if the question were squarely presented to the Colorado Supreme Court, it would hold that the Colorado Legislature never intended "void" in § 8-2-113(2) to have a strict technical meaning (either "void *ab initio*" or "voidable"), but rather as an emphatic synonym for "unenforceable"; and that a noncompete covenant's enforceability must be judged under the circumstances present

at the employee's separation, regardless of whether the noncompete covenant would have been enforceable at some earlier time.

When Paladino left his employment at DGIS, he had been supervising thirty employees and was responsible for ensuring that DGIS fulfilled its role in DRI-7. He had only two layers of DGIS management above him. He had hiring authority. He had knowledge of DGIS's labor rates and salary scales, which he acknowledges to be DGIS's trade secrets. He was earning approximately $180,000 a year. Considering all of these factors together, the Court concludes that Paladino was a manager for purposes of § 8-2-113(2)(d).

        c.     *Are Plaintiffs Likely to Prove All of the Elements of a Breach of Contract Claim Based on Breach of the Noncompete Covenant?*

The Court has held that Plaintiffs are likely to succeed in proving that both the trade secrets exception and executive/management exception apply to the noncompete covenant in the 2013 Agreement. In briefing and at the Preliminary Injunction Hearing, Plaintiffs have argued as if that is all they need to prove—if an exception applies, the noncompete covenant is automatically enforceable through injunctive relief. Given the statutory scheme applicable here, this is manifestly incorrect. Proving that an exception applies only saves a noncompete covenant from unenforceability. Now that the Court has concluded that the covenant is enforceable, the Court must determine whether Plaintiffs are likely to succeed in proving a *breach* of the covenant.

The basic breach-of-contract elements in Colorado are: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (internal

quotation marks and citations omitted). The Court has no doubt that Plaintiffs will prove the existence of a contract and their own performance. The Court also finds that Plaintiffs are likely to prove that Paladino failed to perform. Paladino led the "I&W team" (for lack of a better term) at DGIS, and then Paladino went to BigBear, a competitor, and continued working on I&W (and indeed, leading mostly the same team, once other DGIS employees joined him). Consequently, on the record as it now stands, there is no question that Paladino has "join[ed] . . . an[] entity . . . that engages in or is seeking to engage in the current or planned business activities of [DGIS]," in violation of the 2013 Agreement. (PX 1 § 6.) The Court finds, however, that Plaintiffs have not carried their burden to show a likelihood of proving damages *resulting from Paladino's breach*.

Plaintiffs believe that DIA would not have sent DGIS's I&W work to BigBear but for Paladino's choice to join BigBear, and all parties admit that Paladino's I&W work at BigBear is the same I&W work he had been doing at DGIS. This would appear to be a clear case of detrimental competition but for one unique wrinkle. DIA controlled the I&W work, and—according to Paladino—DIA had decided to move that work away from DGIS regardless of his own personal decision to leave. Indeed, Paladino's testimony is that he decided to leave DGIS *because of* DIA's intent to transfer I&W work from DGIS to STR (as prime contractor) and BigBear (as subcontractor), which intent he claims he learned about in late May 2017.

Plaintiffs point out, of course, that DIA did not revoke the I&W work until June 29, 2017, around the time Paladino joined BigBear. Thus, there is a fair inference that Paladino's move to BigBear influenced DIA's decision whether to act on the intent Paladino had supposedly learned about in late May. But, on the evidence currently in

the record, the Court has not seen enough evidence from which it can hold that Plaintiffs are *likely* to succeed in proving this theory, or anything like it (*e.g.*, that but for Paladino, DIA would have become disappointed with BigBear and moved the I&W work back to DGIS). As the case now stands, it is just as likely that a jury could find that DGIS's pending merger with MDA, and DGIS's perceived overreaching with respect to intellectual property arguably owned by the government, had generally soured the relationship with DIA, and DIA was therefore likely to revoke the I&W work regardless of Paladino's presence at BigBear. Thus, to the extent Plaintiffs believe that they have been harmed by losing the specific I&W work that Paladino took with him to BigBear, DGIS has not shown on this record that it is likely to succeed in proving any damages that Plaintiffs would not have otherwise incurred due to their own conduct—although the Court does not foreclose the possibility that, on a more fully developed record, a jury could conclude to the contrary.

Plaintiffs also believe that DGIS's competitive position will be harmed in the future as new opportunities to serve the Defense Department arise. Presumably this harm would come because BigBear would have access, through Paladino, to DGIS's alleged trade secrets, thus depriving DGIS of its ability to promote its unique capabilities when competing for Defense Department contracts. To the extent this is Plaintiffs' theory, the Court once again finds that Plaintiffs have not demonstrated a *likelihood* of proving it, or more specifically, a likelihood of proving that Paladino possesses any trade secrets that he will use to BigBear's advantage. *Cf. Miller*, 762 P.2d at 766 (in the context of a noncompete covenant designed to protect trade secrets, stating that "[t]he trial court must first examine the factual situation to determine whether a restrictive

covenant is justified at all").

Plaintiffs argue that Paladino possesses two categories of trade secrets: technical secrets and "competitive assets." (ECF No. 46 at 2.) Concerning technical secrets, Plaintiffs describe them in briefing as follows:

> Paladino was instrumental in developing DGIS's technical approach to its geospatial analytics program at the United States government's Defense Intelligence Agency ("DIA"), including in particular its algorithms and methods for applying machine learning to large volumes of geospatial data, and he retains all the key aspects of DGIS's technical information.

(ECF No. 46 at 2.) The Court does not doubt that "algorithms and methods for applying machine learning to large volumes of geospatial data" could qualify as trade secrets. However, Plaintiffs do not assert (and certainly have not proven) that Paladino retained these algorithms and methods in his possession, or even in his head. Rather, Plaintiffs say that Paladino "retains all the key aspects of DGIS's technical information." This is far too generic for the Court to conclude that Paladino possesses some item of competitively advantageous knowledge. Indeed, this problem is emphasized by the testimony of Tony Frazier, DGIS's CEO, who was asked at the Preliminary Injunction Hearing about the technical trade secrets allegedly in Paladino's possession:

> Q.     Mr. Frazier . . . by "capabilities," do you mean the technical skills that DGIS has developed that permits it to perform its services work for the various United States Government agencies?
>
> A.     I do.  I do.  And I'll give you a few examples.  We have—one of the patterns that we've seen in our industry is that there is an explosion of sources of geospatial data, but most of that data's unstructured.  There's a need—in order to do corrective analysis, you need to be able to have rich information to feed those analytics.

23

And so an area that we've been focused on as a team is how do we leverage advances and artificial intelligence and machine learning, computer vision, you know, et cetera, to be able to extract information, you know, from satellite imagery, you know, so to be able to look at a picture and understand, you know, where all the features are, where all the bridges, the tunnels, you know, the educational institutions, et cetera, as well as ground photos, you know, how to be able to take imagery collected from social media and be able to identify objects of interest.

So that—that extension of our capabilities is something that is—we have a road map that has had multiple sources of internal and Government funding to advance, you know, that capability. And so that will be an example of a—

Q. Did Mr. Paladino have access to those capabilities?

A. He did. I mean, he had access to the resulting—his team had a combination of geospatial analysts, data scientists, and software developers that build algorithms and then applied those algorithms, you know, to the sources of data that were of interest to the Defense Intelligence Agency.

Q. And those capabilities are—are the mechanism by which DGIS performs its services function; is that correct?

A. It is. So we have—you know, as I mentioned, we have data scientists that—and software developers and analysts. And across our different customers, you know, there's a slightly different mix, kind of across each customer based on the needs of their mission. But they work together in partnership with the customer to be able to do a form of information extraction or data analysts.

Q. Is this confidential information, these trade secrets? Are they valuable to DGIS?

A. Absolutely.

(Tr. at 36–38.) Frazier here describes technical capabilities that certainly look like they

could be trade secrets. But as to the most important question for present purposes—

what trade secrets does Paladino still possess?—Frazier's answer is that Paladino had

24

"access" to something "resulting" from his team's efforts.

In the Court's experience, a plaintiff who believes its trade secrets are at risk can point to specific information or data sources that the defendant "carried out the door" (sometimes literally), or that the defendant may be able to recreate from memory. *See, e.g.*, *Engility Corp. v. Daniels*, 2016 WL 7034976, at *3 (D. Colo. Dec. 2, 2016) (defendant impermissibly copied numerous sensitive computer files); *First W. Capital Mgmt. Co. v. Malamed*, 2016 WL 8358549, at *3–4 (D. Colo. Sept. 30, 2016) (defendant obtained a printout of the company's book of current clients and prospects, as well as account statements from current clients) ("*Malamed*"); *id.* at *7 ("[the defendant] likely remembers at least some of the management fee percentages charged to various clients, or categories of clients"). Here, Plaintiffs offer no such specificity, instead falling back on vague terms such as "key aspects" and "access to" unspecified "result[s]." Thus, the current record does not contain enough to establish a likelihood of success on the theory that Paladino possesses technical trade secrets and therefore must be enjoined from working for BigBear.

Plaintiffs' second category of alleged trade secrets is "competitive assets," meaning "business strategies and details of [DGIS's] pricing and salary structure." (ECF No. 46 at 2.) Paladino acknowledges that he possesses at least some of this information, and he does not deny the trade-secret status of such information. (Tr. at 229–34.) However, he also testified—credibly, in the Court's opinion—that BigBear has never asked him to divulge any of that information, nor does he plan to divulge it. (*Id.*)

There is, nonetheless, a potentially troubling possibility not directly covered by Paladino's testimony. It is likely that Paladino will eventually participate on BigBear's

behalf in business proposals to the Defense Department, and it is possible that some of these proposals will compete directly or indirectly with DGIS proposals. In formulating such proposals, Paladino need not affirmatively divulge anything to his BigBear colleagues about DGIS's pricing and salary structures, for example, but could nonetheless suggest business terms that he knows (in his own mind) would be competitive with DGIS. *Cf. Malamed*, 2016 WL 8358549, at *7 ("without making any explicit comparison to [his former company], he can offer management fees that are, say, a quarter of a percent lower than what he knows the individual was paying at [the former company], and thereby entice the client—who almost certainly would recognize that he or she was being offered a discount as compared to [the former company]").

However, the Court finds this insufficient to show a likelihood of success for two reasons. First, Frazier and Paladino both testified that "labor rates" have a "shelf life" of only about one year. (Tr. at 95, 232.) Second, the evidence as a whole shows Paladino's intention to respect the trade-secret status of this sort of information. *Contra Malamed*, 2016 WL 8358549, at *7 ("This evidence is sufficient for preliminary injunction purposes to convince the Court that Malamed does not consider his knowledge of Plaintiffs' client information to be a trade secret, and that he will use it to compete with Plaintiffs if not enjoined.").

In conclusion, the Court finds that Plaintiffs have not met their burden to show a likelihood of success on the damages element of their breach of contract claim. Accordingly, they are not entitled to a preliminary injunction enforcing the noncompete covenant in the 2013 Agreement.[5]

---

[5] There remains, of course, the Court's finding that the executive/management exception

26

3. <u>Nonsolicitation</u>

The nonsolicitation covenant at issue here reads as follows:

> For a period of one year immediately following the termination of my employment with the Company, I shall not, directly or indirectly, recruit, solicit, attempt to persuade, or assist in the recruitment or solicitation of, any employee of the Company who was an employee, officer or agent of the Company during the three month period immediately preceding the date of termination of my employment, for the purpose of employing him or her or obtaining his or her services or otherwise causing him or her to leave his or her employment with the Company.

(PX 1 § 8.)  Paladino argues, and Plaintiffs have not disputed, that by its terms this covenant applies only to post-separation activities.  (ECF No. 26 at 21.)

The evidence certainly shows that, *prior to* Paladino's separation from DGIS, he pitched the possibility of other employment opportunities to certain DGIS colleagues. This course of conduct may be relevant to Plaintiffs' claim for breach of the duty of loyalty, which is not at issue in these preliminary injunction proceedings.  As to *post-separation* conduct, the current record contains insufficient evidence to find that Paladino has "directly or indirectly, recruit[ed], solicit[ed], attempt[ed] to persuade, or assist[ed] in the recruitment or solicitation of, any [DGIS] employee."

---

applies to Paladino.  That exception is separate from the trade secrets exception, strongly suggesting that the Colorado Legislature meant noncompete covenants to be enforceable as to executives and managers even when trade secrets are not at risk.  One might argue—although Plaintiffs have not—that the executive/management exception is a legislative endorsement of some sort of presumed harm when a manager or executive takes his or her business acumen and experience to a competitor.  But the parties have not presented the Court with case law endorsing such a theory, and so the Court must treat alleged breach of a noncompete covenant saved from unenforceability under the executive/management exception the same as alleged breach of any other contract.  For all the reasons explained above, the record as currently developed does not show that Plaintiffs are any more likely than Paladino to succeed in proving that Paladino's breach caused (or did not cause) them any harm.  And, in any event, Plaintiffs have also failed to show irreparable harm, as discussed below in Part IV.B.

In particular, the Court finds that Paladino's post-separation text message complaining to his former DGIS colleagues about DGIS's lawsuit (PX 15) does not qualify as direct or indirect recruitment or solicitation, or an attempt to persuade his former colleagues to leave DGIS.  The Court instead agrees with the perception of one of the text message's recipients, Andrew Jenkins, whom Paladino had solicited to leave DGIS before his separation, but who chose to remain at DGIS.  When Jenkins received this text message, he interpreted it as an attempt to gain sympathy among those still employed at DGIS, who might then influence DGIS's decision-makers to drop the legal action against him: "[H]e was trying to appeal to his friends, a lot of people that he worked with, he had a long history with the company, but you know, that—this is very— this is not right, and what they're doing to me, and stuff like that."  (Tr. at 154.)

Consequently, Plaintiffs have not shown a likelihood of success in proving breach of the nonsolicitation covenant.  No preliminary injunction is justified on these grounds.

4.    Nondisclosure

The nondisclosure provision in the 2013 Agreement reads, in relevant part, as follows:

> . . . I agree that neither during the term of my employment nor at any time after my employment is terminated (until such time, as ever, as the Business Confidential Information becomes part of the public domain other than by my breach of this Agreement), I shall not: (i) disclose or furnish to any person any Business Confidential Information; (ii) use any Business Confidential Information for my own benefit or the benefit of others, or (iii) remove any Business Confidential Information from the Company facilities.  Any Business Confidential Information, including all hard copies and electronic storage, that I receive shall be returned to the Company upon request or, in any event, immediately upon termination of my employment with the Company.

(PX 1 § 2.)

Even if Paladino will not be enjoined from working at BigBear, the Court could still enjoin him from disclosing BigBear's trade secrets. However, for the reasons already explained above (Part IV.A.2.c), Plaintiffs have failed to persuade the Court on the record as it is currently developed that any trade secrets are at risk. Thus, Plaintiffs have not established a likelihood of success in proving breach of the nondisclosure covenant.

Nonetheless, to be clear, the Court takes no position on the view expressed at the Preliminary Injunction Hearing by Paladino and Porcelli (BigBear's CEO) that technical capabilities developed with government dollars should not be considered trade secrets. (Tr. at 188, 291.) Paladino has proffered no legal argument to support that position, and the current record suggests that Plaintiffs *do* possess protectable technical trade secrets, such as the algorithms for analyzing geospatial data—regardless of whether Plaintiffs developed those trade secrets through money earned on a government contract. If discovery reveals that Paladino retains these trade secrets (or any others) and has used them or is likely to use them to further BigBear's business at DGIS's expense, nothing prevents Plaintiffs from filing a renewed preliminary injunction motion specifically to enforce the nondisclosure covenant.

**B.     Irreparable Harm**

Apart from the foregoing, the Court also finds that Plaintiffs have failed to demonstrate a threat of irreparable harm.

1.     <u>The Need for a Genuine Showing of Irreparable Harm</u>

In a previous noncompetition lawsuit involving a statutory claim of trade secret

misappropriation (which Plaintiffs have not pleaded in this lawsuit), the Court granted a preliminary injunction, reluctantly following a line of Tenth Circuit precedent establishing that irreparable harm is presumed when a defendant "is or will soon be engaged in acts or practices prohibited by statute, and that statute provides for injunctive relief to prevent such violations." *Malamed*, 2016 WL 8358549, at *11 (citing *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651 (10th Cir. 2004); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001); and *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981)). The Court nonetheless stated that, "but for *Star Fuel* and its predecessors, the Court would not have found irreparable harm," and the Court expressed doubt that *Star Fuel* remained good law after certain Supreme Court decisions suggesting that no element of the preliminary injunction test should ever be presumed. *Id.* at *12 n.5.

One month after that order, the Tenth Circuit announced in *Diné Citizens* that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." 839 F.3d at 1282. About three months after *Diné Citizens*, the Tenth Circuit stayed this Court's preliminary injunction pending appeal. (*See First W. Capital Mgmt. Inc. et al. v. Malamed*, Civil Action No. 16-cv-1961, ECF No. 124 (Jan. 27, 2017).) The Tenth Circuit did not explain its decision beyond announcing that the stay-pending-appeal factors "weigh in favor of granting a stay." (*Id.* at 2.) Nonetheless, the Court strongly suspects that its reluctant reliance on and criticism of *Star Fuel* was the decisive consideration for the Tenth Circuit, particularly in light of *Diné Citizens*.

Whether or not the Court has correctly read the appellate tea leaves, *Diné*

*Citizens* itself makes clear that the Court may not presume irreparable harm simply because this case involves a noncompete covenant, trade secrets, or the like. *Contra, e.g.*, *Miller v. Kendall*, 541 P.2d 126, 127 (Colo. App. 1975) ("Where there is a noncompetition agreement, breach is the controlling factor and injunctive relief follows almost as a matter of course. Damage is presumed to be irreparable and the remedy at law is considered inadequate.").

        2.     <u>Plaintiffs' Failure to Demonstrate Irreparable Harm</u>

"[A] plaintiff satisfies the irreparable harm requirement by demonstrating a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (internal quotation marks omitted). "Courts finding irreparable harm" in similar types of cases "have identified the following as factors supporting irreparable harm determinations: inability to calculate damages, harm to goodwill, diminishment of competitive positions in [the] marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004). As explained below, these factors tip in favor of Paladino, not Plaintiffs.[6]

        a.     *"Inability to Calculate Damages"*

Plaintiffs have not shown an inability to calculate damages. If Plaintiffs can prove that Paladino's breach of any portion of the 2013 Agreement caused DIA to transfer the I&W work from DGIS to BigBear, damages are calculable, namely, whatever amounts

---

[6] The Court will not analyze the "impact of state law" factor. It has no clear relevance here.

DGIS would have received under its current DIA contract for performing the I&W work. If Plaintiffs can prove that Paladino's breach caused DIA not to pick up subsequent option years on DGIS's sole-source contract, Plaintiffs' damages are again calculable, namely, the amounts DGIS would have been paid under those option years.

Plaintiffs have a stronger case as to potential future opportunities to contract with the Defense Department or other entities. Nonetheless, the industry in which DGIS and BigBear compete is not one characterized by a high volume of transactions. Rather, contract awards to any one business are relatively infrequent, and are also highly formal. If some contract eventually goes to BigBear and Plaintiffs can prove at trial that it is more likely than not that the contract would have gone to DGIS but for Paladino's breach of the 2013 Agreement, Plaintiffs will be able to calculate their damages according to the value of the contract awarded to BigBear.[7]

      b.    *"Harm to Goodwill," "Diminishment of Competitive Positions in [the] Marketplace," and "Lost Opportunities to Distribute Unique Products"*

The evidence currently of record suggests that DGIS inflicted harm to its own goodwill, competitive position, and opportunities by its actions with respect to patents, and through the pending acquisition by MDA. Thus, although discovery may reveal otherwise, it appears more likely at this point that the relevant harm had already been suffered when Paladino left DGIS for BigBear.

      c.    *"Loss of Employees' Unique Services"*

This factor partially favors DGIS because it has lost Paladino and, allegedly,

---

[7] The statute of limitations on such a claim would likely not begin to run until Plaintiffs learn or have reason to learn of the contract being awarded to BigBear.

other employees at Paladino's encouragement.  Even so, there is significant factual doubt whether any of these employees would have stayed at DGIS given its waning reputation among relevant DIA decisionmakers.

        d.     *Synthesis*

Having considered the relevant factors, the Court concludes that Plaintiffs have not carried their burden to demonstrate a likelihood of irreparable harm.  For this additional reason, they are not entitled to a preliminary injunction.

## V.  CONCLUSION

For the reasons set forth above, Plaintiffs' Renewed Motion for Preliminary Injunction (ECF No. 25) is DENIED.

Dated this 18th day of September, 2017.

BY THE COURT:

_____

William J. Martinez
United States District Judge